RANSOM, GILBERTSON, MARTIN &
RATLIFF, LLP
Jeffrey S. Ratliff
5441 S. Macadam Avenue, Suite 301
Portland, OR 97239
T: 503-226-3664

*Liaison Counsel for Plaintiff*

[Additional counsel on signature page]

**UNITED STATES DISTRICT COURT**
**DISTRICT OF OREGON**

| | |
|---|---|
| HRSA-ILA FUNDS, Individually and on behalf of all others similarly situated, <br><br>     Plaintiff, <br><br> v. <br><br> ADIDAS AG., KASPER RØRSTED, and HARM OHLMEYER, <br><br>     Defendants. | **Case No: 3:23-cv-629** <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff HRSA-ILA Funds ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding adidas AG. ("adidas", "Adidas" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded adidas securities between May 3, 2018 and February 21, 2023, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased adidas securities during the Class Period and was economically damaged thereby.

2

7.      Defendant adidas is a sports brand and engages in the design, distribution, and marketing of athletic and sporting lifestyle products. The Company was founded by Adolf Dassler in 1920 and is headquartered in Herzogenaurach, Bavaria, Germany.

8.      The Company's head American offices are located at 5055 N Greeley Avenue, Portland, Oregon 97217. adidas' American depositary receipts ("ADR" or "ADRs") trade on the under the ticker symbols "ADDYY" and "ADDDF."

9.      Defendant Kasper Rørsted ("Rørsted" or "Rorsted") served as the Company's Chief Executive Officer from 2016 to December 31, 2022.

10.     Defendant Harm Ohlmeyer ("Ohlmeyer") has served as the Company's Chief Financial Officer since 2017, and served as interim CEO from November 12, 2022 to December 31, 2022.

11.     Related nonparty Ye, formerly known as Kanye West ("Kanye West" or "West") is an American musician and fashion designer who had a business association with adidas from 2013 to October 25, 2022 (the "Partnership")

12.     Defendants Rørsted and Ohlmeyer are collectively referred to herein as the "Individual Defendants."

13.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)  was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)  was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)  approved or ratified these statements in violation of the federal securities laws.

14.  adidas is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

15.  The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to adidas AG under *respondeat superior* and agency principles.

16.  Defendant adidas and the Individual Defendants are collectively referred to herein as "Defendants."

## BACKGROUND

17.  In November 2013, adidas announced the beginning of the Partnership with Kanye West, whereby West would endorse adidas shoes. The Partnership commenced after West's relationship with Nike broke down.

18.  On February 8, 2015, West debuted the first adidas shoe that he helped design, the Yeezy 750 Boost, at the 2015 Grammy awards. He followed this performance up with the February 12, 2015 debut of the Yeezy Season 1 collection at New York Fashion Week.

19.  On December 2, 2015, the Adidas Yeezy Boost shoe won Shoe of the Year at the Footwear News Achievement Awards, which has been referred to as the "Shoe Oscars." He gave an acceptance speech while surrounded by some of the designers who helped work on the

4

collection.

20.     On June 29, 2016, adidas and West announced that the Partnership had deepened. The two parties referred to it as a "Yeezy-branded entity creating footwear, apparel and accessories for all genders across street and sport." adidas called the Partnership "the most significant partnership ever created between a non-athlete and an athletic brand."

21.     Under their arrangement, West licensed his trademark of "Yeezy" to adidas in exchange for a 15% cut of sales. The Company was responsible for manufacturing the Yeezy goods and then selling them, and it retained ownership of the designs themselves.

22.     In addition, Kanye West has full ownership of Yeezy LLC, which is an apparel company that sells clothing under the name "Yeezy," but is unrelated to adidas.

