Jeffrey S. Ratliff
Ransom, Gilbertson, Martin & Ratliff, LLP
5441 S. Macadam Avenue, Suite 301
Portland, OR 97239

*Liaison Counsel for Plaintiff*

[Additional counsel on signature page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON

| | |
|---|---|
| HRSA-ILA FUNDS, Individually and on behalf of all others similarly situated, | **Case No: 3:23-cv-629** |
| Plaintiff, | **SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | |
| ADIDAS AG., KASPER RØRSTED, and HARM OHLMEYER, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff HRSA-ILA Funds ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding adidas AG. ("adidas", "Adidas" or the "Company"), analysts' reports and advisories about the Company, interviews with witnesses, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Adidas securities between May 3, 2018 and February 21, 2023, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.     Adidas signed Kanye West, who now goes by "Ye", away from Nike in 2013 by promising him royalties for apparel sales that Nike would only grant to professional athletes. The Company's partnership with West's design shop – Yeezy – quickly became Adidas's most profitable line of business. By 2021, the Yeezy partnership brought in more than $1.7 billion in sales, which represented 8% of the Company's total revenue and more than 40% of the Company's profits.

3.     Adidas described the partnership as "the most significant partnership ever created between a non-athlete and an athletic brand." The partnership benefited Adidas far beyond the direct Yeezy sales by enhancing the brand's reputation in markets in which it had struggled.

4.     At the same time as the Yeezy partnership bolstered Adidas's financials, the Company touted its commitment to social sustainability, diversity, equity and inclusion and the Company's inclusion in various sustainability indexes. The European Union's Non-Financial Reporting Directive required the Company to disclose material risks related to its business relationships and explain how the Company manages those risks. Adidas also told investors that it voluntarily complied with the core requirements of the Global Reporting Initiative, which

required the Company to disclose a balanced and reasonable representation of an organization's positive and negative contributions to social impact.

5.     Adidas told investors that "diversity, inclusion, and equality are key to the success of our company" and provide a "competitive business advantage." Adidas also claimed to have a "zero-tolerance" approach to discrimination and harassment and stated that its business partnership agreements with entertainers contained clauses allowing the Company to terminate the partnerships in case of improper or unethical conduct.

6.     Investors were shocked in October 2022 as the profitable partnership crumbled as West made a series of anti-Semitic and racist comments at public events, on social media, and in public interviews. West wore a "White Lives Matter" t-shirt to a Paris fashion show on October 3 and, a week later, posted on his 31-million-follower Twitter (now called "X") account: "[W]hen I wake up I'm going death con 3 On JEWISH PEOPLE" and "[y]ou guys have toyed with me and tried to black ball anyone whoever opposes your agenda." On October 7, 2022, West made a post to his Instagram account showing a text conversation he had with Sean "Diddy" Combs. West commented on the post that he would "show the Jewish people that told you to call me that no one can threaten or influence me." West was insinuating that Diddy's previous criticism of West's "White Lives Matter" t-shirt was part of a Jewish plot against West. On this news, shares of ADDYY fell $2.69 per ADR, or 4.6%, to close at $56.17 on October 7, 2022. ADDDF fell $11.32 per ADR, or 9.5%, to close at $107.18 on October 7, 2022.

7.     West bragged on a podcast that "the thing about it being Adidas is like, I can literally say anti-Semitic shit and they can't drop me. I can say anti-Semitic things, and Adidas can't drop me." On this news, shares of ADDYY fell $2.19 per ADR, or 4.1%, to close at $51.75 on October 21, 2022. ADDDF fell $8.61 per ADR, or 7.5%, to close at $105.75 on October 21,

2022.

8.    On October 25, 2022, after weeks of silence and inaction, Adidas finally announced that it was terminating its partnership with West and Yeezy. Adidas's press release stated that "adidas does not tolerate antisemitism and any other sort of hate speech" and that West's offensive comments "violate the company's values of diversity and inclusion, mutual respect and fairness."

9.    Unbeknownst to investors, Defendants knew and concealed throughout the Class Period that West routinely made racist and anti-Semitic comments to Yeezy and Adidas employees. Throughout the Class Period, Defendants violated their disclosure obligations and misled investors by failing to disclose (i) West's racist and anti-Semitic comments, (ii) West's harassment and mistreatment of Yeezy and Adidas employees, (iii) the Company's refusal to take action in response to complaints about West, and (iv) the material risks West's misconduct posed to the partnership and the Company.

10.    On November 27, 2022, The Wall Street Journal published an article entitled "Adidas Top Executives Discussed Risk of Staff's 'Direct Exposure' to Kanye West Years Ago." The article disclosed that Adidas executives were fully aware by 2018 that West routinely mistreated employees—some of whom had escalated complaints to human resources. West watched pornography at work and "**made anti-Semitic comments in front of Adidas staff, including in 2018 when he suggested naming an album after Hitler**." The article disclosed that Rorsted and "senior leaders in Germany discussed as far back as four years ago the risk of continuing a relationship with Kanye West that they feared could blow up at any moment" following an October 2018 presentation to the Adidas executive board that "highlighted the

risks for employees interacting with Mr. West and detailed mitigation strategies for the relationship with the Yeezy creator, including cutting ties with the rapper-turned-designer."

11.    On this news, ADDYY fell $2.02 per ADR, or 3.13%, to close at $62.34 on November 28, 2022. ADDDF fell $0.81 per ADR to close at $126.44 on November 28, 2022, and then $0.44 per ADR to close at $126.00 on November 29, 2022, a 1% decline.

12.    Interviews with former employees and other news articles confirm that Defendants were fully aware of West's misconduct and the risks it posed to the Company throughout the Class Period. A confidential witness – Yeezy's former Chief Human Resources Officer – stated that, in July 2018, a Yeezy executive accused West of making horrifically anti-Semitic comments and demanded $100 million to settle his claim. The CW, who personally investigated the claim and negotiated the eventual $5 million settlement, immediately told Adidas CFO Harm Ohlmeyer about the allegation and the settlement. Numerous other news articles and confidential witnesses confirmed that West routinely made anti-Semitic and misogynistic comments to employees and that Adidas ignored complaints from employees about West's behavior. Indeed, Adidas established a unique system whereby employee complaints about West bypassed the normal human resources reporting chain and instead went directly to Adidas's General Counsel, Paul Ehrlich.

13.    On February 9, 2023, Adidas warned that it could shift from a profit to a loss if it should fail to sell its inventory of Yeezy shoes, following its termination of the Partnership. On this news, ADDYY fell $7.4, or 8.96%, to close at $75.16 on February 9, 2023. On February 10, ADDYY fell another $0.55, or 0.73%, to close at $74.61. ADDDF fell $21.83, or 13.22%, to close at $143.23 on February 9, 2023.

14.     Finally, on February 21, 2023, S&P Global announced that it was downgrading Adidas to 'A-/A-2' From 'A-1' because "[e]nding the Yeezy partnership with Mr. West will have a stronger-than-expected hit on the group's operating performance in 2023." On this news, ADDYY fell $3.56, or 4.62%, to close at $73.59 on February 21, 2023, and ADDDF fell $4.85, or 3.17%.

## JURISDICTION AND VENUE

15.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

17.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

18.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

19.     Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased adidas securities during the Class Period and was economically damaged thereby. Plaintiff's PSLRA certification was previously filed with the Court and is incorporated by reference herein.

20.     Defendant adidas AG is a sports brand and engages in the design, distribution, and marketing of athletic and sporting lifestyle products. The Company is headquartered in Herzogenaurach, Bavaria, Germany. The Company's head North American offices are located at 5055 N Greeley Avenue, Portland, Oregon 97217. Adidas' American depositary receipts ("ADR" or "ADRs") trade under the ticker symbols "ADDYY" and "ADDDF." As alleged below, each of the materially false or misleading statements and omissions challenged herein were made by, or are attributable to, the Company because they were issued in the Company's name, frequently in the Company's Annual Reports or press releases, or were made by Company executives or board members while acting within the scope of their authority, including but not limited to Defendant Rørsted.

21.     Defendant Kasper Rørsted ("Rørsted" or "Rorsted") served as the Company's Chief Executive Officer from 2016 to November 11, 2022.

22.     Defendant Harm Ohlmeyer ("Ohlmeyer") has served as the Company's Chief Financial Officer since 2017, and served as interim CEO from November 12, 2022 to December 31, 2022.

23.     Defendants Rørsted and Ohlmeyer are collectively referred to herein as the "Individual Defendants."

24.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)    was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)    was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)    was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)    approved or ratified these statements in violation of the federal securities laws.

25.    Adidas is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

26.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to adidas AG under *respondeat superior* and agency principles.

27.    Defendant Adidas and the Individual Defendants are collectively referred to herein as "Defendants."

## **RELEVANT NON-PARTIES**

28.    Ye, formerly known as Kanye West ("Kanye West" or "West") is an American musician and fashion designer. West controls and either wholly owns or owns substantially all of Yeezy LLC, Yeezy Marketing LLC, and Yeezy Footwear LLC (collectively, "Yeezy").

29.    West had a business association with adidas from 2013 to October 25, 2022 (the "Partnership"). Under the partnership, Yeezy licensed its trademark of the word "Yeezy" to

Adidas in exchange for 15% of sales. Adidas manufactured and sold the goods, and Adidas retained ownership of the product designs.

