**Matthew A. Levin, OSB #003054**
mattlevin@markowitzherbold.com
**Chad M. Colton, OSB #065774**
chadcolton@markowitzherbold.com
**Stanton R. Gallegos, OSB #160091**
stantongallegos@markowitzherbold.com
**MARKOWITZ HERBOLD PC**
1455 SW Broadway, Suite 1900
Portland, Oregon 97201
(503) 295-3085

**Maeve O'Connor**, *pro hac vice*
moconnor@debevoise.com
**Elliot Greenfield**, *pro hac vice*
egreenfield@debevoise.com
**Brandon Fetzer**, *pro hac vice*
bfetzer@debevoise.com
**DEBEVOISE & PLIMPTON LLP**
66 Hudson Boulevard
New York, New York 10001
(212) 909-6000

*Attorneys for adidas AG*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| HRSA-ILA Funds, Individually and on behalf of all others similarly situated,<br><br>                                 Plaintiff,<br><br>    v.<br><br>ADIDAS AG, KASPER RØRSTED, and HARM OHLMEYER,<br><br>                             Defendants. | No. 3:23-cv-00629-IM<br><br>**ADIDAS AG'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**<br><br>**REQUEST FOR ORAL ARGUMENT** |

**ADIDAS AG'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

CERTIFICATE OF COMPLIANCE............................................................................................. 1

MOTION.................................................................................................................................... 1

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS ......................................................................................................... 3

I.      THE PARTIES AND RELEVANT NON-PARTIES. ...................................................... 3

II.     THE ADIDAS-YEEZY COLLABORATION. ................................................................ 4

III.    RISK DISCLOSURES ................................................................................................... 6

IV.     STATEMENTS REGARDING DIVERSITY AND INCLUSION, ANTI-
        HARASSMENT AND SUSTAINABILITY. ................................................................... 7

V.      ADIDAS TERMINATES THE PARTNERSHIP WITH YEEZY. .................................... 9

VI.     PLAINTIFF'S CLAIMS. .............................................................................................. 10

ARGUMENT ........................................................................................................................... 11

I.      PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 10(b)........................... 11

        A.      Plaintiff Fails to Plead an Actionable Misrepresentation. ................................... 12

                1.      The Risk Disclosures Are Not False or Misleading................................. 13

                2.      Mr. Rørsted's Statements Are Not False or Misleading. ......................... 15

                3.      The Statements Concerning Commitment to Diversity and
                        Inclusion Are Not Actionable Under the Securities Laws....................... 15

                4.      Plaintiff Fails to Identify Any Independent Duty to Disclose Ye's
                        Prior Misconduct..................................................................................... 17

        B.      Plaintiff Fails to Plead Scienter............................................................................ 18

        C.      Plaintiff Fails to Plead Loss Causation. ............................................................... 20

II.     THE SAC SHOULD BE DISMISSED WITH PREJUDICE. .......................................... 22

CONCLUSION ........................................................................................................................ 22

**i - ADIDAS AG'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

# TABLE OF AUTHORITIES

**Cases**

*Axial Vector Engine Corp. v. Transporter, Inc.*,
  2008 WL 4547795 (D. Or. Oct. 9, 2008)...................................................................11

*Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*,
  964 F. Supp. 2d 1128 (N.D. Cal. 2013) ...................................................................14

*City of Pontiac Gen. Emps.' Ret. Sys. v. Bush*,
  2022 WL 1467773 (N.D. Cal. Mar. 1, 2022)...........................................................15

*Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*,
  433 F. Supp. 3d 515 (S.D.N.Y. 2020).....................................................................14

*Gompper v. VISX, Inc.*,
  298 F.3d 893 (9th Cir. 2002) ..................................................................................11

*Heliotrope Gen., Inc. v. Ford Motor Co.*,
  189 F.3d 971 (9th Cir. 1999) ....................................................................................3

*In re Dropbox Sec. Litig.*,
  2020 WL 6161502 (N.D. Cal. Oct. 21, 2020)...........................................................17

*In re Nektar Therapeutics Sec. Litig.*,
  34 F.4th 828 (9th Cir. 2022) ..............................................................................20, 21

*In re Rigel Pharms., Inc. Sec. Litig.*,
  697 F.3d 869 (9th Cir. 2012) ..................................................................................20

*In re Twitter, Inc. Sec. Litig.*,
  506 F. Supp. 3d 867 (N.D. Cal. 2020) .....................................................................19

*Irving Firemen's Relief & Ret. Fund v. Uber Techs.*,
  398 F. Supp. 3d 549 (N.D. Cal. 2019) .....................................................................14

*Loos v. Immersion Corp.*,
  762 F.3d 880 (9th Cir. 2014) ..............................................................................20, 21

*Marder v. Lopez*,
  450 F.3d 445 (9th Cir. 2006) ....................................................................................3

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
  540 F.3d 1049 (9th Cir. 2008) ........................................................................11, 12, 21

*Ocegueda v. Zuckerberg*,
    526 F. Supp. 3d 637 (N.D. Cal. 2021) ...................................................................16

*Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
    774 F.3d 598 (9th Cir. 2014) ................................................................................21

*Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*,
    52 F. Supp. 3d 961 (N.D. Cal. 2014) .....................................................................16

*Scandlon v. Blue Coat Sys., Inc.*,
    2013 WL 308879 (N.D. Cal. Jan. 25, 2013) ..........................................................12

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
    552 U.S. 148 (2008) ..............................................................................................11

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) ..............................................................................................18

*W. Penn. Elec. Emps. Pension Fund v. Mentor Graphics Corp.*,
    2017 WL 3668957 (D. Or. June 2, 2017) ..............................................................17

*Xiaojiao Lu v. Align Tech., Inc.*,
    417 F. Supp. 3d 1266 (N.D. Cal. 2019) .................................................................19

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ...........................................................................18, 19

**Statutes**

15 U.S.C. § 78u-4(b)(1) .............................................................................................11

15 U.S.C. § 78u-4(b)(2)(A).................................................................................11, 18

## CERTIFICATE OF COMPLIANCE

In compliance with Local Rule 7-1(a)(1), counsel for the parties made a good faith effort, by telephone conferral on January 19, 2024, to resolve the disputes that are the subject of this motion and have been unable to do so.