23.     His collaboration with adidas had a positive impact on the Company. Mark King, a former President of adidas North America, stated, "[h]e's brought the idea that the Adidas brand is willing to create new and different things. The association with Kanye West and how he sees himself as an artist — with design, music and culture — said 'this Adidas brand is not just a typical sports brand. It's one that looks at creativity and considers both sports and culture.' And his influence runs deeper than that — to products he really has no connection with, such as the NMD. He has opened our eyes [to the fact that] it's a big world out there and we should be looking at it in many different ways."

24.     The Yeezy shoes were extremely popular. By 2019, sales of Yeezy shoes hit over $1 billion. Further, Kanye West accumulated significant wealth as a result of the Partnership. By September 2019, Forbes ranked him as the Number 1 highest-paid hip-hop star, largely as a result of the Partnership. Further, by 2019, the Adidas Yeezy sneaker line was on pace to compete with the leading Nike Jordan line.

25.     Over the Fall of 2022, West began to make overtly anti-Semitic and other racially offensive remarks in public, beginning with wearing a shirt with the slogan "White Lives Matter" which has been described by the Anti-Defamation League as a "white supremacist phrase"), to a fashion show in Paris on October 1, 2022.

26.     On or around October 7, 2022, West posted a screenshot of a private argument he had with hip-hop star Sean Combs, better known as Puff Daddy, regarding his wearing of the "White Lives Matter" shirt in which he stated, "[t]his ain't a game. Ima use you as an example to show the Jewish people that told you to call me that no one can threaten or influence me. I told you this was war. Now gone get you some business."

27.     On October 9, 2022, he posted the following (which has since been removed) on Twitter: "I'm a bit sleepy tonight but when I wake up I'm going death con 3 on JEWISH PEOPLE The funny thing is I actually can't be Anti Semitic because black people are actually Jew also You guys have toyed with me and tried to black ball anyone whoever opposes your agenda."

28.     On October 11, 2022, it was revealed that the aired version of an interview between West and Tucker Carlson left out a series of anti-Semitic remarks by West. For example, he stated "I prefer my kids knew Hanukkah than Kwanzaa. At least it will come with some financial engineering."

29.     West did not believe that adidas would end the Partnership as a result of his incendiary and hateful remarks. On October 21, 2022, he publicly stated, "the thing about it being Adidas is like, I can literally say anti-Semitic s*** and they cannot drop me. I can say anti-Semitic things, and Adidas can't drop me. Now what? Now what?"

30.     By late October, adidas was facing public calls for a boycott as a result of its failure to end the Partnership with West. In contrast to the overwhelming public disapproval towards

West, neo-Nazi groups publicly supported him. In one instance, a neo-Nazi group held a banner which read "Kanye is right about the Jews" over a busy Los Angeles freeway while members performed Nazi salutes.

31.    After weeks of criticism over its failure to end the Partnership as a result of West's blatant and virulent anti-Semitism, adidas ended the Partnership on October 25, 2022.

### SUBSTANTIVE ALLEGATIONS
### Materially False and Misleading
### Statements Issued During the Class Period

32.    Over the life of the Partnership, West began to accrue controversy as a result of his various statements on topics such as slavery, racial issues, and politics. For example, on TMZ Live, on May 2, 2018, West suggested that slavery in the United States was a "choice" for enslaved persons. West stated, in pertinent part:

> *"When you hear about slavery for 400 years. For 400 years?! That sounds like a choice. You was there for 400 years and it's all of y'all.* It's like we're mentally in prison. I like the word 'prison' because 'slavery' goes too direct to the idea of blacks. Slavery is to blacks as the Holocaust is to Jews. Prison is something that unites as one race, blacks and whites, that we're the human race."

(Emphasis added).

33.    The Company stuck by West despite these comments. In response to West's comment, on May 3, 2018, Defendant Rørsted stated, while declining to address West's comments about slavery, or internal comments that he made at adidas by that time, *"[t]here clearly are some comments we don't support[.] Kanye has been and is a very important part of our strategy and has been a fantastic creator."* (Emphasis added). Tellingly, Rørsted also stated that West and the Yeezy footwear brand are a "very important part of our brand from a revenue standpoint and how we promote our products."