30.     Confidential Witness 1 ("CW1") was the Chief Human Resources Officer and Executive Vice President of Business Strategy across all entities at Yeezy from June 2018 to November 2018. CW1 reported directly to West.

31.     Confidential Witness 2 ("CW2") worked for Adidas from April 2013 to December 2022 and served as the General Manager and Senior Vice President for Adidas' Yeezy Business Unit from January 2016 to January 2020 and Senior Vice President of the Business Unit from January 2020 to December 2022. During the Class Period, CW2 managed the Yeezy partnership on behalf of Adidas.

32.     Confidential Witness 3 ("CW3") served as Senior Vice President and Chief Human Resources Officer for North America for Adidas from July 2017 to January 2018. CW3 reported to Senior Vice President and Global Chief HR Officer Karin Parkin, and Parkin reported to directly CEO Kasper Rorsted.

## BACKGROUND

33.     Adidas announced a shoe partnership with West in November 2013 after West split from his previous partnership with Nike (the "Partnership"). West helped design the shoes in his brand line and promoted them at public events like the Grammys and New York Fashion Week.

34.     On February 8, 2015, West debuted the first adidas shoe that he helped design, the Yeezy 750 Boost, at the 2015 Grammy awards. He followed this performance up with the February 12, 2015 debut of the Yeezy Season 1 collection at New York Fashion Week.

35.     On December 2, 2015, the Adidas Yeezy Boost shoe won Shoe of the Year at the

Footwear News Achievement Awards, which has been referred to as the "Shoe Oscars." He gave an acceptance speech while surrounded by some of the designers who helped work on the collection.

36.     On June 29, 2016, Adidas and West announced that the Partnership had deepened. Adidas and West announced a new 10-year agreement and outlined plans to expand Yeezy styles, open retail stores, and enter more markets. The two parties referred to it as a "Yeezy-branded entity creating footwear, apparel and accessories for all genders across street and sport." Adidas called the Partnership "the most significant partnership ever created between a non-athlete and an athletic brand."

37.     West has full ownership of Yeezy, which is an apparel company that sells clothing under the name "Yeezy." Under their arrangement, West licensed his "Yeezy" trademark to Adidas in exchange for a 15% cut of sales. The Company was responsible for manufacturing the Yeezy goods and then selling them, and it retained ownership of the designs themselves. Adidas also provided Yeezy with $100 million per year for marketing purposes. Adidas created a Yeezy business unit to work closely with West and his team.

38.     Adidas routinely touted the positive material impact the Partnership had on the Company. Mark King, a former President of adidas North America, stated, "[h]e's brought the idea that the Adidas brand is willing to create new and different things. The association with Kanye West and how he sees himself as an artist — with design, music and culture — said 'this Adidas brand is not just a typical sports brand. It's one that looks at creativity and considers both sports and culture.' And his influence runs deeper than that — to products he really has no connection with, such as the NMD."

39.     Yeezy shoes and other apparel were extremely popular. In 2017, Yeezy's first full

year with Adidas after the contract extension, net sales reached $300 million, and the Company

broke $1 billion in annual revenue after just three years, according to a cash-flow document

prepared by UBS Group and reviewed by Bloomberg Businessweek.

40.     By 2019, sales of Yeezy shoes hit over $1 billion. Further, Kanye West

accumulated significant wealth as a result of the Partnership. By September 2019, Forbes ranked

him as the Number 1 highest-paid hip-hop star, largely as a result of the Partnership. Further, by

2019, the Adidas Yeezy sneaker line was on pace to compete with the leading Nike Jordan line.

41.     By the time the Partnership dissolved, the shoes accounted for 8% of Adidas's

total revenue and 40% of its profit, according to estimates from Morgan Stanley.

42.     Over the Fall of 2022, West made a series of public anti-Semitic and other

racially offensive remarks.

43.     On October 3, 2022, at a fashion show in Paris for his "Yeezy Season 9" fashion

line, West wore a t-shirt he designed that said "White Lives Matter." The Anti-Defamation

League has described the slogan as a "white supremacist phrase."

44.     On October 6, 2022, Adidas issued a statement to CNBC stating "After repeated

efforts to privately resolve the situation, we have taken the decision to place the partnership

under review. We will continue to co-manage the current product during this period." The

statement from Adidas did not mention West's "White Lives Matter" t-shirt or his history of

anti-Semitic remarks.

45.     Later, on October 6, 2022, in response to the Company's statement, West posted

on Instagram "FUUUUUUCK ADIDAS I AM ADIDAS ADIDAS RAPED AND STOLE MY

DESIGNS."

46.     On October 7, 2022, West posted a screenshot of a private argument he had with

hip-hop star Sean Combs, better known as Diddy, regarding his wearing of the "White Lives Matter" shirt in which he stated, "[t]his ain't a game. Ima use you as an example to show the Jewish people that told you to call me that no one can threaten or influence me. I told you this was war. Now gone get you some business."

47.     On October 9, 2022, West posted to Twitter: "I'm a bit sleepy tonight but when I wake up I'm going death con 3 on JEWISH PEOPLE The funny thing is I actually can't be Anti Semitic because black people are actually Jew also You guys have toyed with me and tried to black ball anyone whoever opposes your agenda." Twitter, now known as X, deleted the tweet and locked West's account. Instagram also suspended West's account.

48.     On October 10, 2022, West posted a video to his YouTube account that included a clip of a mid-September meeting between West, Adidas chief creative officer Alasdhair Willis, Adidas senior vice president Torben Schumacher, and former Adidas brand president Eric Liedtke. The video shows West playing a pornographic video on his phone, holding the phone close to the Adidas executives' faces, and remarking that the pornographic actor has a similar voice to one of the Adidas executives. The Adidas executive says, "come on, man," and pushes the phone away. The New York Times reported that West showed the Adidas executives a pornographic film about a woman betrayed by her cheating boyfriend "to emphasize his sense of betrayal."

49.     Despite these horrific public statements, *Bloomberg* reported that "Adidas and Yeezy employees were told to keep working as if nothing unusual was happening, according to a person familiar with the situation. New Yeezy products kept hitting the market, with RBC Capital Markets LLC estimating that **Adidas generated more than $100 million of Yeezy sales in the first few weeks of October**." [Emphasis added.]

50.    On October 11, 2022, *Vice* published portions of an interview West had conducted with Tucker Carlson, who at that time was a host for Fox News, that had been edited out before the interview was aired on Fox News. The unaired clips included a series of anti-Semitic remarks by West. For example, he stated "I prefer my kids knew Hanukkah than Kwanzaa. At least it will come with some financial engineering." West further stated that Planned Parenthood founder Margaret Sanger, a "known eugenics," as he put it, created Planned Parenthood with the KKK "to control the Jew population." West clarified that he believes Black people are the "real" Jews: "When I say Jew, I mean the 12 lost tribes of Judah, the blood of Christ, who the people known as the race Black really are." West also stated, "us judging each other on how white we could talk would be like, you know, a Jewish person judging another Jewish person on how good they danced or something."

51.    On October 11, 2022, ESPN's *Andscape* reported that Maverick Carter's The Shop stated that it would not air a recently taped episode with West because "he used The Shop to reiterate more hate speech and extremely dangerous stereotypes." West reportedly "doubled down on his recent antisemitic remarks" in the unaired episode.

52.    Given Adidas's failure to act on West's years of misconduct, West did not believe that adidas would end the Partnership as a result of his incendiary and hateful remarks. On October 21, 2022, a clip surfaced of West stating on the Drink Champs podcast that "***the thing about it being Adidas is like, I can literally say anti-Semitic shit and they can't drop me. I can say anti-Semitic things, and Adidas can't drop me***. Now what? Now what?" During the same interview, West stated that he has "gotten used to getting screwed by the Jewish media" and that "the Jewish media blocked me out."

53.    By late October, Adidas was facing public calls for a boycott as a result of its

failure to end the Partnership. In contrast to the overwhelming public disapproval towards West, neo-Nazi groups publicly supported him. In one instance, a neo-Nazi group held a banner which read "Kanye is right about the Jews" over a busy Los Angeles freeway while members performed Nazi salutes. Anti-Defamation League chief executive Jonathan Greenblatt told the *Washington Post* that he held a number of conversations with senior Adidas executives and shareholders over the weekend to discuss West. The response was "insufficient," Greenblatt said. Greenblatt continued, stating that he was "flummoxed how Adidas has dropped the ball and failed to make a clear and cogent statement about their values," and "the fact that Adidas has not made that simple point is shocking when one considers Adidas's history as a company that once outfitted the Hitler Youth."

54.      French fashion house Balenciaga ended its partnership with West on October 21, 2022. On October 24, 2022, Creative Arts Agency dropped West as a client, and Hollywood financier and producer MRC canceled a documentary on West that was already in production. Morningstar analyst David Swartz told the Washington Post that Adidas's failure to even comment on West's racist and anti-Semitic remarks—much less end their Partnership—was due to the Company's fear of losing revenue. Swartz explained that "It is not easy to stop without a huge loss, which clearly is something Adidas does not want at the moment given their other problems."

55.      After weeks of criticism over its silence in response to West's blatant and virulent anti-Semitism, adidas ended the Partnership on October 25, 2022. Adidas stated the following:

> "***adidas does not tolerate antisemitism and any other sort of hate speech. Ye's recent comments and actions have been unacceptable, hateful and dangerous, and they violate the company's values of diversity and inclusion, mutual respect and fairness.*** After a thorough review, the company has taken the decision to terminate the partnership with Ye immediately, end production of Yeezy branded products and stop all payments to Ye and his companies. adidas will stop the adidas

Yeezy business with immediate effect. This is expected to have a short-term negative impact of up to €250 million on the company's net income in 2022 given the high seasonality of the fourth quarter. adidas is the sole owner of all design rights to existing products as well as previous and new colorways under the partnership. More information will be given as part of the company's upcoming Q3 earnings announcement on November 9, 2022.