## MOTION

Defendant adidas AG ("adidas" or the "Company") hereby moves to dismiss the Second Amended Complaint ("SAC") filed by Plaintiff HRSA-ILA Funds with prejudice for failure to state a claim upon which relief can be granted pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4. In support of this motion, adidas relies on the following memorandum of points and authorities and the accompanying declaration of Brandon Fetzer.

## PRELIMINARY STATEMENT

This lawsuit is a misguided attempt to transform the dramatic and unfortunate end of the commercial partnership between adidas and Ye, the musician and designer formerly known as Kanye West, into a claim for securities fraud. After nearly a decade of collaborating to produce the enormously profitable "adidas Yeezy" line of footwear, the business relationship between adidas and Ye publicly imploded in the fall of 2022, after Ye accused adidas of "stealing" his designs, wore a t-shirt with the white supremacist slogan "White Lives Matter" to a Paris fashion show, and made a series of hateful, antisemitic statements over social media. Plaintiff opportunistically takes those unfortunate events and asserts, without basis, that earlier statements by adidas – primarily broad, robust risk disclosures and expressions of its commitment to diversity and inclusion – were somehow fraudulent. The federal securities laws do not permit such claims of "fraud by hindsight."

**1 - ADIDAS AG'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

Although Ye's reprehensible public conduct and the end of the adidas-Yeezy partnership were unfortunate for many reasons, Plaintiff falls far short of pleading securities fraud. The SAC should be dismissed because Plaintiff fails to plead the core elements of a securities fraud claim: a false or misleading statement, facts giving rise to a strong inference of scienter (*i.e.*, intent to defraud), and loss causation.

*First*, Plaintiff fails to plead that adidas made any false or misleading statement. As the SAC makes clear, adidas issued comprehensive risk disclosures in all of its annual reports from 2018 forward that expressly warned investors about numerous issues, including the potential negative impact of a creative partner's inappropriate conduct – *precisely* what Plaintiff alleges occurred with Ye in October 2022. Plaintiff's assertion that those same risk disclosures somehow misled investors turns the securities laws on their head. Although Plaintiff alleges that adidas knew of discrete instances of misconduct by Ye from years earlier, there is no legal obligation to accompany broad risk disclosures with a description of prior incidents of inappropriate behavior. The same is true for the other alleged misstatements alleged in the SAC: then-CEO Kaspar Rørsted's response to Ye's 2018 public statement that slavery was a "choice" and various expressions by adidas of its commitment to diversity, inclusion, anti-harassment and sustainability.

*Second*, Plaintiff fails to plead scienter because the SAC does not state particularized facts giving rise to the required "strong inference" that adidas made false or misleading statements intentionally or with deliberate recklessness. Plaintiff alleges no specific facts supporting an inference that adidas knew or believed that Ye's inappropriate conduct years earlier would lead to the termination of the partnership in 2022. Indeed, the SAC contains no allegations of any similar misconduct by Ye for the four years prior to the termination of the

**2 - ADIDAS AG'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

partnership.  Securities claims cannot be based on such allegations of "fraud by hindsight."  The far more compelling inference to be drawn from the factual allegations in the SAC is that adidas believed it was successfully managing the sometimes difficult partnership with Yeezy.

*Third*, Plaintiff fails to plead loss causation because there is no causal relationship between the alleged misrepresentations and the declines in adidas's stock price.  None of the events that Plaintiff alleges caused adidas's stock price to decline revealed any fraudulent conduct.

The Court should dismiss the SAC with prejudice.

## STATEMENT OF FACTS[1]

### I.    THE PARTIES AND RELEVANT NON-PARTIES.

Defendant adidas is a sports footwear and apparel company headquartered in Germany with its North American headquarters in Portland, Oregon.  (SAC ¶ 20.)

Plaintiff also names Kasper Rørsted and Harm Ohlmeyer as defendants, but neither of those individuals has appeared in this action (or has been served).  Mr. Rørsted served as adidas's CEO from 2016 to November 11, 2022.  (SAC ¶ 21.)  Mr. Ohlmeyer served as its CFO from 2017 and as its interim CEO from November 12, 2022 through December 31, 2022. (SAC ¶ 22.)

---

[1]    The factual allegations in the SAC are taken as true solely for the purpose of this motion, except where those allegations contradict the contents of adidas's annual reports and other documents cited in the SAC.  *See Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) ("The court may treat . . . a document [referenced in the complaint] as part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6).").  Furthermore, the Court may take judicial notice of the news articles cited by adidas not for their truth, but for the fact that the "market was aware" of information contained therein.  *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 980-81 n.18 (9th Cir. 1999).  The Company requests that the Court take judicial notice of the documents attached as exhibits to the accompanying Declaration of Brandon Fetzer, which are cited as "Ex. __."

**3 - ADIDAS AG'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

Ye, formerly known as Kanye West, is a musical artist and fashion designer.  (SAC ¶ 28.) Ye controls or owns Yeezy, LLC, Yeezy Marketing LLC, and Yeezy Footwear LLC (collectively, "Yeezy"), the corporate entities that entered into a business relationship with adidas.  (SAC ¶¶ 28, 33, 36-37.)