34.    In the same interview, the interviewer pressed Rørsted, stating "if someone makes

comments that are around the issue of slavery, and [implying that was a choice], that goes beyond just your average comment by an external collaborator, especially for a German brand like adidas, isn't it important to get in front of that kind of issue before it becomes a real problem for the entire company?" To that, Rørsted emphasized the Company's focus on delivering quality sporting goods and declined to comment further on Kanye West, except to state that he had not considered dropping West in the prior 24 hours.

35.     Defendant Rørsted elaborated on his views with regard to West's speech in other interviews, without disclosing that West had made offensive remarks at Company premises or otherwise engaged in problematic behavior. On November 6, 2018, he stated the following:

> *"Kanye brings different points of view out. We want creators to have freedom and sometimes have a different point of view, something people could react to in a positive or a negative sense*. That is what Kanye brings to the table. *If he brought a common position for everybody, I think people would not react the way they do. And in many ways, we're very supportive of what he does, but it doesn't mean we're supportive of every statement*. We're not signing up to his statements; we're signing up to what he brings to the brand and the products he's bringing out."

(Emphasis added).

36.     On March 13, 2019, adidas publicly released its yearly report for the year ended December 31, 2018 (the "2018 Report") on its website.

37.     The 2018 Report, in its section on Business Partner Risk, ignored serious issues affecting the Partnership, and the resulting potential risk to shareholders, by generally alluding to risks involving individuals that adidas partnered with, rather than stating that the Company had actually considered ending the Partnership as a result of West's personal behavior, or how the Company's reputation might be affected if his behavior as it related to the Company were to become public:

38.     Regarding Partnership Risks, the 2018 Report stated, in pertinent part:

*"adidas interacts and enters into partnerships with various third parties, such as athletes, creative partners, innovation partners, retail partners, or suppliers of goods or services. As a result, the company is exposed to a multitude of business partner risks.*

*Injuries to individual athletes or poor on-field performance on the part of sponsored teams or athletes could reduce their consumer appeal and eventually result in lower sales and diminished attractiveness of our brands. Failure to cement and maintain strong relationships with retailers could have substantial negative effects on our wholesale activities and thus the company's business performance.* Losing important customers in key markets due to sub-par relationship management would result in significant sales shortfalls. We work with strategic partners in various areas of our business (e.g. product creation, manufacturing, research and development) or distributors in a few selected markets whose approach might differ from our own business practices and standards, which could also negatively impact the company's business performance and reputation. Similarly, failure to maintain strong relationships with suppliers or service providers could negatively impact the company's sales and profitability. Risk's may also arise from a dependence on particular suppliers, customers or service providers. Overreliance on a supplier for a substantial portion of the company's product volume, or overdependence on a particular customer, increases the company's vulnerability to delivery and sales shortfalls and could lead to significant margin pressure. Business partner default (including insolvency) or other disruptive events such as strikes may negatively affect the company's business activities and result in additional costs and liabilities as well as lower sales for the company. *Unethical business practices on the part of business partners or improper behavior of individual athletes, influencers or partners in the entertainment industry could have a negative spill-over effect on the company's reputation, lead to higher costs or liabilities or even disrupt business activities.*

*To mitigate business partner risks, adidas has implemented various measures. For example, we generally include clauses in contractual agreements with athletes, clubs and federations or other partners that allow us to suspend or even terminate our partnership in case of improper or unethical conduct. In addition, we work with a broad portfolio of promotion partners, including individual athletes, club teams and federations or associations in numerous sports as well as entertainers and influencers to reduce the dependence on the success and popularity of a few individual partners. [. . .]"*

(Emphasis added).

39.    In the Inventory Risk section of the 2018 Report's discussion of business risk, the

Company ignored the risks of oversupply of Yeezy branded shoes in the event that the Partnership

were to suddenly end, and in particular, if demand for the shoes were to fall due to any controversy

surrounding West.