[Emphasis added.]

56.    Adidas filed a lawsuit against West and Yeezy seeking to recover $75 million in marketing funds that Adidas had transferred to Yeezy in 2022. In that action, Adidas admitted that West "made a series of highly public and offensive statements which violated the terms of the Agreement" and "destroyed billions of dollars of brand value."

**Defendants Were Fully Aware of West's Misconduct and the Risks it Posed to the Company and the Partnership**

57.    News articles published after the termination of the Partnership and interviews with confidential witnesses confirm that Defendants knew about West's misconduct by 2018 and understood the risks his misconduct posed to the Company.

58.    On October 27, 2023, the *New York Times* published an article entitled "Kanye and Adidas: Money, Misconduct and the Price of Appeasement." The Times reported that Adidas was aware of West's misconduct from the start of the Partnership in 2013. Just after signing the Partnership, "West made Adidas executives watch pornography during a meeting at his Manhattan apartment." A few weeks later, as West met with Adidas at the Company's German headquarters to discuss ideas for the first Yeezy shoe, West drew a swastika on the top of a shoe.

59.    On November 27, 2022, *The Wall Street Journal* released an article entitled "Adidas Top Executives Discussed Risk of Staff's 'Direct Exposure' to Kanye West Years Ago." The *Journal* article revealed that the Company's senior leadership, including Defendant

Rørsted, held discussions as far back as 2018 concerning the risk of continuing a relationship

with Kanye West, stating, in pertinent part:

> Adidas AG's chief executive and senior leaders in Germany **discussed as far back as four years ago the risk of continuing a relationship with Kanye West that they feared could blow up at any moment**, according to people familiar with the matter and documents reviewed by The Wall Street Journal.
>
> **A 2018 presentation to members of the Adidas executive board, a group that included CEO Kasper Rorsted and the head of human resources, highlighted the risks for employees interacting with Mr. West and detailed mitigation strategies for the relationship with the Yeezy creator, including cutting ties with the rapper-turned-designer, documents show. Instead of parting ways when concerns were raised, these people said, the senior executives had business-unit leaders share various proposals with Mr. West so Adidas could hang on to the Yeezy partnership, which analysts estimate accounted for 8% of annual sales**.
>
> These efforts to keep the Yeezy partnership occurred again in September when the Adidas executive board met to discuss Mr. West's latest public outbursts, the people said. Mr. West, who legally changed his name to Ye, met with Adidas executives in mid-September and asked for more money and control over the Yeezy brand, according to people familiar with the meeting. **During the meeting, he showed the Adidas executives a clip from an adult video and accused them of stealing his designs, these people said**. Soon after the meeting, the people said, Adidas agreed to some of Mr. West's demands: The company offered Mr. West the ability to sell Yeezy footwear directly to consumers and ownership of future designs as well as a cut of the sales from Yeezy look-alike products. The proposal offered to continue the partnership through at least 2026, the people said.
>
> **Mr. West wasn't satisfied and wanted as much as $3 billion, the people said.** Weeks later, after Mr. West wore a "White Lives Matter" T-shirt at his fashion show and posted anti-Semitic comments on social media, Adidas said it would end its Yeezy partnership.
>
> * * *
>
> **Employees raised concerns to executives about Mr. West's behavior after the artist appeared on TMZ in early 2018 saying that slavery "sounds like a choice," former employees said. At a meeting with Adidas executives, including a member of the executive board, the focus shifted from concerns about Mr. West's comments to complaints about how the company handled the controversy internally, the employees said. In October 2018, Adidas executives conducted a deep dive of the Yeezy partnership that was presented to leaders based in Germany, including Mr. Rorsted**. The presentation reviewed options for dealing

with Mr. West, who was asking to be named creative director of Adidas, according to documents.

One of the risks identified was Adidas employees having "direct exposure" to Mr. West and leaders evaluated rotating key staff to mitigate the risk, the documents show*. One proposal was running Yeezy as a stand-alone brand like Nike's Jordan brand, which would limit Mr. West's exposure to the rest of the company. Another option was buying the Yeezy trademark from Mr. West and running the brand without him, according to the documents.* The documents say Mr. West wanted to be paid out to focus on philanthropy. Another proposal called "immediate mitigation" was to separate from Mr. West, sell off remaining Yeezy products and replace them with other revenue streams, including products from other celebrities, the documents show. The executive board opted to continue its arrangement with Mr. West.

[Emphasis added.]

60.    CW2 and Adidas Senior VP Torbin Schumacher gave the October 2018 presentation, as described in the *Journal* article, to Adidas's executive board describing the risks involved with continuing the Partnership. CW2 stated that CEO Kasper Rorsted; CFO Harm Ohlmeyer; Brand President Eric Liedtke; Head of Human Resources Karen Parkin; Head of Global Sales Roland Auschel; and the Head of Operations all attended the presentation. CW2 stated that only one risk was presented to the board: West, himself. CW2 said the presentation put forth two options: terminate the Partnership or dedicate more resources to managing West.

61.    The *Times* confirmed that Rorsted and Liedtke discussed with the executive board either spinning off Yeezy into a separate company or buying West of out of his contract. Jim Anfuso, general manager of the Yeezy unit at Adidas, told the executive board at the October 2018 meeting that he "favored paying Mr. West to make a clean break because he "feared Adidas was becoming dangerously dependent on an increasingly unmanageable partnership." The Board chose to continue the Partnership, and they never disclosed the risk or the presentation to investors.

62.     The *Journal* discussed tensions behind the scenes as a result of West berating Adidas staff and engaging in other misconduct, and also revealed that West made anti-Semitic comments in front of adidas staff, including his desire to name an album after Adolf Hitler. In pertinent part, it stated:

> The two sides extended their partnership, adding staff and items to the Yeezy product line, which became central to Adidas's sales growth. ***There were tensions behind the scenes. Current and former employees said Mr. West berated staff in front of colleagues and sometimes watched pornography at work, which was escalated to human resources in 2018. He also occasionally made anti-Semitic comments in front of Adidas staff, including in 2018 when he suggested naming an album after Hitler, they said***. [. . .]

> [Emphasis added.]

63.     The *Times* confirmed that Adidas employees complained about West's bigoted statements directly to Liedtke, who "promised that Adidas would work to address its racial diversity issues." The *Times* also reported that West's "Adidas handlers" knew in 2018 that West was considering naming his next album "Hitler."

64.     CW1 stated that a Yeezy employee had alleged in July 2018 that West made anti-Semitic comments to the Yeezy employee, and demanded $100 million to settle the matter. CW1 led a two-week investigation into the incident, advised West to settle the claim, and ultimately negotiated a $5 million payout to the Yeezy employee. CW1 believed that the media might come to learn of the allegation and the settlement, so CW1 personally held a call with "all the top brass in Germany," including CFO Harm Ohlmeyer, former Yeezy COO and President of Yeezy Footwear Udi Avshalom, and West. On the call, CW1 explained the allegation and the settlement to the Adidas executives. CW1 stated that "Adidas never listened to me." The media never learned of the settlement or the allegation, and Defendants never disclosed either to investors.

65.     The *Times* confirmed that West disclosed to Liedtke (Adidas's global brand

manager and an executive board member) and another Adidas manager that he "paid a seven-figure settlement to the outgoing chief executive of his Yeezy operation, who had accused him of commending Hitler and creating a hostile workplace."

66.     CW1 also said that West and Avshalom, who is Israeli and Jewish, almost got into a physical fight in 2018 in response to comments West made praising Adolf Hitler and Nazis.

67.     CW1 described numerous other incidents of West's misconduct. West was obsessed with Hitler and his purported "productivity" and routinely made anti-Semitic remarks to CW1. CW1, who is Jewish, once said to West that Hitler's "productivity" was "to murder 30,000 Jews a day." West responded that "[y]ou have to admit that's productive." West was also obsessed with pornography and once asked CW1 to host "an employee relations meeting at PornHub."

68.     Jon Wexler, who was instrumental in luring West to Adidas while serving as the Company's global director of entertainment and influencer marketing, also knew about West's anti-Semitism. The *Times* reported that Wexler yelled at West after West told him to "hang a photo of Hitler in his kitchen and kiss it every day to practice unconditional love."

69.     The Times reported that, in February 2015, West berated Adidas's Yeezy manager Rachel Muscat and other Adidas employees "using sexually explicit language." Employees complained to Adidas executive about West's verbal abuse.

70.     Adidas was so concerned about the risk West posed to the Company that they insisted on adding a morals clause to West's contract when Adidas sought to extend and expand the Partnership in 2016. Wexler and Anfuso led the negotiations for Adidas. According to a copy of the contract obtained by the Times, the 2016 contract allowed Adidas to terminate the Partnership for a "felony conviction, bankruptcy, 30 consecutive days of mental health or

substance abuse treatment, or anything that brings 'disrepute, contempt, scandal' to him or tarnishes Adidas."