## II.    THE ADIDAS-YEEZY COLLABORATION.

Ye and Yeezy first collaborated with adidas to create a line of footwear in 2013. (SAC ¶ 33.)  The collaboration was immediately fruitful – in 2015, the first Yeezy sneaker was released and promptly named the "Shoe of the Year" at the Footwear News Achievement Awards, which is considered to be the "Shoe Oscars."  (SAC ¶¶ 34-35.)  By 2016, adidas proclaimed that the partnership was "the most significant partnership ever created between a non-athlete and an athletic brand."  (SAC ¶ 36.)  The Yeezy brand was commercially successful, generating tremendous profits for adidas and its investors, with net sales reaching $300 million in 2017 and over $1 billion in 2019.  (SAC ¶¶ 39-40.)

Despite this commercial and critical success, the relationship with Ye was not without its challenges.  Plaintiff alleges that Ye engaged in inappropriate behavior during the early part of the adidas-Yeezy relationship, from 2013 to 2018.  In 2013, Ye allegedly showed pornography to adidas executives during a meeting.  (SAC ¶ 58.)  A few weeks later, during a meeting at adidas's German headquarters, Ye allegedly "drew a swastika on the top of a shoe."  (SAC ¶ 58.) In 2015, Ye allegedly used "sexually explicit language" with an adidas employee.  (SAC ¶ 69.) In 2018, Ye allegedly paid a $5 million settlement to a Yeezy employee in connection with antisemitic statements, and adidas management was allegedly informed that he had done so. (SAC ¶ 64.)

**4 - ADIDAS AG'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

Plaintiff's allegations indicate that adidas took those incidents seriously.  In October 2018, adidas executives met to discuss the future of the Company's partnership with Ye. (SAC ¶ 59.)  After considering various alternatives, including termination, adidas chose to dedicate more resources to the relationship with Ye in order to better manage it.  (SAC ¶¶ 59-61.)  Plaintiff's allegations further indicate that this strategy succeeded.  The SAC does not allege any similar misconduct by Ye between the October 2018 meeting and the events four years later that led to the termination of the partnership.[2]

Other instances of Ye's problematic conduct played out in the public arena; indeed, Ye is undeniably one of the most closely watched pop-culture figures of the last decade, particularly during the period of time when he was married to Kim Kardashian.  In 2013, for example, Ye publicly stated that "Black people don't have the same level of connections as Jewish people," a statement that was decried by the Anti-Defamation League as "classic antisemitism."  (Ex. 1.)  In 2015, Ye proclaimed in an interview for *The Guardian* that "racism is a dated concept."  (Ex. 2.) And in 2018, Ye made the profoundly offensive statement, cited in the SAC, that slavery in the United States was a "choice" for enslaved persons.  (SAC ¶ 97.)  Ye continued to offer his views on slavery in 2020 when, during a rally for his short-lived presidential candidacy, he criticized Harriet Tubman, stating that she "never actually freed the slaves" and "just had them work for other white people."  (Ex. 3.)

Regarding Ye's 2018 statement about slavery, Mr. Rørsted made clear in an interview that while Ye "has been and is a very important part of our strategy and has been a fantastic creator," he made "comments we don't support."  (SAC ¶ 98.)  In a subsequent interview,

---

[2]    Plaintiff's allegation that, in 2019, Ye "threw a tantrum" over where the Yeezy team should be located does not implicate concerns regarding racism or antisemitism.  (SAC ¶ 71.)

**5 - ADIDAS AG'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

Mr. Rørsted reiterated that adidas was "not signing up to his statements; we're signing up to what he brings to the brand and the products he's bringing out."  (SAC ¶ 103.)

## III.     RISK DISCLOSURES.

In its Annual Reports, adidas thoroughly disclosed the risks of working with creative business partners, such as Ye.  As relevant here, adidas warned investors of risks regarding its business partners ("Business Partner Risk"), key personnel ("Personnel Risk"), and relating to media and stakeholders ("Media Risk").  (SAC ¶¶ 105-09, 127-28.)

The Business Partner Risk disclosures specifically cautioned that "[u]nethical business practices on the part of business partners or *improper behavior of individual athletes, influencers or partners in the entertainment industry* could have a negative spill-over effect on the company's reputation, lead to higher costs or liabilities or even *disrupt business activities*." (SAC ¶ 107 (emphasis added).)  As one way to mitigate such risks, adidas explained that it "generally include[s] clauses in contractual agreements with athletes, clubs and federations or other partners that allow us to suspend or even terminate our partnership in case of improper or unethical conduct," which is the type of clause that adidas ultimately invoked to end its partnership with Ye.[3]  (*Id.*)

The Company's Personnel Risk disclosures warned investors that "the failure to install and maintain a performance-oriented culture that fosters diversity and inclusion and strong employee engagement amongst our workforce" could "substantially impede" the Company's ability to achieve its business goals.[4]  (SAC ¶ 109.)

---

[3]    The 2019-2021 Business Partnership Risk disclosures used similar language.  (SAC ¶ 111; *see also* Ex. 6 at 184; Ex. 7 at 201.)

[4]    The 2019-2021 Personnel Risk disclosures used similar language.  (SAC ¶ 111; *see also* Ex. 5 at 128; Ex. 6 at 185; Ex. 7 at 202.)

**6 - ADIDAS AG'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

And, in its Media Risk disclosures, adidas warned that "[a]dverse or inaccurate media coverage on our products or business practices as well as negative social media discussion may significantly harm the adidas reputation and brand image, lead to public misperception of the company's business performance and eventually result in a sales slowdown."  (SAC ¶ 128.)