40.    Regarding Inventory Risks, the 2018 Report stated, in pertinent part:

> *"As we place initial production orders up to nine months in advance of delivery, adidas is exposed to inventory risks relating to misjudging consumer demand at the time of production planning. Overestimating demand could result in inappropriate capacity utilization at our suppliers' factories, lead to overproduction, and cause excess inventory for the company as well as in the marketplace.* This can have negative implications for our financial performance, including product returns, inventory obsolescence and higher levels of clearance activity as well as reduced liquidity due to higher working capital requirements. Similarly, underestimating demand can lead to product shortfalls at the point of sale. In this situation, adidas faces the risk of missed sales opportunities and/or customer and consumer disappointment, which could lead to a reduction in brand loyalty and hurt our reputation. In addition, the company faces potential profitability impacts from additional costs such as airfreight in efforts to speed up replenishment.
>
> *In order to mitigate these risks, we actively manage inventory levels, for example by continuous monitoring of stock levels as well as centralizing stock holding and clearance activities.* In addition, our Global Operations function is continuously improving the agility and flexibility of our planning environment in order to shorten lead times and ensure availability of products while trying to avoid excess inventories. In this context, the company's strategic choice 'Speed' is an important driver, enabling us to respond quickly to consumer demand and to deliver concepts that are fresh and desirable and made available when and where they are wanted by the consumer."

(Emphasis added).

41.    In the Personnel Risk section of the 2018 Report's discussion of risk, the

Company extolled its commitment to having an equitable workplace, and its strategic workforce

management process, known as "People Strategy", while failing to discuss how it routinely

ignored extreme behavior from Kanye West.

42.    Regarding Personnel Risk, the 2018 Report stated, in pertinent part:

> *"Achieving the company's strategic and financial objectives is highly dependent on our employees and their talents. In this respect, strong leadership and a performance-enhancing culture are critical to the company's success.*

*Therefore, ineffective leadership as well as the failure to install and maintain a performance-oriented culture that fosters diversity and inclusion and strong employee engagement amongst our workforce could also substantially impede our ability to achieve our goals.* An ineffective, unbalances allocation of resources to business activities could cause operational inefficiencies and result in lower employee engagement. In addition, global competition for highly qualified personnel remains fierce. As a result, the loss of key personnel in strategic positions and the ability to identify, recruit, and retain highly qualified and skilled talents who best meet the specific needs of our company pose risks to our business performance. Unattractive or non-competitive management and employee remuneration may exacerbate these risks. In addition, a lack of sufficient training measures and inadequate documentation of critical know-how might dilute or lead to a loss of key capabilities.

*Our People Strategy is an essential part of our strategic business plan 'Creating the New' and is designed to reduce these risks. To optimize staffing levels and resource allocation (i.e. having the right people with the right skillsets in the right roles at the right time), we have established a strategic workforce management process.* We continuously invest in improving employer branding activities to be the 'employer of choice in our industry and as a result attract and retain the right talent. We established a global recruiting organization to enhance our internal and external recruiting services and capabilities. To ensure effective leadership across the company, we defined and activated our global *Leadership Framework* that articulates the behaviors expected of our leaders. Our global succession management helps create strong internal talent pipelines for critical leadership positions and reduce succession risk. We also strengthen employee retention by providing attractive leadership development and learning programs as well as global career opportunities. Numerous initiatives such as our global 'BIG Deal' gender intelligence training foster diversity and inclusion. We also have attractive reward and incentive schemes in place, designed to further support long-term employee commitment."

(Emphasis added).

43.     The Company's 2019, 2020, and 2021 Annual Reports either had similar language regarding Partnership Risk, Inventory Risk, and Personnel Risk, or otherwise failed to mention risks relating to the Partnership. Other filings similarly failed to disclose risks stemming from the Partnership.