71.     The Times reported that, in 2018, Adidas executives and managers began a text message group called the "Yzy hotline" to discuss their concerns about West. The group included Wexler, Liedtke, and Anfuso. In 2019, after West demanded that Adidas relocate its Yeezy team to Cody, Wyoming, Anfuso wrote to the group: "We are in a code red. The first line is completely exhausted and don't feel supported or comfortable with how this is progressing." Rorsted, Liedtke, and Wexler met with West weeks later in Oregon. West threw a tantrum at the meeting—hurling shoes and storming out. Still, eager to continue the profitable Partnership, Adidas agreed to help establish Yeezy in Wyoming and agreed to give West a $100 million annual marketing budget that West could spend with "less oversight."

72.     CW3 stated that Adidas executives established a unique system to remove human resources complaints about West from the usual chain of command. Human resources manager Rachel Skaarup was West's assigned HR Manager, and she reported any complaints directly to General Counsel Paul Ehrlich. Skaarup told CW3 that she had been explicitly instructed not to share information about West with CW3 and that it instead "goes right to Paul Ehrlich." CW3 said this arrangement was "massively unusual" because "[a]nything people that was happening in North America went to me. Except for Yeezy. It was the weirdest thing ever." CW3 once raised the issue with CW3's supervisor, Senior Vice President/Global Chief HR Officer Karin Parkin. Parkin "moved onto the next topic as quickly as she could. So, she absolutely knew." CW3 stated that complaints were sent to Ehrlich "so there would be attorney-client privilege" to protect West from public disclosure of his misconduct.

73.     On November 24, 2022, *Rolling Stone* reported that "Former Yeezy and Adidas

staffers and creative collaborators claim that he played pornography to Yeezy staff in meetings; discussed porn and showed an intimate photograph of Kim Kardashian in job interviews; and showed an explicit video and photos of Kardashian as well as his own sex tapes to Yeezy team members." *Rolling Stone* also obtained a letter "by prominent former members of the Yeezy team" that "insists that leaders from Adidas were aware of West's 'problematic behavior' but 'turned their moral compass off,' raising questions about whether his corporate partner could have stepped in years ago." In response to *Rolling Stone*'s questions, Adidas stated only that it "will not discuss private conversations, details, or events that lead [sic] to our decision to terminate the Adidas Yeezy partnership." The article detailed that "two Adidas executives" warned an incoming senior employee that West commonly shows pornography to coworkers at the office. After the publication of the article, the Company issued a statement:

> It is currently not clear whether the accusations made in an anonymous letter are true. However, we take these allegations very seriously and have taken the decision to launch an independent investigation of the matter immediately to address the allegations.

> Adidas does not tolerate hate speech and offensive behavior and therefore has terminated the adidas Yeezy partnership. We have been and continue to be actively engaged in conversations with our employees about the events that lead [sic] to our decision to end the partnership. They have our full support and we're working through the details of the termination.

74.    *Rolling Stone* further reported that, instead of admonishing or punishing West for his misconduct, Adidas executives moved mistreated employees to other divisions within Adidas: "She was basically moved out of the team' after complaining to her manager in human resources, the senior employee says. Two other former senior staffers described being told by Adidas leaders in Portland that a 'soft landing' spot was available back at the mothership for colleagues who feared West."

75.    *NBC News* and *CNN* both reported on separate settlements between West and

former employees concerning West's anti-Semitic comments:

> In the settlement reviewed by NBC News, Ye paid a former employee who alleged having witnessed more than one incident in which Ye praised Hitler or Nazis in business meetings. Ye denied the claims made by the former employee in the agreement.
>
> The former employee spoke on the condition of anonymity, having signed a nondisclosure agreement. NBC News, which is withholding certain details about the settlement to protect the person's anonymity, reviewed the settlement, along with other correspondence and proof of the payment the former employee said they had received.
>
> Representatives for Ye did not respond to requests for comment.
>
> CNN reported last Thursday that a business executive who worked for Ye had accused him of creating a hostile work environment through an "obsession" with Hitler and had received a settlement. NBC News has not confirmed the settlement, which appears to be separate from the case of the former employee who shared settlement documents with NBC News.

76.    Defendants either misled investors by failing to disclose these settlements or were reckless in failing to discover them given all of the red flags concerning West's misconduct.

## SUBSTANTIVE ALLEGATIONS

### Disclosure Obligations Imposed a Duty on Defendants to Disclose Risks to the Yeezy Partnership

77.    Since 2014, the European Union's Non-Financial Reporting Directive ("NFRD") has required large public companies like Adidas to publicly disclose certain non-financial information to investors. Amongst other things, NFRD required Adidas to disclose information about its business model, policies, outcomes, risks, risk management and key performance; and Key Performance Indicators ("KPIs") relating to social and employee issues and human rights.

78.    The EU states that the NFRD is "vital for managing change towards a sustainable global economy by combining long-term profitability with social justice" and the "objective of the NFRD is therefore to raise the transparency of the social and environmental information

provided."

79.     Section 29 of the NFRD obligated Adidas to publish an annual "consolidated non-financial statement containing information to the extent necessary for an understanding of the group's development, performance, position and impact of its activity, relating to, as a minimum, . . . social and employee matters."

80.     Specifically, Section 29 requires disclosure of (a) a brief description of the group's business model; (b) a description of the policies pursued by the group in relation to those matters, including due diligence processes implemented; (c) outcome of those policies; and (d) *the principal risks related to those matters linked to the group's operations including, where relevant and proportionate, its business relationships*, products or services which are likely to cause adverse impacts in those areas, and how the group manages those risks.

81.     The NFRD required Adidas to "provide adequate information in relation to *matters that stand out as being most likely to bring about the materialisation of principal risks of severe impacts, along with those that have already materialized*" and instructed that "[t]he severity of such impacts should be judged by their scale and gravity." The NFRD's required risk disclosures explicitly extend to the Company's "business relationships."

82.     Additionally, throughout the Class Period, Adidas promised investors that the Company complied with the core requirements of the Global Reporting Initiative. For example, the Company's 2018 Annual Report stated that the Annual Report's "non-financial statement combined with further information in this report and on our corporate website fulfills the Global Reporting Initiative's Standards 'Core' option." The Company's 2019, 2020, and 2021 Annual Reports made nearly identical claims.

83.     Defendants' failure to disclose West's misconduct, and the material risks it posed

to the Company and the Partnership, violated the NFRD's disclosure requirements. The 2018 presentation to the executive board—as detailed by the *Wall Street Journal* and confirmed by CW2—demonstrates that Defendants were fully aware of the specific risks the Yeezy Partnership posed, and Defendants deliberately or recklessly chose to conceal those risks from investors.

84.    Defendants' omissions concerning West's repeated misconduct, Adidas's failure to investigate or act on the misconduct, and the risks the misconduct posed to the Company also rendered untrue Defendants' statements in each of its 2018, 2019, 2020, and 2021 annual reports that the Company complied with GRI disclosure standards.

85.    The Company's annual reports identified DEI as a material social topic, but Adidas failed to disclose information that was sufficiently detailed, complete, and balanced, as required by the GRI.

86.    First, GRI 101 paragraph 1.4, titled "Completeness", states that the information disclosed should present a complete picture of the organization's performance:

> The report shall include coverage of material topics and their Boundaries, ***sufficient to reflect significant economic, environmental, and social impacts, and to enable stakeholders to assess the reporting organization's performance in the reporting period***.

> \* \* \*

> In making estimates of future impacts (both positive and negative), ***the reported information is expected to be based on well-reasoned estimates that reflect the likely size and nature of impacts***. Although such estimates are by nature subject to uncertainty, they provide useful information for decision-making, as long as the basis for estimates is clearly reported and the limitations of the estimates are clearly acknowledged. Disclosing the nature and likelihood of such impacts, even if they can only materialize in the future, is consistent with the goal of providing a balanced and reasonable representation of the organization's economic, environmental, and social impacts…. ***The report does not omit relevant information that substantively influences stakeholder assessments and decisions, or that reflects significant economic, environmental, and social impacts.***

[Emphasis added.]

87.    The Company's social impact disclosures were incomplete because they failed to provide *any* information concerning West's misconduct or the impact it had on Yeezy and Adidas employees—much less provide a well-reasoned estimate concerning the scope of the impact.

88.    Second, GRI 101 paragraph 1.5, titled "Accuracy", states that "the reported information shall be sufficiently accurate and detailed for stakeholders to assess the reporting organization's performance." Although GRI allows for omission of information in certain prescribed cases (i.e., information is not-applicable, subject to confidentiality constraints, subject to legal prohibition, or not available), it requires the entity to describe the specific information that has been omitted and the reasons for omission -- e.g., the specific legal or confidentiality constraints (GRI 101, par. 3.2). Adidas did not have valid reasons for omitting material information regarding the West partnership and did not disclose that it had omitted this material information.

89.    Third, GRI 101, paragraph 1.6, titled *"Balance"*, states that the information presented should be *balanced* with respect to both positive and negative aspects of the organization's performance:

> The reported information shall reflect **positive and negative aspects of the reporting organization's performance to enable a reasoned assessment of overall performance.**
>
> * * *
>
> The overall presentation of the report's content is expected to provide an **unbiased picture** of the organization's performance. The report is expected to **avoid selections, omissions, or presentation formats that are reasonably likely to unduly or inappropriately influence a decision or judgment by the report reader**. The report is expected to include **both favorable and unfavorable results,**

**as well as information that can influence the decisions of stakeholders in proportion to their materiality**. The report is also expected to distinguish clearly between facts and the organization's interpretation of them.

[Emphasis added.]