In addition to those risk disclosures, adidas's Annual Reports included a description of its Compliance Management System, which, among other things, was designed to "preserve diversity by fighting harassment and discrimination."  (SAC ¶ 110.)  The Compliance Management disclosures explained that "[a]ppropriate and timely response to compliance violations is essential," and that adidas "track[s], monitor[s], and report[s] potential incidents of non-compliance worldwide" and "react[s] promptly to confirmed compliance violations, through appropriate and effective sanctions ranging from warnings to termination of employment contracts."[5]  (*Id.*)

## IV.  STATEMENTS REGARDING DIVERSITY AND INCLUSION, ANTI-HARASSMENT AND SUSTAINABILITY.

Plaintiff also alleges as purported misstatements a number of expressions by adidas of its commitment to diversity and inclusion, anti-harassment and sustainability, both in its Annual Reports and in a handful of press releases.

In 2018 and 2019, adidas issued press releases notifying the public that it was one of the companies included in the Dow Jones Sustainability Index (the "DJSI").  (SAC ¶¶ 101, 113.) The two press releases contained similar language and explained that adidas "was rated as industry leader in corporate economic, environmental and social dimensions," and that the DJSI

---

[5]    The 2019-2021 Compliance Management disclosures used similar language to the 2018 disclosure.  (SAC ¶ 111; Ex. 5 at 122-23; Ex. 6 at 177-78; Ex. 7 at 195-96.)

**7 - ADIDAS AG'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

was "based on a thorough analysis of corporate economic, environmental and social

performance." *Id.*

On June 9, 2020, shortly after the murder of George Floyd, adidas issued a press release,

with a statement from Mr. Rørsted:

> The events of the past two weeks have caused all of us to reflect on
> what we can do to confront the cultural and systemic forces that
> sustain racism.  We have had to look inward to ourselves as
> individuals and our organization and reflect on systems that
> disadvantage and silence Black individuals and communities. . . .
> While we have talked about the importance of inclusion, we must
> do more to create an environment in which all of our employees
> feel safe, heard and have equal opportunity to advance their
> careers.  At adidas, we will create a lasting change and we will do
> it now.

(Ex. 8.)  In the SAC, Plaintiff twists that statement out of context and seeks to attach it to Ye's

alleged misconduct as opposed to the "systems that disadvantage and silence Black individuals

and communities" that were its express subject.  (SAC ¶¶ 118-19.)

Over the course of the following year, adidas provided updates on the steps it was taking

to "create a lasting change":

- On August 28, 2020, adidas issued a press release announcing a series of
  additional commitments, including establishing a global committee "to focus on
  the advancement of underrepresented groups and drive company-wide change"
  and strengthening its anti-discrimination and non-retaliation policy.  (SAC ¶ 120;
  Ex. 9.)

- On February 25, 2021, adidas announced that nearly all adidas employees had
  completed extensive "Creating a Culture of Inclusion" training totaling
  approximately 30 hours "in which employees explore[d] critical topics including
  diversity dimensions, unconscious biases, privilege and microaggressions."  At
  the same time, adidas announced that its anti-discrimination and non-retaliation
  policy was strengthened to provide "clear guidance on how the company will
  respond to harassment, discrimination, disrespectful conduct and retaliation."
  (SAC ¶ 122; Ex. 10.)

- On June 2, 2021, adidas announced, among other things, that "[a]ll corporate
  employees have now completed" the Creating a Culture of Inclusion training.
  (SAC ¶ 130; Ex. 11.)

**8 - ADIDAS AG'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

- On June 14, 2022, adidas announced that "[e]quity has been newly added to our diversity and inclusion commitment in 2021" and that adidas is "committed to eliminating bias and creating an equal playing field for each of our employees, irrespective of their diversity and intersectionality." (SAC ¶ 135; Ex. 12.)

In its 2020 Annual Report, issued on March 10, 2021, adidas again expressed its commitment to the values of diversity, equity, and inclusion, stating that the Company "ha[s] always been and will always be against discrimination in all forms and stand united against racism." (SAC ¶ 126.) The Company restated this commitment to the values of diversity, equity, and inclusion in its 2021 Annual Report. (Ex. 7 at 104-06.)

## V.    ADIDAS TERMINATES THE PARTNERSHIP WITH YEEZY.

Four years or more after the incidents of misconduct alleged in the SAC, Ye's conduct spiraled out of control in the fall of 2022, ultimately leading adidas to conclude that a partnership with Yeezy was no longer tenable. (SAC ¶ 55.)

In September 2022, based on unfounded allegations that adidas had "stolen" Ye's designs, Ye made a series of Instagram posts in which he targeted, threatened, insulted, and disparaged adidas and its employees and encouraged his massive following on social media to boycott adidas. (Ex. 13.) Ye's public statements then escalated beyond disparaging adidas and turned blatantly racist and antisemitic, beginning with a high-profile appearance at his own fashion show during Paris Fashion Week on October 3, 2022, at which Ye wore a t-shirt emblazoned with the white supremacist slogan "White Lives Matter." (SAC ¶ 43.) Three days later, adidas announced that it was placing its relationship with Ye under review. (SAC ¶ 44.)

Ye responded on Instagram: "FUUUUUUCK ADIDAS I AM ADIDAS ADIDAS RAPED AND STOLE MY DESIGNS." (SAC ¶ 45.) The next day, Ye posted a screenshot of a text message exchange purportedly between Ye and Sean "Diddy" Combs, in which Ye warned Diddy: "Ima use you as an example to show the Jewish people that . . . no one can threaten or

**9 - ADIDAS AG'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

influence me." (SAC ¶ 46.)  The day after that, on October 9, Ye posted on his 31-million-follower Twitter account:  "[W]hen I wake up I'm going death con 3 on JEWISH PEOPLE." (SAC ¶ 47.)  Then, as if to deliberately provoke adidas, Ye boasted on the popular "Drink Champs" internet show and podcast that "I can literally say anti-Semitic shit and [adidas] can't drop me."  (SAC ¶ 52.)  He added that he has "gotten used to getting screwed by the Jewish media" and that "the Jewish media blocked me out."  (*Id.*)

On October 25, adidas announced that it had decided to "terminate the partnership with Ye immediately," stating that "Ye's recent comments and actions have been unacceptable, hateful and dangerous, and they violate the company's values of diversity and inclusion, mutual respect and fairness."  (SAC ¶ 55.)