44.     In addition, the 2020 Annual Report posted on the Company's website included a section on Risks related to media and stakeholder activities. While it disclosed that adverse or inaccurate media coverage could have an adverse negative impact on the Company, it failed to disclose that the Company risked considerable negative media coverage if Kanye West made

public comments which were consistent with statements he made internally in the Company (such as anti-Semitic statements). Further, the Company failed to disclose that it stood to receive negative coverage if West's abusive behavior at the Company, and how the Company failed to meaningfully act on the issue, were to be publicly disclosed.

45.     The 2020 Annual Report's section on risks related to media and stakeholder activities stated, in pertinent part, the following:

> The company faces considerable risk if we are unable to uphold high levels of consumer awareness, affiliation, and purchase intent for our products. ***Adverse or inaccurate media coverage on our products or business practices as well as negative social media discussion may significantly harm the adidas' reputation and brand image, lead to public misperception of the company's business performance and eventually result in a sales slowdown.*** Similarly, certain activities on the part of key stakeholders (e.g. nongovernmental organizations, governmental institutions) could cause reputational damage, distract top management, and disrupt business activities. To mitigate these risks, we pursue proactive, open communication and engagement with key stakeholders (e.g. consumers, media, the financial community, non-governmental organizations, governmental institutions ) on a continuous basis. ***In addition, we have established clear crisis communication processes to ensure a quick and effective response to adverse developments. We have also strengthened social media capabilities and created various digital newsrooms around the globe that enable continuous monitoring of social media content related to the company's products and activities and allow early management of potentially damaging social media discussion.*** On a case-by-case basis, we seek external advice from experts in communication and stakeholder management.

> (Emphasis added).

46.     On October 25, 2022, in its statement ending the Partnership, adidas stated the following:

> "***adidas does not tolerate antisemitism and any other sort of hate speech.*** Ye's recent comments and actions have been unacceptable, hateful and dangerous, and they violate the company's values of diversity and inclusion, mutual respect and fairness. After a thorough review, the company has taken the decision to terminate the partnership with Ye immediately, end production of Yeezy branded products and stop all payments to Ye and his companies. adidas will stop the adidas Yeezy business with immediate effect. This is expected to have a short-term negative impact of up to €250 million on the company's net income in 2022 given the high seasonality of the fourth quarter. adidas is the sole owner of all design rights to existing products as well as previous and new colorways under the partnership. More information will be given as part of the company's upcoming Q3 earnings announcement on November 9, 2022.

(Emphasis added).

47.     The statements contained in ¶¶ 32-46 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) In addition to other misconduct, Kanye West made anti-Semitic comments in front of adidas staff, and even suggested naming an album after Adolf Hitler; (2) adidas was aware of his behavior, and failed to warn investors that it was aware of that behavior, and had considered ending the Partnership as a result of it; (3) adidas failed to take meaningful precautionary measures to limit negative financial exposure if the Partnership were to end as a result of West's behavior; (4) adidas overstated the risk mitigation measures it took with regard to Yeezy shoes in the event that it terminated the Partnership; (5) as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

**THE TRUTH BEGINS TO EMERGE**

48.     On November 27, 2022, *The Wall Street Journal* released an article entitled "Adidas Top Executives Discussed Risk of Staff's 'Direct Exposure' to Kanye West Years Ago."

49.     This article revealed that the Company's senior leadership, including Defendant Rørsted, discussed as far back as 2018 the risk of continuing a relationship with Kanye West, stating, in pertinent part:

> Adidas AG's chief executive and senior leaders in Germany *discussed as far back as four years ago the risk of continuing a relationship with Kanye West that they feared could blow up at any moment,* according to people familiar with the matter and documents reviewed by The Wall Street Journal.
>
> *A 2018 presentation to members of the Adidas executive board, a group that included CEO Kasper Rorsted and the head of human resources, highlighted the risks for employees interacting with Mr. West and detailed mitigation strategies for the relationship with the Yeezy creator, including cutting ties with the rapper-turned-designer, documents show. Instead of parting ways when concerns were raised, these people said, the senior executives had business-unit leaders share various proposals with Mr. West so Adidas could hang on to the Yeezy partnership, which analysts estimate*