90.    Adidas's annual reports disclosed that it had a "zero-tolerance approach" towards discrimination and harassment, that it has "always been and will always be against discrimination in all forms and stand united against racism," and touted its various DEI commitments and programs. But the Company did not present information about the negative aspects of its DEI culture and performance: that West routinely mistreated Yeezy and Adidas employees by subjecting them to anti-Semitic comments and other workplace misconduct; that West had paid $5 million to a Yeezy employee to settle allegations that he subjected employees to anti-Semitism; that the Company endangered employees by segregating complaints about West from normal human resources reporting to protect him; that the Company's reaction to employee complaints about West's behavior was to either ignore them or to transfer the employee—not to punish West or intervene on the employees' behalf; and that Defendants knew and had discussed that these facts, individually and collectively, posed a material risk to the Company's finances. These overly rosy disclosures violated the GRI disclosure requirements the Company claimed to have fulfilled.

91.    Fourth, GRI 102, paragraph 102-44, required Adidas to report on specific issues and concerns raised by its stakeholders, such as employees: "The reporting organization shall report … key topics and concerns that have been raised through stakeholder engagement, including: i. how the organization has responded to those key topics and concerns, including through its reporting; ii. the stakeholder groups that raised each of the key topics and concerns." GRI 102 required Adidas to disclose that Adidas employees repeatedly raised concerns about

West's misconduct. As the Times reported, "executives disregarded employee concerns that his troubling conduct risked tainting the brand's reputation."

92.     Finally, West's misconduct, the risks it posed to the Company, and the Company's inappropriate handling of it were material under the NFRD and GRI standards. Under GRI, "materiality is the principle that determines which relevant topics are sufficiently important that it is essential to report on them." Materiality is determined by a mix of factors, including "the organization's overall mission and competitive strategy," "the concerns expressed directly by stakeholders," and "broader societal expectations." Compliance with GRI requires disclosing the reporting organization's "significant economic . . . and social impacts" or topics that "substantively influence the assessments and decisions of stakeholders."

93.     Adidas's disclosures around diversity, equality, and inclusion ("DEI") imply that the Company understood that this ESG topic was material to its stakeholders and required disclosure pursuant to GRI. For example, Adidas emphasized the importance of DEI in its 2020 Annual Report:

> **We strongly believe that diversity, inclusion, and equality are key to the success of our company.** To be the best sports brand in the world, we need the best diverse talent that reflects the diversity of our customers and consumers. We celebrate this diversity as it helps us better serve the communities we work in, while also providing a competitive business advantage."

[Emphasis added.]

94.     As disclosed in its Annual Reports, the Company also understood that human resources was "a key partner in many compliance matters, especially those related to harassment and discrimination." Yet the Company intentionally shielded West from complaints to human resources about harassment and discrimination and concealed this compliance failure from investors.

95.     Anti-Semitism was especially material to Adidas given the Company's sordid history with Adolf Hitler and the Nazi party. Adidas founders Adi and Rudi Dassler were members of the Nazi party—joining in 1933, the same year Adolf Hitler became Chancellor—and the Company cooperated with the Nazi party during the 1930s and 1940s. According to journalist Barbara Smit's book "Sneaker Wars," the Dassler brothers carried their party membership cards and signed off their letters with "Heil Hitler."

96.     Beyond its specific history, as a German company, Adidas understood the social importance of anti-Semitism and the "broader societal expectations" of German companies to stamp out anti-Semitism. The German penal code prohibits disseminating Nazi propaganda, including sharing images such as swastikas, wearing an SS uniform, and making statements in support of Hitler. As the Times reported, West drawing a swastika on a shoe at Adidas's headquarters in Germany "was shocking" because "displays of the symbol are banned in" Germany and were "acutely sensitive for a company whose founder belonged to the Nazi Party." Further, "they were meeting just miles from Nuremberg, where leaders of the Third Reich were tried for crimes against humanity."

### Materially False and Misleading
### Statements Issued During the Class Period

97.     On May 2, 2018, West suggested on TMZ Live that slavery in the United States was a "choice" for enslaved persons. West stated, in pertinent part:

> "***When you hear about slavery for 400 years. For 400 years?! That sounds like a choice. You was there for 400 years and it's all of y'all.*** It's like we're mentally in prison. I like the word 'prison' because 'slavery' goes too direct to the idea of blacks. Slavery is to blacks as the Holocaust is to Jews. Prison is something that unites as one race, blacks and whites, that we're the human race."

[Emphasis added.]

28

98.     The Company stuck by West despite these comments. In response to West's comment, on May 3, 2018, Defendant Rørsted stated, while declining to address West's comments about slavery, or internal comments that he made at adidas by that time, ***"[t]here clearly are some comments we don't support***[.] ***Kanye has been and is a very important part of our strategy and has been a fantastic creator***." [Emphasis added.] Tellingly, Rørsted also stated that West and the Yeezy footwear brand are a "very important part of our brand from a revenue standpoint and how we promote our products."

99.     In the same interview, the interviewer pressed Rørsted, stating "if someone makes comments that are around the issue of slavery, and [implying that was a choice], that goes beyond just your average comment by an external collaborator, especially for a German brand like adidas, isn't it important to get in front of that kind of issue before it becomes a real problem for the entire company?" To that, Rørsted emphasized the Company's focus on delivering quality sporting goods and declined to comment further on Kanye West, except to state that he had not considered dropping West in the prior 24 hours.

100.    The statements referenced in ¶¶ 98, 99 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts that were known to Defendants or recklessly disregarded by them. Specifically, the statements were materially false or misleading because they omitted that West routinely mistreated Yeezy and Adidas employees by subjecting them to anti-Semitic comments and other workplace misconduct; that West had paid $5 million to a Yeezy employee to settle allegations that he subjected employees to anti-Semitism; that the Company endangered employees by segregating complaints about West from normal human resources reporting to protect him; that the Company's reaction to employee complaints about West's behavior was to either ignore them or to transfer the employee—not to

punish West or intervene on the employees' behalf; and that Defendants knew and had discussed that these facts, individually and collectively, posed a material risk to the Company's finances.

101.   On September 13, 2018, the Company issued a press release touting its inclusion in the Dow Jones Sustainability Indices. The press release stated that Adidas "was rated as industry leader in corporate economic, environmental and social dimensions" and "was rated industry best in seven criteria," including "Human Rights" and "Social Reporting." The press release further stated that the index "is based on a thorough analysis of corporate economic, environmental and social performance, assessing issues such as corporate governance, risk management, climate change mitigation, supply chain standards, labor practices, branding and customer relationship management."

102.   The statements referenced in ¶ 101 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts that were known to Defendants or recklessly disregarded by them. Specifically, the statements were materially false or misleading because they omitted that West routinely mistreated Yeezy and Adidas employees by subjecting them to anti-Semitic comments and other workplace misconduct; that West had paid $5 million to a Yeezy employee to settle allegations that he subjected employees to anti-Semitism; that the Company endangered employees by segregating complaints about West from normal human resources reporting to protect him; that the Company's reaction to employee complaints about West's behavior was to either ignore them or to transfer the employee—not to punish West or intervene on the employees' behalf; and that Defendants knew and had discussed that these facts, individually and collectively, posed a material risk to the Company's finances.

103.   Defendant Rørsted elaborated on his views with regard to West's slavery comments in other interviews, without disclosing that West had made offensive remarks at

Company premises or otherwise engaged in problematic behavior. On November 6, 2018, he stated the following:

> "Kanye brings different points of view out. We want creators to have freedom and sometimes have a different point of view, something people could react to in a positive or a negative sense. That is what Kanye brings to the table. If he brought a common position for everybody, I think people would not react the way they do. And in many ways, we're very supportive of what he does, but it doesn't mean we're supportive of every statement. We're not signing up to his statements; we're signing up to what he brings to the brand and the products he's bringing out."

104.    The statements referenced in ¶ 103 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts that were known to Defendants or recklessly disregarded by them. Specifically, the statements were materially false or misleading because they omitted that West routinely mistreated Yeezy and Adidas employees by subjecting them to anti-Semitic comments and other workplace misconduct; that West had paid $5 million to a Yeezy employee to settle allegations that he subjected employees to anti-Semitism; that the Company endangered employees by segregating complaints about West from normal human resources reporting to protect him; that the Company's reaction to employee complaints about West's behavior was to either ignore them or to transfer the employee—not to punish West or intervene on the employees' behalf; and that Defendants knew and had discussed that these facts, individually and collectively, posed a material risk to the Company's finances.

105.    On March 13, 2019, adidas publicly released its yearly report for the year ended December 31, 2018 (the "2018 Report") on its website. Defendants Rørsted and Ohlmeyer signed the 2018 Report.

106.    The 2018 Report, in its section on Business Partner Risk, ignored serious issues affecting the Partnership, and the resulting potential risk to shareholders, by generally alluding to risks involving individuals that Adidas partnered with, rather than stating that the Company had

actually considered ending the Partnership as a result of West's personal behavior, or how the Company's reputation might be affected if his behavior as it related to the Company were to become public.