## VI.    PLAINTIFF'S CLAIMS.

Following the Company's termination of its partnership with Ye, Plaintiff filed this lawsuit asserting claims against adidas under Section 10(b) of the Securities Exchange Act of 1934.  Plaintiff cites three categories of statements in support of its claims:

- adidas's warnings regarding Business Partner Risk, Personnel Risk, and Media Risk (SAC ¶¶ 105-111, 115-16, 124-28, 132-33);

- Mr. Rørsted's responses to Ye's 2018 statement regarding slavery (SAC ¶ 98-99, 103); and

- adidas's expressions of its commitment to diversity and inclusion, anti-harassment and sustainability (SAC ¶¶ 101, 113, 118, 120, 122, 130, 135).

Plaintiff asserts that all of those statements were "false and/or misleading" because they failed to disclose certain discrete incidents of offensive conduct by Ye that occurred four years or more prior to the termination.

**10 - ADIDAS AG'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

## ARGUMENT

### I.    PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 10(b).

The Court should dismiss Plaintiff's Section 10(b) claim because Plaintiff fails to plead (*i*) an actionable misstatement or omission, (*ii*) scienter, and (*iii*) loss causation. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008) (listing elements of a Section 10(b) claim). Plaintiff's Section 10(b) claim is subject to a demanding heightened pleading standard under both Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA").

The PSLRA goes far beyond Rule 9(b) and imposes "formidable pleading requirements to properly state a claim" for securities fraud. *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1055 (9th Cir. 2008). Indeed, "the strict pleading requirements demanded by the PSLRA cannot be overstated"; it is "demanding and exacting." *Axial Vector Engine Corp. v. Transporter, Inc.*, 2008 WL 4547795, at *6 (D. Or. Oct. 9, 2008). This strict pleading reflects the purpose of the PSLRA, which is "to eliminate abusive and opportunistic securities litigation and to put an end to the practice of pleading fraud by hindsight." *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002).

Under the PSLRA, adequately pleading the element of falsity requires Plaintiff to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). To adequately plead the element of scienter (intent to defraud), Plaintiff must – with respect to each alleged misstatement – "state *with particularity* facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added).

**11 - ADIDAS AG'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

A.    **Plaintiff Fails to Plead an Actionable Misrepresentation.**

Plaintiff fails to plead that any of the alleged misstatements – adidas's risk disclosures, Mr. Rørsted's 2018 statements, or the Company's statements regarding diversity and inclusion, anti-harassment and sustainability – are false or misleading.

Plaintiff's claims fail at that threshold because Plaintiff makes no attempt to satisfy the PSLRA's exacting requirements for pleading falsity.  Instead, Plaintiff merely recites a long list of public statements, often large block quotations, and repeats the exact same boilerplate language as to why all of those statements are supposedly "false and/or misleading." (SAC ¶¶ 100, 102, 104, 112, 114, 117, 119, 121, 123, 129, 131, 134, 136.)  "A litany of alleged false statements, unaccompanied by the pleading of *specific fact*s indicating why those statements were false" does not satisfy the PSLRA.  *Metzler*, 540 F.3d at 1070 (9th Cir. 2008) (emphasis added) (affirming dismissal where plaintiffs failed to specify how and why a "far-ranging collection" of statements were false); *see also Scandlon v. Blue Coat Sys., Inc.*, 2013 WL 308879, at *3 (N.D. Cal. Jan. 25, 2013) ("Merely quoting long passages from various public statements, even with the use of bold face type to emphasize certain phrases, is not a substitute for identifying what representations allegedly were false and why.").

As discussed below, to the extent that Plaintiff identifies alleged misstatements, they are not actionable under the securities laws:  adidas's thorough and relevant risk disclosures, Mr. Rørsted's truthful responses to Ye's 2018 slavery comment, and broad statements of the Company's commitment to diversity and inclusion, anti-harassment, and sustainability.  Nor does Plaintiff identify any independent duty to detail prior incidents of misconduct by Ye.

1.    **The Risk Disclosures Are Not False or Misleading.**

Plaintiff's attempt to base a securities fraud claim on adidas's risk disclosures –
statements consistently made over a four-year period that warned investors of exactly what
occurred with Ye in 2022 – makes no sense and has no basis in the law.

The robust disclosures issued by adidas cautioned investors about numerous risks that
could impact the Company's performance, including Business Partner Risk, Personnel Risk, and
Media and Stakeholder Risk.  In particular, the Company's disclosure regarding Business Partner
Risk warned investors of precisely the type of occurrence that Plaintiff alleges regarding Ye in
the fall of 2022.  adidas warned that it was "exposed to a multitude of business partner risks,"
including that the "improper behavior of . . . partners in the entertainment industry could have a
negative spill-over effect on the company's reputations, lead to higher costs or liabilities or even
disrupt business activities."  (SAC ¶ 107.)  Furthermore, the disclosure describes the exact risk
mitigation mechanism that adidas ultimately invoked when it terminated the Yeezy partnership
in October 2022, explaining that adidas's contracts with third parties include clauses allowing the
Company "to suspend or even terminate our partnership in case of improper or unethical
conduct."  (*Id.*)

Similarly, the Personnel Risk Disclosures warned investors that the "failure to install and
maintain a performance-oriented culture that fosters diversity and inclusion and strong employee
engagement amongst our workforce could also substantially impede our ability to achieve our
goals."  (SAC ¶ 109.)  And, as Plaintiff admits, the Media and Stakeholder Risk Disclosures
contemplated precisely the sort of negative press coverage of Ye that ultimately emerged; they
warned that "adverse" media coverage and "negative social media discussion may significantly
harm the adidas reputation and brand image."  (SAC ¶ 128.)