*accounted for 8% of annual sales.*

These efforts to keep the Yeezy partnership occurred again in September when the Adidas executive board met to discuss Mr. West's latest public outbursts, the people said. Mr. West, who legally changed his name to Ye, met with Adidas executives in mid-September and asked for more money and control over the Yeezy brand, according to people familiar with the meeting. ***During the meeting, he showed the Adidas executives a clip from an adult video and accused them of stealing his designs, these people said.*** Soon after the meeting, the people said, Adidas agreed to some of Mr. West's demands: The company offered Mr. West the ability to sell Yeezy footwear directly to consumers and ownership of future designs as well as a cut of the sales from Yeezy look-alike products. The proposal offered to continue the partnership through at least 2026, the people said.

***Mr. West wasn't satisfied and wanted as much as $3 billion, the people said.*** Weeks later, after Mr. West wore a "White Lives Matter" T-shirt at his fashion show and posted anti-Semitic comments on social media, Adidas said it would end its Yeezy partnership.

\* \* \*

***Employees raised concerns to executives about Mr. West's behavior after the artist appeared on TMZ in early 2018 saying that slavery "sounds like a choice," former employees said. At a meeting with Adidas executives, including a member of the executive board, the focus shifted from concerns about Mr. West's comments to complaints about how the company handled the controversy internally, the employees said. In October 2018, Adidas executives conducted a deep dive of the Yeezy partnership that was presented to leaders based in Germany, including Mr. Rorsted.*** The presentation reviewed options for dealing with Mr. West, who was asking to be named creative director of Adidas, according to documents.

One of the risks identified was Adidas employees having "direct exposure" to Mr. West and leaders evaluated rotating key staff to mitigate the risk, the documents show. ***One proposal was running Yeezy as a stand-alone brand like Nike's Jordan brand, which would limit Mr. West's exposure to the rest of the company. Another option was buying the Yeezy trademark from Mr. West and running the brand without him, according to the documents.*** The documents say Mr. West wanted to be paid out to focus on philanthropy. Another proposal called "immediate mitigation" was to separate from Mr. West, sell off remaining Yeezy products and replace them with other revenue streams, including products from other celebrities, the documents show. The executive board opted to continue its arrangement with Mr. West.

(Emphasis added).

50.     The article discussed tensions behind the scenes as a result of West berating adidas

staff and engaging in other misconduct, and also revealed that West made anti-Semitic comments

in front of adidas staff, including his desire to name an album after Adolf Hitler. In pertinent part,

it stated:

> The two sides extended their partnership, adding staff and items to the Yeezy product line, which became central to Adidas's sales growth. ***There were tensions behind the scenes. Current and former employees said Mr. West berated staff in front of colleagues and sometimes watched pornography at work, which was escalated to human resources in 2018. He also occasionally made anti-Semitic comments in front of Adidas staff, including in 2018 when he suggested naming an album after Hitler, they said.*** [. . .]

(Emphasis added).

51.    On this news, ADDYY fell $2.02 per ADR, or 3.13%, to close at $62.34 on

November 28, 2022. ADDDF fell $0.81 per ADR to close at $126.44 on November 28, 2022, and

then $0.44 per ADR to close at $126.00 on November 29, 2022, a 1% decline.

52.    Then, on February 9, 2023, adidas warned that it could shift from a profit to a loss

if it should fail to sell its inventory of Yeezy shoes, following its termination of the Partnership.

Specifically, it said that it expected sales to fall at a high single-digit rate in currency-neutral terms

because of the "significant adverse impact of not selling the existing stock" of Yeezy products.

Failure to sell the stock of Yeezy's (valued at 1.2 billion euros) would accordingly lower

Company revenue by 1.2 billion euros (or about $1.29 billion), and operating profit by 500 million

euros."