107.    Regarding Partnership Risks, the 2018 Report stated, in pertinent part, that "the company is exposed to a multitude of business partner risks." The disclosure further stated that "[u]nethical business practices on the part of business partners or improper behavior of individual athletes, influencers or partners in the entertainment industry could have a negative spill-over effect on the company's reputation, lead to higher costs or liabilities or even disrupt business activities." Adidas also promised that, to "mitigate business partner risks, adidas has implemented various measures. For example, we generally include clauses in contractual agreements with athletes, clubs and federations or other partners that allow us to suspend or even terminate our partnership in case of improper or unethical conduct. In addition, we work with a broad portfolio of promotion partners, including individual athletes, club teams and federations or associations in numerous sports as well as entertainers and influencers to reduce the dependence on the success and popularity of a few individual partners. [. . .]"

108.    In the Personnel Risk section of the 2018 Report's discussion of risk, the Company extolled its commitment to having an equitable workplace, and its strategic workforce management process, known as "People Strategy", while failing to discuss how it routinely ignored extreme behavior from Kanye West.

109.    Regarding Personnel Risk, the 2018 Report stated, in pertinent part:

"***Achieving the company's strategic and financial objectives is highly dependent on our employees and their talents. In this respect, strong leadership and a performance-enhancing culture are critical to the company's success. Therefore, ineffective leadership as well as the failure to install and maintain a performance-oriented culture that fosters diversity and inclusion and strong employee engagement amongst our workforce could also substantially impede***

***our ability to achieve our goals***. An ineffective, unbalanced allocation of resources to business activities could cause operational inefficiencies and result in lower employee engagement. In addition, global competition for highly qualified personnel remains fierce. As a result, the loss of key personnel in strategic positions and the ability to identify, recruit, and retain highly qualified and skilled talents who best meet the specific needs of our company pose risks to our business performance. Unattractive or non-competitive management and employee remuneration may exacerbate these risks. In addition, a lack of sufficient training measures and inadequate documentation of critical know-how might dilute or lead to a loss of key capabilities.

***Our People Strategy is an essential part of our strategic business plan 'Creating the New' and is designed to reduce these risks. To optimize staffing levels and resource allocation (i.e. having the right people with the right skillsets in the right roles at the right time), we have established a strategic workforce management process***. We continuously invest in improving employer branding activities to be the 'employer of choice in our industry and as a result attract and retain the right talent. We established a global recruiting organization to enhance our internal and external recruiting services and capabilities. To ensure effective leadership across the company, we defined and activated our global *Leadership Framework* that articulates the behaviors expected of our leaders. Our global succession management helps create strong internal talent pipelines for critical leadership positions and reduce succession risk. We also strengthen employee retention by providing attractive leadership development and learning programs as well as global career opportunities. Numerous initiatives such as our global 'BIG Deal' gender intelligence training foster diversity and inclusion. We also have attractive reward and incentive schemes in place, designed to further support long-term employee commitment."

[Emphasis added.]

110.    The 2018 Report's Compliance Management System disclosures (the "CMS Disclosures") stated that the Company's CMS is designed to "preserve diversity by fighting harassment and discrimination;" that "[a]ppropriate and timely response to compliance violations is essential;" that "[w]e track, monitor, and report potential incidents of non-compliance worldwide; and that, "[w]here necessary, we react promptly to confirmed compliance violations, through appropriate and effective sanctions ranging from warnings to termination of employment contracts."

111.    The Company's 2019 Annual Report ("2019 Report"), 2020 Annual Report ("2020 Report"), and 2021 Annual Report ("2021 Report") contained similar language regarding the Compliance Management System, Partnership Risk, Inventory Risk, and Personnel Risk, or otherwise failed to mention risks relating to the Partnership. The Company's website and other filings similarly failed to disclose the specific risks stemming from the Partnership.

112.    The statements referenced in ¶¶ 105-111 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts that were known to Defendants or recklessly disregarded by them. Specifically, the statements were materially false or misleading because they omitted that West routinely mistreated Yeezy and Adidas employees by subjecting them to anti-Semitic comments and other workplace misconduct; that West had paid $5 million to a Yeezy employee to settle allegations that he subjected employees to anti-Semitism; that the Company endangered employees by segregating complaints about West from normal human resources reporting to protect him; that the Company's reaction to employee complaints about West's behavior was to either ignore them or to transfer the employee—not to punish West or intervene on the employees' behalf; and that Defendants knew and had discussed that these facts, individually and collectively, posed a material risk to the Company's finances.

113.    On September 16, 2019, the Company issued a press release touting its inclusion in the Dow Jones Sustainability Indices. The press release stated that Adidas "was ranked best in its industry in the criteria of . . . Social Reporting and Talent Attraction & Retention." The press release further stated that the index "is based on a thorough analysis of corporate economic, environmental and social performance."

114.    The statements referenced in ¶ 113 above were materially false and/or misleading

because they misrepresented and failed to disclose adverse facts that were known to Defendants or recklessly disregarded by them. Specifically, the statements were materially false or misleading because they omitted that West routinely mistreated Yeezy and Adidas employees by subjecting them to anti-Semitic comments and other workplace misconduct; that West had paid $5 million to a Yeezy employee to settle allegations that he subjected employees to anti-Semitism; that the Company endangered employees by segregating complaints about West from normal human resources reporting to protect him; that the Company's reaction to employee complaints about West's behavior was to either ignore them or to transfer the employee—not to punish West or intervene on the employees' behalf; and that Defendants knew and had discussed that these facts, individually and collectively, posed a material risk to the Company's finances.

115.   On March 11, 2020, adidas publicly released its yearly report for the year ended December 31, 2019 (the "2019 Report") on its website. Defendants Rørsted and Ohlmeyer signed the 2019 Report.

116.   As described above, the 2019 Report's disclosures about the Compliance Management System, Partnership Risk, Inventory Risk, and Personnel Risk failed to mention risks relating to the Partnership.

117.   The statements referenced in ¶ 115-116 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts that were known to Defendants or recklessly disregarded by them. Specifically, the statements were materially false or misleading because they omitted that West routinely mistreated Yeezy and Adidas employees by subjecting them to anti-Semitic comments and other workplace misconduct; that West had paid $5 million to a Yeezy employee to settle allegations that he subjected employees to anti-Semitism; that the Company endangered employees by segregating complaints about West from

35

normal human resources reporting to protect him; that the Company's reaction to employee complaints about West's behavior was to either ignore them or to transfer the employee—not to punish West or intervene on the employees' behalf; and that Defendants knew and had discussed that these facts, individually and collectively, posed a material risk to the Company's finances.

118.    On June 9, 2020, the Company issued a press release. The press release quoted Defendant Rorsted as stating "While we have talked about the importance of inclusion, we must do more to create an environment in which all of our employees feel safe, heard and have equal opportunity to advance their careers. As adidas, we will create a lasting change and we will do it now."

119.    The statements referenced in ¶ 118above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts that were known to Defendants or recklessly disregarded by them. Specifically, the statements were materially false or misleading because they omitted that West routinely mistreated Yeezy and Adidas employees by subjecting them to anti-Semitic comments and other workplace misconduct; that West had paid $5 million to a Yeezy employee to settle allegations that he subjected employees to anti-Semitism; that the Company endangered employees by segregating complaints about West from normal human resources reporting to protect him; that the Company's reaction to employee complaints about West's behavior was to either ignore them or to transfer the employee—not to punish West or intervene on the employees' behalf; and that Defendants knew and had discussed that these facts, individually and collectively, posed a material risk to the Company's finances.

120.    On August 28, 2020, the Company issued a press release entitled "Factsheet: Inclusion & Equality Commitments." The press release announced that Adidas established "a global Committee to Accelerate Inclusion & Equality, sponsored by CEO Kasper Rorsted to focus

on the advancement of underrepresented groups and drive company-wide change." The press release further announced that the Company strengthened its Global Anti-Discrimination and Non-Retaliation Policy and stated that "[w]e do not tolerate discrimination of any kind, including microaggression."

121.    The statements referenced in ¶ 120 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts that were known to Defendants or recklessly disregarded by them. Specifically, the statements were materially false or misleading because they omitted that West routinely mistreated Yeezy and Adidas employees by subjecting them to anti-Semitic comments and other workplace misconduct; that West had paid $5 million to a Yeezy employee to settle allegations that he subjected employees to anti-Semitism; that the Company endangered employees by segregating complaints about West from normal human resources reporting to protect him; that the Company's reaction to employee complaints about West's behavior was to either ignore them or to transfer the employee—not to punish West or intervene on the employees' behalf; and that Defendants knew and had discussed that these facts, individually and collectively, posed a material risk to the Company's finances.

122.    On February 25, 2021, the Company issued a press release entitled "Factsheet: Progress on Creating Lasting Change Now." The press release announced, among other things, that the Company launched "Creating a Culture of Inclusion training, in which employees explore critical topics including diversity dimensions, unconscious biases, privilege and microaggressions" and stated that "globally all senior leaders and nearly all adidas employees have completed the program, committing approximately 25 hours each over the last 4 months." The press release also stated that the Company "[s]trengthened and reinforced the global Anti-Discrimination and Anti-Harassment Policy" and "collaborated with a third-party consultant to

create the new Corrective Action Matrix" that "provides clear guidance on how the company will respond to harassment, discrimination, disrespectful conduct and retaliation."

123.    The statements referenced in ¶ 122 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts that were known to Defendants or recklessly disregarded by them. Specifically, the statements were materially false or misleading because they omitted that West routinely mistreated Yeezy and Adidas employees by subjecting them to anti-Semitic comments and other workplace misconduct; that West had paid $5 million to a Yeezy employee to settle allegations that he subjected employees to anti-Semitism; that the Company endangered employees by segregating complaints about West from normal human resources reporting to protect him; that the Company's reaction to employee complaints about West's behavior was to either ignore them or to transfer the employee—not to punish West or intervene on the employees' behalf; and that Defendants knew and had discussed that these facts, individually and collectively, posed a material risk to the Company's finances.