**13 - ADIDAS AG'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

Nothing in adidas's risk disclosures states, or even implies, that Ye or any other partner had never engaged in any inappropriate or problematic conduct. Accordingly, those disclosures are not misleading merely because they do not specifically describe each instance of Ye's past misconduct, as Plaintiff suggests. (SAC ¶¶ 112, 117, 129, 134.) Courts have rejected such assertions in similar cases, where risk warnings do not detail the misconduct of specific individuals or quantify the risk that a specific individual would leave the company. *See*, *e.g.*, *Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*, 433 F. Supp. 3d 515, 537-38 (S.D.N.Y. 2020) (holding that CBS's risk disclosures of potential consequences of CEO's termination were not false or misleading where the disclosures "did not state or suggest that [CEO] had always behaved appropriately" or "purport to assess the likelihood that he would leave [CBS] or be implicated in accusations of misconduct"); *Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*, 964 F. Supp. 2d 1128, 1141 (N.D. Cal. 2013) (holding that HP's risk disclosures warning regarding loss of executives and key employees were not false or misleading because they failed to disclose a CEO's prior misconduct).

For the same reason, the risk disclosures did not give rise to a duty to disclose Ye's prior misconduct. *See Irving Firemen's Relief & Ret. Fund v. Uber Techs.*, 398 F. Supp. 3d 549, 557 (N.D. Cal. 2019) (holding that Uber's "generic" risk disclosure regarding reputational harm "does not give rise to a duty to disclose" the existence of past events that could cause "possible reputational harms"), *aff'd*, 998 F.3d 397 (9th Cir. 2021); *Hewlett Packard*, 964 F. Supp. 2d at 1141 (holding that risk disclosures did not "create a duty to disclose [CEO's] alleged violations of the code of ethics"). To hold otherwise would improperly render every company "liable to every investor for every act that . . . harmed reputation," whenever it acknowledges the possibility of future reputational harm. *Uber Techs.*, 398 F. Supp. 3d at 557.

**14 - ADIDAS AG'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

2.      **Mr. Rørsted's Statements Are Not False or Misleading.**

Plaintiff identifies nothing that is false or misleading about Mr. Rørsted's comments regarding Ye's highly offensive May 2018 statement that "slavery . . . sounds like a choice" for enslaved individuals.  (SAC ¶¶ 98-99, 103.)  Mr. Rørsted stated that, although Ye "has been and is a very important part of our strategy and has been a fantastic creator," there "clearly are some comments we don't support."  (SAC ¶ 98.)  Mr. Rørsted made the same point in a later interview, stating that adidas was supportive of Ye "in many ways" but did not agree with "every statement" he made:  "We're not signing up to his statements; we're signing up to what he brings to the brand and the products he's bringing out."  (SAC ¶ 103.)  Those statements accurately reflect the Company's position, and Plaintiff alleges nothing to the contrary.  If anything, this public episode merely confirms that the public was well aware of any risk that Ye's conduct posed to the adidas-Yeezy partnership.

3.      **The Statements Concerning Commitment to Diversity and Inclusion
        Are Not Actionable Under the Securities Laws.**

None of adidas's statements expressing its commitment to the values of diversity and inclusion can form the basis of a claim for securities fraud.  (SAC ¶¶ 101, 110, 113, 118, 120, 122, 126, 130, 135.)  They consist of (*i*) broad aspirational statements that, under the securities laws, are considered inactionable "puffery," and (*ii*) true statements of historical fact regarding adidas's efforts to promote diversity and inclusion.  Those statements do not represent that Ye, or any other business partner, had always acted in a manner consistent with adidas's diversity, inclusion, and anti-harassment goals.

*First*, courts have consistently held that aspirational expressions of a company's values are not the type of statement on which investors reasonably rely and therefore are not actionable under the federal securities laws.  *See*, *e.g.*, *City of Pontiac Gen. Emps.' Ret. Sys. v. Bush*, 2022

**15 - ADIDAS AG'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

WL 1467773, at *4 (N.D. Cal. Mar. 1, 2022) (holding that the statement "[d]iversity, inclusion, collaboration, and technology are fundamental to who we are" was "aspirational" and thus non-actionable); *Ocegueda v. Zuckerberg*, 526 F. Supp. 3d 637, 651 (N.D. Cal. 2021) (holding that diversity statements from Facebook's annual report constituted non-actionable puffery); *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 52 F. Supp. 3d 961, 970 n.2 (N.D. Cal. 2014) (holding that the statement "[l]et us commit together, as individuals and as a company, to build trust in everything we do by living our values and conducting business consistent with the high ethical standards" to be non-actionable), *aff'd*, 845 F.3d 1268 (9th Cir. 2017).

The alleged statements regarding diversity and inclusion are aspirational in nature:

- June 9, 2020 statement after the death of George Floyd that adidas will "create a lasting change" (SAC ¶ 118; Ex. 8);

- August 28, 2020 statement the Company "do[es] not tolerate discrimination of any kind" (SAC ¶ 120; Ex. 9);

- Statements in the 2020 Annual Report that adidas "ha[s] always been and will always be against discrimination in all forms and stand united against racism," a description of "what diversity and inclusion mean to us as a company," and areas of "strategic focus" (SAC ¶ 126); and

- June 14, 2022 statement that "[e]quity has been newly added to our diversity and inclusion commitment in 2021" and that the Company was "committed to eliminating bias and creating an equal playing field for each of our employees, irrespective of their diversity and intersectionality" (SAC ¶ 135; Ex. 12).