53.    Further, the Company stated "[s]hould the company irrevocably decide not to

repurpose any of the existing Yeezy product going forward, this would result in the write-off of

the existing Yeezy inventory and would lower the company's operating profit by an additional €

500 million this year. In addition, adidas expects one-off costs of up to € 200 million in 2023.

These costs are part of a strategic review the company is currently conducting aimed at reigniting

profitable growth as of 2024. If all these effects were to materialize, the company would expect

to report an operating loss of € 700 million in 2023."

54.     Current CEO Bjørn Gulden commented, "[t]he numbers speak for themselves. We are currently not performing the way we should[.] 2023 will be a year of transition to set the base to again be a growing and profitable company. We will put full focus on the consumer, our athletes, our retail partners and our adidas employees. Together we will work on creating brand heat, improve our product engine, better serve our distribution and assure that adidas is a great and fun place to work. adidas has all the ingredients to be successful: A great brand, great people, fantastic partners and a global infrastructure second to none. We need to put the pieces back together again, but I am convinced that over time we will make adidas shine again. But we need some time."

55.     On this news, ADDYY fell $7.4, or 8.96%, to close at $75.16 on February 9, 2023. On February 10, ADDYY fell another $0.55, or 0.73%, to close at $74.61. ADDDF fell $21.83, or 13.22%, to close at $143.23 on February 9, 2023.

56.     Then, on February 21, 2023, S&P Global announced that it was downgrading adidas to "'A-/A-2' From A-1' On Deteriorating Credit Metrics; Outlook Negative." In announcing this downgrade, S&P Global stated the following, in pertinent part, regarding the Partnership:

> Ending the Yeezy partnership with Mr. West will have a stronger-than-expected hit on the group's operating performance in 2023. On Feb. 9, Adidas communicated that terminating the partnership will lower 2023 sales by €1.2 billion and operating profit by €500 million compared with 2022. The company now expects for 2023 the top line will decline 7%-9% on an organic basis, with reported underlying operating profit at break-even. This estimate is materially worse than our previous base-case scenario. Based on our previous conversations with management, we expected Adidas could have rebranded a portion of the collection thanks to the legal protection on the design rights, which the group owns. However, the company's latest guidance factor in the scenario of not selling any existing Yeezy stock. We understand the company continues to review options for using the Yeezy inventory, and we expect a decision in the next few months. According to the group, should Adidas decide not to repurpose any Yeezy products, this would result in the write-off (noncash) of about €500 million, affecting group EBITDA. This strategy will have the benefit of cleaning the distribution channel and support Adidas' launch of new collections. However, given how profitable the Yeezy partnership has become over the past seven years, it will take time for the company to restore its revenues and EBITDA base close to 2019 levels.

57.    On this news, ADDYY fell $3.56, or 4.62%, to close at $73.59 on February 21, 2023, and ADDDF fell $4.85, or 3.17%.

58.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

59.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired adidas securities publicly traded on the OTC markets during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of adidas, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

60.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, adidas securities were actively traded on the OTC Market. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

61.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

62.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

63.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of adidas;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused adidas to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of adidas securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

64.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

65.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- adidas shares met the requirements for listing, and were listed and actively traded on the OTC, an efficient market;

- As a public issuer, adidas filed periodic public reports;

- adidas regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- adidas' securities were liquid and traded with moderate to heavy volume during the Class Period; and

- adidas was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

66.     Based on the foregoing, the market for adidas securities promptly digested current information regarding adidas from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

67.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

**COUNT I**
**For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

68.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

69.    This Count asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

70.    During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

71.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of adidas securities during the Class Period.

72.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of adidas were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by

virtue of their receipt of information reflecting the true facts of adidas, their control over, and/or

receipt and/or modification of adidas' allegedly materially misleading statements, and/or their

associations with the Company which made them privy to confidential proprietary information

concerning adidas, participated in the fraudulent scheme alleged herein.