124.    On March 10, 2021, adidas publicly released its yearly report for the year ended December 31, 2020 (the "2020 Report") on its website. Defendants Rørsted and Ohlmeyer signed the 2020 Report.

125.    As described above, the 2020 Report's disclosures about the Compliance Management System, Partnership Risk, Inventory Risk, and Personnel Risk failed to mention risks relating to the Partnership.

126.    Additionally, the 2020 Report included additional DEI disclosures (the "DEI Disclosures"). The 2020 Report stated "[w]e have always been and will always be against discrimination in all forms and stand united against racism." The 2020 Report also stated:

> In 2020, we redefined our framework for diversity and inclusion with a clear definition of what diversity and inclusion mean to us as a company: They mean

championing individual uniqueness, and cultivating a culture of belonging so that everyone can create at their best. The framework highlights our approach both internally and externally which is why we defined three strategic focus areas:

— **Workplace**: We want to create a work environment where all employees feel like they belong, are valued and are engaged to produce exceptional results.

— **Workforce**: We want to attract, recruit, promote, and retain the best talent and maintain a diverse workforce at all levels and areas of the business.

— **Marketplace**: We want to represent the diverse communities we serve through our communications, products, partnerships, and investments.

As part of the three focus areas, we have made global internal commitments to promote inclusion and equality at adidas. These commitments are supported by specific actions with clear timelines, and progress is communicated internally. This action plan underpins our stance against discrimination and microaggressions.

127.    In addition, the 2020 Report included a section on Risks related to media and stakeholder activities (the "Stakeholder Activity" disclosures). While it disclosed that adverse or inaccurate media coverage could have an adverse negative impact on the Company, it failed to disclose that the Company risked considerable negative media coverage if Kanye West made public comments which were consistent with statements he made internally in the Company (such as anti-Semitic statements). Further, the Company failed to disclose that it stood to receive negative coverage if West's abusive behavior at the Company, and how the Company failed to meaningfully act on the issue, were to be publicly disclosed.

128.    The 2020 Report's section on risks related to media and stakeholder activities stated, in pertinent part, the following:

The company faces considerable risk if we are unable to uphold high levels of consumer awareness, affiliation, and purchase intent for our products. ***Adverse or inaccurate media coverage on our products or business practices as well as negative social media discussion may significantly harm the adidas' reputation and brand image, lead to public misperception of the company's business performance and eventually result in a sales slowdown***. Similarly, certain activities on the part of key stakeholders (e.g. nongovernmental organizations, governmental institutions) could cause reputational damage, distract top management, and disrupt business activities. To mitigate these risks, we pursue proactive, open communication and engagement with key stakeholders (e.g. consumers, media, the financial community, non-governmental organizations, governmental institutions) on a continuous basis. ***In addition, we have established***

*clear crisis communication processes to ensure a quick and effective response to adverse developments. We have also strengthened social media capabilities and created various digital newsrooms around the globe that enable continuous monitoring of social media content related to the company's products and activities and allow early management of potentially damaging social media discussion*. On a case-by-case basis, we seek external advice from experts in communication and stakeholder management.

129.    The statements referenced in ¶¶ 125-128 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts that were known to Defendants or recklessly disregarded by them. Specifically, the statements were materially false or misleading because they omitted that West routinely mistreated Yeezy and Adidas employees by subjecting them to anti-Semitic comments and other workplace misconduct; that West had paid $5 million to a Yeezy employee to settle allegations that he subjected employees to anti-Semitism; that the Company endangered employees by segregating complaints about West from normal human resources reporting to protect him; that the Company's reaction to employee complaints about West's behavior was to either ignore them or to transfer the employee—not to punish West or intervene on the employees' behalf; and that Defendants knew and had discussed that these facts, individually and collectively, posed a material risk to the Company's finances.

130.    On June 2, 2021, the Company issued a press release entitled "Factsheet: Progress on Creating Lasting Change Now." The press release announced, among other things, that "All corporate employees have now completed" the Creating a Culture of Inclusion training. The press release also stated that the Company "[c]reated global and local policies, including the consequences guidelines which are complemented by the new Corrective Action Matrix in the U.S., that provide clear guidance on how the company will respond to harassment, discrimination, disrespectful conduct and retaliation."

131.    The statements referenced in ¶ 130 above were materially false and/or misleading

because they misrepresented and failed to disclose adverse facts that were known to Defendants or recklessly disregarded by them. Specifically, the statements were materially false or misleading because they omitted that West routinely mistreated Yeezy and Adidas employees by subjecting them to anti-Semitic comments and other workplace misconduct; that West had paid $5 million to a Yeezy employee to settle allegations that he subjected employees to anti-Semitism; that the Company endangered employees by segregating complaints about West from normal human resources reporting to protect him; that the Company's reaction to employee complaints about West's behavior was to either ignore them or to transfer the employee—not to punish West or intervene on the employees' behalf; and that Defendants knew and had discussed that these facts, individually and collectively, posed a material risk to the Company's finances.

132.    On March 9, 2022, adidas publicly released its yearly report for the year ended December 31, 2021 (the "2021 Report") on its website. Defendants Rørsted and Ohlmeyer signed the 2021 Report.

133.    As described above, the 2021 Report's disclosures about the Compliance Management System, DEI, Stakeholder Activity, Partnership Risk, Inventory Risk, and Personnel Risk failed to mention risks relating to the Partnership.

134.    The statements referenced in ¶ 133 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts that were known to Defendants or recklessly disregarded by them. Specifically, the statements were materially false or misleading because they omitted that West routinely mistreated Yeezy and Adidas employees by subjecting them to anti-Semitic comments and other workplace misconduct; that West had paid $5 million to a Yeezy employee to settle allegations that he subjected employees to anti-Semitism; that the Company endangered employees by segregating complaints about West from

normal human resources reporting to protect him; that the Company's reaction to employee complaints about West's behavior was to either ignore them or to transfer the employee—not to punish West or intervene on the employees' behalf; and that Defendants knew and had discussed that these facts, individually and collectively, posed a material risk to the Company's finances.

135.    On June 14, 2022, the Company issued a press release entitled "Factsheet: Progress on Creating Lasting Change Now." The press release announced, among other things, that "Equity has been newly added to our diversity and inclusion commitment in 2021" and stated that "we recognize that the legacy of historical events caused an inequitable playing field for marginalized groups." The press release further stated that "[W]e are committed to eliminating bias and creating an equal playing field for each of our employees, irrespective of their diversity and intersectionality, so that they have the opportunity to perform at their best, be consistently and fairly developed, recognized, and rewarded for their efforts."

136.    The statements referenced in ¶ 135 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts that were known to Defendants or recklessly disregarded by them. Specifically, the statements were materially false or misleading because they omitted that West routinely mistreated Yeezy and Adidas employees by subjecting them to anti-Semitic comments and other workplace misconduct; that West had paid $5 million to a Yeezy employee to settle allegations that he subjected employees to anti-Semitism; that the Company endangered employees by segregating complaints about West from normal human resources reporting to protect him; that the Company's reaction to employee complaints about West's behavior was to either ignore them or to transfer the employee—not to punish West or intervene on the employees' behalf; and that Defendants knew and had discussed that these facts, individually and collectively, posed a material risk to the Company's finances.

## THE TRUTH BEGINS TO EMERGE

137.    On October 7, 2022, West made a post to his Instagram account showing a text conversation he had with Sean "Diddy" Combs. West commented on the post that he would "show the Jewish people that told you to call me that no one can threaten or influence me." West was insinuating that Diddy's previous criticism of West's "White Lives Matter" t-shirt was part of a Jewish plot against West.

138.    On this news, shares of ADDYY fell $2.69 per ADR, or 4.6%, to close at $56.17 on October 7, 2022. ADDDF fell $11.32 per ADR, or 9.5%, to close at $107.18 on October 7, 2022.

139.    On October 21, 2022, *Women's Wear Daily* reported that French fashion house Balenciaga announced that it was severing its relationship with West. That same day, a clip also surfaced of West stating on the Drink Champs podcast that "***the thing about it being Adidas is like, I can literally say anti-Semitic shit and they can't drop me. I can say anti-Semitic things, and Adidas can't drop me***. Now what? Now what?" During the same interview, West stated that he has "gotten used to getting screwed by the Jewish media" and that "the Jewish media blocked me out."

140.    On this news, shares of ADDYY fell $2.19 per ADR, or 4.1%, to close at $51.75 on October 21, 2022. ADDDF fell $8.61 per ADR, or 7.5%, to close at $105.75 on October 21, 2022.

141.    On November 27, 2022, *The Wall Street Journal* released an article entitled "Adidas Top Executives Discussed Risk of Staff's 'Direct Exposure' to Kanye West Years Ago." This article revealed that the Company's senior leadership, including Defendant Rørsted, discussed as far back as 2018 the risk of continuing a relationship with Kanye West.

142.     On this news, ADDYY fell $2.02 per ADR, or 3.13%, to close at $62.34 on

November 28, 2022. ADDDF fell $0.81 per ADR to close at $126.44 on November 28, 2022,

and then $0.44 per ADR to close at $126.00 on November 29, 2022, a 1% decline.