Again, Plaintiff offers only the same, repeated allegation as to why these statements were "false and/or misleading." (SAC ¶¶ 119, 121, 129, 136.)

*Second*, Plaintiff cannot base a securities fraud claim on accurate statements of historical fact:

- September 13, 2018 and September 16, 2019 announcements that adidas had been included in the Dow Jones Sustainability Indices (SAC ¶¶ 101, 113);

**16 - ADIDAS AG'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

- Description of certain elements and operations of its Compliance Management System in its 2018 Annual Report (SAC ¶ 110); and

- Statements in press releases regarding concrete steps the Company had taken in furtherance of its "Inclusion & Equality Commitments," including the formation of a global committee, strengthening of its anti-discrimination and non-retaliation policy, launching and completion of diversity trainings, and the creation of policies for responding to "harassment, discrimination, disrespectful conduct and retaliation" (SAC ¶¶ 120, 122, 130; Exs. 9, 10, 11).

Plaintiff alleges no facts indicating that any of those statements was false or misleading in any respect. (SAC ¶¶ 102, 112, 114, 121, 123, 131.) It is axiomatic that "accurate and non-misleading statements of contemporaneous or historical fact" are "not actionable under Section 10(b) or Rule 10b-5." *W. Penn. Elec. Emps. Pension Fund v. Mentor Graphics Corp.*, 2017 WL 3668957, at *30 (D. Or. June 2, 2017), *R&R adopted*, 2017 WL 3622779 (D. Or. Aug. 23, 2017); *see also In re Dropbox Sec. Litig.*, 2020 WL 6161502, at *7 (N.D. Cal. Oct. 21, 2020) (stating that courts have consistently "refused to find disclosure of accurate historical data misleading").

### 4.    Plaintiff Fails to Identify Any Independent Duty to Disclose Ye's Prior Misconduct.

Unable to identify a false or misleading statement, Plaintiff asserts – incorrectly – that the European Union's Non-Financial Reporting Directive ("NFRD") and the Global Reporting Initiative's ("GRI") guidelines imposed a duty to disclose Ye's prior incidents of misconduct. (SAC ¶¶ 77, 84.) No court has held that the provisions cited by Plaintiff give rise to disclosure obligations that are actionable under the federal securities laws. And, in any event, neither framework requires adherents to identify specific incidents of misconduct, by business partners or otherwise. The NFRD merely requires companies to disclose "the principal risks related to those matters linked to the group's operations . . . and how the group manages those risks." Council Directive 2014/95, art. 1, 2014 O.J. (L 330) 6 (EU). Likewise, the GRI's "Core" standards recommend that a company's disclosures "reflect significant . . . social impacts" and

**17 - ADIDAS AG'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

that the reported information "be sufficiently accurate and detailed for stakeholders to assess the

reporting organization's performance" and "reflect positive and negative aspects" of that

performance.  Global Sustainability Standards Board, GRI 101 §§ 1.4-1.6.  They also suggest

that organizations report "key topics and concerns that have been raised through stakeholder

engagement, including[] how the organization has responded to those key topics and concerns."

Global Sustainability Standards Board, GRI 102 § 44.  The Company's Annual Reports easily

satisfied the NFRD requirements and GRI guidelines by providing in their "Risk and

Opportunity" sections (and elsewhere throughout each Annual Report) both detailed

explanations of various risk categories, and the steps taken to mitigate each of those risks.  (*See*,

*e.g.*, Ex. 4 at 131-43; Ex. 5 at 120-29; Ex. 6 at 172-89; Ex. 7 at 190-208.)

> **B.**    **Plaintiff Fails to Plead Scienter.**

Plaintiff falls far short of the PSLRA's requirement that it "state with particularity facts

giving rise to a *strong inference* that the defendant acted with the required state of mind,"

15 U.S.C. § 78u-4(b)(2)(A) (emphasis added) – *i.e.*, that adidas "made false or misleading

statements either intentionally or with deliberate recklessness."  *Zucco Partners, LLC v.

Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009) (internal quotations omitted).  To qualify as

"strong," the inference of scienter "must be more than merely reasonable or permissible – it must

be cogent and compelling" and "at least as compelling as any opposing inference one could draw

from the facts alleged."  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007)

(internal quotations omitted).  Accordingly, courts analyzing scienter "must compare the

malicious and innocent inferences cognizable from the facts pled in the complaint, and only

allow the complaint to survive a motion to dismiss if the malicious inference is at least as

compelling as any opposing innocent inference."  *Zucco Partners*, 552 F.3d at 991.  To plead

scienter, "the complaint must contain allegations of specific contemporaneous statements or

conditions that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." *Xiaojiao Lu v. Align Tech., Inc.*, 417 F. Supp. 3d 1266, 1279 (N.D. Cal. 2019) (internal quotations omitted). Pleading "deliberate recklessness" requires specific factual allegations showing "a *highly unreasonable omission*, involving . . . an *extreme departure* from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is *so obvious* that the actor *must have been aware of it.*" *Zucco Partners*, 552 F.3d at 991 (emphasis added).

Plaintiff's allegations, considered individually or together, do not give rise to a strong inference of fraudulent intent. Rather, the opposing inference – that adidas did not know in advance that Ye would take actions requiring the termination of the adidas-Yeezy partnership – is far more compelling.