73.    Individual Defendants, who are the senior officers and/or directors of the

Company, had actual knowledge of the material omissions and/or the falsity of the material

statements set forth above, and intended to deceive Plaintiff and the other members of the Class,

or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and

disclose the true facts in the statements made by them or other adidas personnel to members of

the investing public, including Plaintiff and the Class.

74.    As a result of the foregoing, the market price of adidas securities was artificially

inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff

and the other members of the Class relied on the statements described above and/or the integrity

of the market price of adidas securities during the Class Period in purchasing adidas securities at

prices that were artificially inflated as a result of Defendants' false and misleading statements.

75.    Had Plaintiff and the other members of the Class been aware that the market price

of adidas securities had been artificially and falsely inflated by Defendants' misleading statements

and by the material adverse information which Defendants did not disclose, they would not have

purchased adidas securities at the artificially inflated prices that they did, or at all.

76.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of

the Class have suffered damages in an amount to be established at trial.

77.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934

Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members

of the Class for substantial damages which they suffered in connection with their purchase of adidas securities during the Class Period.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

78.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

79.     During the Class Period, the Individual Defendants participated in the operation and management of adidas, and conducted and participated, directly and indirectly, in the conduct of adidas' business affairs. Because of their senior positions, they knew the adverse non-public information about adidas' false financial statements.

80.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to adidas' financial condition and results of operations, and to correct promptly any public statements issued by adidas which had become materially false or misleading.

81.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which adidas disseminated in the marketplace during the Class Period concerning adidas' results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause adidas to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of adidas within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of adidas securities.

82.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by adidas.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of itself and the Class, prays for judgment and relief as follows:

(a)    declaring this action to be a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiff's counsel as Lead Counsel;

(b)    awarding damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)    awarding Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: April 28, 2023

RANSOM, GILBERTSON, MARTIN &
RATLIFF, LLP
By: _____
Jeffrey S. Ratliff
5441 S. Macadam Avenue, Suite 301
Portland, OR 97239
T: 503-226-3664
Email: RGMR1500@gmail.com

*Liaison Counsel for Plaintiff*

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq.

Laurence M. Rosen, Esq.
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
       lrosen@rosenlegal.com

*Counsel for Plaintiff*

## CERTIFICATION

The undersigned, on behalf of the Hampton Roads Shipping Association – International Longshoremen's Association ("HRSA-ILA"), hereby certify, as to the claims asserted under the federal securities laws, that:

1.    I have reviewed a complaint and authorize the filing thereof and the filing of a lead plaintiff motion on behalf of HRSA-ILA.

2.    HRSA-ILA did not engage in transactions in the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this or any other litigation under the securities laws of the United States.

3.    HRSA-ILA is willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

4.    Schedule A hereto, is a list of all of the purchases and sales HRSA-ILA has made in adidas AG securities during the class period.

5.    HRSA-ILA has not, within the three years preceding the date of this certification, sought to serve or served as a representative party on behalf of a class in an action involving alleged violations of the federal securities laws, except for the following company(ies):'

6.    HRSA-ILA will not accept any payment for serving as a representative party beyond its pro rata share of any recovery, except reasonable costs and expenses, such as travel expenses and lost wages directly related to the class representation, as ordered or approved by the court pursuant to law.

I declare, under penalty of perjury that the foregoing is true and correct. Executed this 28th day of April, 2023.

**Hampton    Roads    Shipping    Association–**
**International    Longshoremen's    Association**
**Funds**

Signature: _____
BY: Steve Greene
TITLE:  Administrator

SCHEDULE A

Class Period Transactions- May 3, 2018 through February 21, 2023

Purchases:

| Date | Shares | Price |
|------|--------|-------|
| 1/27/2022 | 1,298 | $136.44 |
| 3/1/2022 | 1,200 | $113.28 |
| 3/21/2022 | 339 | $117.93 |

Sales:

| Date | Shares | Price |
|------|--------|-------|
| 12/6/2022 | 2837 | $62.43 |

2