143.     Then, on February 9, 2023, Adidas warned that it could shift from a profit to a

loss if it should fail to sell its inventory of Yeezy shoes, following its termination of the

Partnership. Specifically, it said that it expected sales to fall at a high single-digit rate in

currency-neutral terms because of the "significant adverse impact of not selling the existing

stock" of Yeezy products. Failure to sell the stock of Yeezy's (valued at 1.2 billion euros) would

accordingly lower Company revenue by 1.2 billion euros (or about $1.29 billion), and operating

profit by 500 million euros."

144.     Further, the Company stated "[s]hould the company irrevocably decide not to

repurpose any of the existing Yeezy product going forward, this would result in the write-off of

the existing Yeezy inventory and would lower the company's operating profit by an additional €

500 million this year. In addition, adidas expects one-off costs of up to € 200 million in 2023.

These costs are part of a strategic review the company is currently conducting aimed at

reigniting profitable growth as of 2024. If all these effects were to materialize, the company

would expect to report an operating loss of € 700 million in 2023."

145.     Current CEO Bjørn Gulden commented, "[t]he numbers speak for themselves.

We are currently not performing the way we should[.] 2023 will be a year of transition to set the

base to again be a growing and profitable company. We will put full focus on the consumer, our

athletes, our retail partners and our adidas employees. Together we will work on creating brand

heat, improve our product engine, better serve our distribution and assure that adidas is a great

and fun place to work. adidas has all the ingredients to be successful: A great brand, great

44

people, fantastic partners and a global infrastructure second to none. We need to put the pieces

back together again, but I am convinced that over time we will make adidas shine again. But we

need some time."

146.    On this news, ADDYY fell $7.4, or 8.96%, to close at $75.16 on February 9,

2023. On February 10, ADDYY fell another $0.55, or 0.73%, to close at $74.61. ADDDF fell

$21.83, or 13.22%, to close at $143.23 on February 9, 2023.

147.    Then, on February 21, 2023, S&P Global announced that it was downgrading

adidas to "'A-/A-2' From A-1' On Deteriorating Credit Metrics; Outlook Negative." In

announcing this downgrade, S&P Global stated the following, in pertinent part, regarding the

Partnership:

> Ending the Yeezy partnership with Mr. West will have a stronger-than-expected hit
> on the group's operating performance in 2023. On Feb. 9, Adidas communicated
> that terminating the partnership will lower 2023 sales by €1.2 billion and operating
> profit by €500 million compared with 2022. The company now expects for 2023
> the top line will decline 7%-9% on an organic basis, with reported underlying
> operating profit at break-even. This estimate is materially worse than our previous
> base-case scenario. Based on our previous conversations with management, we
> expected Adidas could have rebranded a portion of the collection thanks to the legal
> protection on the design rights, which the group owns. However, the company's
> latest guidance factor in the scenario of not selling any existing Yeezy stock. We
> understand the company continues to review options for using the Yeezy inventory,
> and we expect a decision in the next few months. According to the group, should
> Adidas decide not to repurpose any Yeezy products, this would result in the write-
> off (noncash) of about €500 million, affecting group EBITDA. This strategy will
> have the benefit of cleaning the distribution channel and support Adidas' launch of
> new collections. However, given how profitable the Yeezy partnership has become
> over the past seven years, it will take time for the company to restore its revenues
> and EBITDA base close to 2019 levels.

148.    On this news, ADDYY fell $3.56, or 4.62%, to close at $73.59 on February 21,

2023, and ADDDF fell $4.85, or 3.17%.

149.    As a result of Defendants' wrongful acts and omissions, and the precipitous

decline in the market value of the Company's common shares, Plaintiff and other Class

members have suffered significant losses and damages. The fallout from West's public comments and the subsequent termination of the Partnership were a materialization risks Defendants concealed from investors.

## ADDITIONAL FACTS SUPPORTIVE OF SCIENTER

150.    In addition to the many scienter facts alleged above, the fraud alleged herein relates to the core business of the Company, so knowledge of the fraud may be imputed to each of the Individual Defendants. Given the Individual Defendants' knowledge or conscious disregard of West's misconduct and the risks it posed to the Partnership and the Company, the omissions and positive statements detailed above, made contemporaneously with that knowledge, were false and/or misleading. For example, a Morgan Stanley analyst report published on October 25, 2022 stated that "Yeezy is not only important for Adidas in terms of halo effect (e.g. allowing Adidas to secure shelf space at the leading retailers), it also matters from a sales (c.8%) and even more so profits (in excess of 40% of consolidated profit in 2021, we estimate)."

151.    Defendant Rorsted was motivated to mislead investors about West's misconduct and the risks it posed to the Partnership and the Company because his compensation was directly tied to both the Company's ESG performance and the Company's net income. The 2021 Report states that the performance criterion for Rorsted's performance bonus included the "[a]verage target achievement of Brand Heat, Diversity, Equity, and Inclusion, and logistics efficiency." The Board determined Rosted's degree of target achievement for this criterion was 163%, which contributed to netting Rorsted a $2,187,500 performance bonus. Rorsted also received a $4,687,500 long term variable performance bonus in 2020 for Adidas achieving a $1 billion increase in net income, the vast majority of which was attributable to the Partnership.

152.    After the Class Period, on an episode of the In Good Company podcast that aired

on September 12, 2023, new Adidas CEO Bjorn Gulden complimented and defended West. In

response to a question about the termination of the Partnership, Gulden stated:

> "I think Kanye West is one of the most creative people in the world," he said. "Both in music and what I call street culture. So he's extremely creative and has together with Adi created a Yeezy line that was very successful. And then, *as creative people, he did some statements*, which wasn't that good. And that caused Adi to break the contract and withdraw the product. *Very unfortunate, because I don't think he meant what he said and I don't think he's a bad person – it just came across that way*.

> "That meant we lost that business. One of the most successful collabs in history – very sad. But again, when you work with third parties, that could happen. It's part of the game."

153.    Gulden's comments further demonstrate that Adidas never believed its promises

to investors that the Company was committed to diversity and inclusivity. To Adidas, the only

"unfortunate" part of West's anti-Semitism and hate was the fact that he said it publicly—which

eventually forced Adidas to act. The Company would have concealed his misconduct forever, as

it did throughout the Class Period, despite knowing that West had made similar remarks to

Yeezy and Adidas employees, if doing so allowed them to sell more Yeezy shoes.

154.    Gulden's statement that he doesn't "think he meant what he said . . . it just came

across that way" is particularly galling given that West repeatedly doubled down on his anti-

Semitism. For example, on a December 1, 2022 episode of Alex Jones' *Infowars* podcast, West

made himself perfectly clear: "There's a lot of things that I love about Hitler. A lot of things."

West also stated that "[t]he Holocaust is not what happened, let's look at the facts of that, and

Hitler has a lot of redeeming qualities" and that Hitler "didn't kill 6 million Jews, that's just,

like, factually incorrect."

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

155.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired adidas securities publicly traded on the OTC markets during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of adidas, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

156.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, adidas securities were actively traded on the OTC Market. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

157.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

158.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

159.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

•    whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of adidas;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused adidas to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of adidas securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

160.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

161.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- adidas shares met the requirements for listing, and were listed and actively traded on the OTC, an efficient market;

- As a public issuer, adidas filed periodic public reports;

- adidas regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- adidas' securities were liquid and traded with moderate to heavy volume during the Class Period; and

- adidas was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

162.    Based on the foregoing, the market for adidas securities promptly digested current information regarding adidas from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

163.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

### <u>COUNT I</u>
**<u>For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder</u>**
**<u>Against All Defendants</u>**

164.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

165.    This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

166.     During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

167.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of adidas securities during the Class Period.

168.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of adidas were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of adidas, their control over, and/or receipt and/or modification of adidas' allegedly materially misleading

statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning adidas, participated in the fraudulent scheme alleged herein.

169.    Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other adidas personnel to members of the investing public, including Plaintiff and the Class.

170.    As a result of the foregoing, the market price of adidas securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of adidas securities during the Class Period in purchasing adidas securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

171.    Had Plaintiff and the other members of the Class been aware that the market price of adidas securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased adidas securities at the artificially inflated prices that they did, or at all.

172.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

173.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members

of the Class for substantial damages which they suffered in connection with their purchase of adidas securities during the Class Period.

**COUNT II**
**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

174.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

175.    During the Class Period, the Individual Defendants participated in the operation and management of adidas, and conducted and participated, directly and indirectly, in the conduct of adidas' business affairs. Because of their senior positions, they knew the adverse non-public information about adidas' false financial statements.

176.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to adidas' financial condition and results of operations, and to correct promptly any public statements issued by adidas which had become materially false or misleading.

177.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which adidas disseminated in the marketplace during the Class Period concerning adidas' results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause adidas to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of adidas within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of adidas securities.

178.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by adidas.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)    declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)    awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: December 12, 2023

**THE ROSEN LAW FIRM, P.A.**
By: */s/ Phillip Kim*
Phillip Kim
Laurence M. Rosen
Daniel Tyre-Karp
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
        lrosen@rosenlegal.com
        dtyrekarp@rosenlegal.com

*Counsel for Lead Plaintiff and the Class*

**RANSOM, GILBERTSON, MARTIN & RATLIFF, LLP**
Jeffrey S. Ratliff
5441 S. Macadam Avenue, Suite 301
Portland, OR 97239
T: 503-226-3664

*Liaison Counsel for Lead Plaintiff and the Class*