*First*, Plaintiff relies almost entirely on adidas's alleged knowledge of discrete incidents of misconduct during 2013 through 2018 – a full four years before Ye's conduct that led to the termination of the partnership. (SAC ¶ 12, 62-71.) Even assuming that adidas was aware of those incidents, none of that implies – much less gives rise to the required "strong inference" – that adidas knew what would occur in the fall of 2022. Plaintiff's suggestion to the contrary amounts to an assertion of "fraud by hindsight," as Plaintiff relies on later events – Ye's public meltdown in 2022 – to assert that earlier statements were false or misleading and made with fraudulent intent. *See In re Twitter, Inc. Sec. Litig.*, 506 F. Supp. 3d 867, 890 (N.D. Cal. 2020), *aff'd sub nom. Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611 (9th Cir. 2022) ("[P]laintiffs cannot merely speculate in hindsight that because defendants ran into a sales slowdown and reduced revenue by the end of the Class Period that earlier statements of good financial health must have been inaccurate.").

**19 - ADIDAS AG'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

The opposing inference of non-fraudulent intent is far more compelling.  Plaintiff acknowledges that adidas took Ye's conduct during 2013 to 2018 seriously.  In particular, adidas executives met in 2018 to determine whether and how the Company should proceed with the partnership.  (SAC ¶ 59.)  Ultimately, as Plaintiff alleges, the Company dedicated more resources to the relationship with Ye in order to better manage it.  (SAC  ¶¶ 59-61.)  The allegations in the SAC suggest that that strategy worked, as Plaintiff identifies no similar misconduct by Ye between the October 2018 meeting and the events four years later that led to the termination of the partnership.

*Second*, Plaintiff's attempt to bolster its plainly inadequate scienter allegations by referencing Mr. Rørsted's incentive-based compensation fails.  (SAC ¶ 151.)  It is "common for executive compensation . . . to be based partly on the executive's success in achieving key corporate goals" and the Ninth Circuit has rejected the conclusion "that there is fraudulent intent merely because a defendant's compensation was based in part on such successes."  *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 884 (9th Cir. 2012).

*Third*, Plaintiff's reliance on (*i*) statements made by Bjørn Gulden, who joined adidas in 2023, after the partnership was terminated, regarding his views of Ye and (*ii*) additional antisemitic statements by Ye after the partnership was terminated is unavailing, as they have no bearing whatsoever on the state of mind of adidas when it made the earlier statements at issue in this lawsuit.  (SAC ¶¶ 152-54.)

### C.    Plaintiff Fails to Plead Loss Causation.

Having failed to plead an actionable misrepresentation or scienter, it comes as no surprise that Plaintiff also fails to plead loss causation – *i.e.*, that the decline in adidas's stock price was "proximately caused by a revelation of fraudulent activity" rather than other events or information.  *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014); *see also In re Nektar*

*Therapeutics Sec. Litig.*, 34 F.4th 828, 838 (9th Cir. 2022) (Plaintiffs "must show a 'causal connection between the fraud and the loss by tracing the loss back to the very facts about which the defendant lied.'"). Loss causation, like all elements of a securities fraud claim, is subject to the heightened pleading standard of Rule 9(b). *See Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014).

None of the statements that Plaintiff cites as allegedly causing a decline in stock price revealed any prior fraudulent activity:

- Ye's October 7, 2022 Instagram post, in which Ye posted a text message conversation with Sean "Diddy" Combs and commented that Ye would "show the Jewish people that told you to call me that no one can threaten or influence me" (SAC ¶ 137);

- Ye's October 2022 statements on a podcast bragging that "I can literally say anti-Semitic shit, and [adidas] can't drop me" and complaining about the "Jewish media" (SAC ¶ 139);

- a November 27, 2022 *Wall Street Journal* article reporting that, in 2018, adidas executives discussed the risks of continuing a relationship with Ye (SAC ¶ 141);

- adidas's February 9, 2023 statements regarding its 2023 financial picture, including the negative impact of the termination (SAC ¶¶ 143-45); and

- a February 21, 2023 announcement by S&P that it was downgrading adidas based on effects of terminating the adidas-Yeezy partnership (SAC ¶ 147).

These allegations plainly do not reveal any fraudulent conduct by adidas, and Plaintiff therefore fails to "plausibly allege that the defendant's fraud was '*revealed* to the market and *caused* the resulting losses.'" *Loos*, 762 F.3d at 887 (quoting *Metzler*, 540 F.3d at 1063) ("disappointing earnings" did not demonstrate that the company engaged in accounting fraud, but rather were "merely indicative of poor financial health"); *see also In re Nektar Therapeutics*, 34 F.4th at 838 (no loss causation where allegations "most plausibly suggest" that the stock price decline was caused by "disappointing test results, not any revelation of earlier falsehoods").

**21 - ADIDAS AG'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

## II.     THE SAC SHOULD BE DISMISSED WITH PREJUDICE.

Dismissal should be with prejudice.  As directed by the Court during the December 13, 2023 status conference, counsel for the parties met and conferred on January 19, 2024 regarding the grounds upon which adidas intended to move to dismiss.  Plaintiff chose to stand on the SAC rather than seek leave to amend once more, notwithstanding the Court's warning that a dismissal likely would be without leave to amend.

## <u>CONCLUSION</u>

For the reasons stated above, the Court should dismiss the Seconded Amended Complaint with prejudice.

DATED this 2nd day of February, 2024

*/s/ Chad M. Colton*

DEBEVOISE & PLIMPTON LLP
Maeve O'Connor, *pro hac vice*
moconnor@debevoise.com
Elliot Greenfield, *pro hac vice*
egreenfield@debevoise.com
Brandon Fetzer, *pro hac vice*
bfetzer@debevoise.com

MARKOWITZ HERBOLD PC
Matthew A. Levin, OSB #003054
mattlevin@markowitzherbold.com
Chad M. Colton, OSB #065774
chadcolton@markowitzherbold.com
Stanton R. Gallegos, OSB #160091
stantongallegos@markowitzherbold.com

*Attorneys for adidas AG*