**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (pro hac vice)
Laurence M. Rosen, Esq. (pro hac vice)
Daniel Tyre-Karp (pro hac vice)
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
        lrosen@rosenlegal.com
        dtyrekarp@rosenlegal.com

*Lead Counsel for Plaintiff and Class*

[Additional counsel on signature page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## PORTLAND DIVISION

| | |
|---|---|
| HRSA-ILA FUNDS, Individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>        v.<br><br>ADIDAS AG., KASPER RØRSTED, and HARM OHLMEYER,<br><br>        Defendants. | **Case No.: 3:23-cv-00629-IM**<br><br>**CLASS ACTION**<br><br>**OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE SECOND AMENDED COMPLAINT**<br><br>**REQUEST FOR ORAL ARGUMENT** |

## TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ................................................................1

II.   FACTUAL BACKGROUND ................................................................3

    A.    The Parties and Relevant Non-Parties ......................................3

    B.    The Yeezy Partnership ..............................................................4

    C.    Adidas Enables West's Misconduct...........................................5

    D.    The Truth Emerges ....................................................................7

    E.    Defendants' Material Misstatements and Omissions.................9

        1.    The European Union's Non-Financial Reporting Directive ........9

        2.    Risk Disclosures.........................................................12

            a.    Partnership Risk ....................................................12

            b.    Personnel Risk .......................................................13

            c.    Stakeholder Activity Risk .....................................13

        3.    Anti-Discrimination, DEI, and Social Responsibility Statements............13

        4.    Compliance Management System Statements. ..........................14

III.  ARGUMENT ................................................................15

    A.    The SAC Adequately Pleads That Defendants Made Misrepresentations And/Or Omissions of Material Facts ................................................................15

        1.    Defendants Misled Investors By Omitting West's Misconduct From the Company's Non-Financial Disclosures ................16

        2.    Defendants' Risk Disclosures Misled Investors ......................19

        3.    Anti-Discrimination, DEI, and Social Responsibility Statements Misled Investors................................23

        4.    Defendants' "Truth on the Market" Defense Fails. ..................25

    B.    Plaintiff Adequately Alleges Scienter................................................................25

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

1.      Defendants Knew About West's Misconduct and the Risk that it Posed to the Company .................................................................26

2.      New CEO Bjorn Gulden's Post-Class Period Defense of West Supports Inference of Scienter....................................................28

3.      Scienter Can Be Imputed to Defendants ....................................29

4.      Motive and Opportunity Support the Inference of Scienter......................30

5.      The Inference of Scienter Is At Least As Compelling as Defendants' Suggested Inference ...............................................31

C.      The Complaint Adequately Pleads Loss Causation ................................32

D.      Plaintiff Adequately Alleges Control Person Liability...........................34

IV.     CONCLUSION.............................................................................34

## TABLE OF AUTHORITIES

**Page(s)**

**Other Authorities**

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ........................................................................................15

*Berson v. Applied Signal Tech., Inc.,*
  527 F.3d 982 (9th Cir. 2008) .............................................................16, 19, 29

*Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.,*
  964 F. Supp. 2d 1128 (N.D. Cal. 2013) ............................................................21

*City of Dearborn Heights Act 345 Police & Fire Retirement Sys. v. Align Tech., Inc.,*
  856 F.3d 605 (9th Cir. 2017) ............................................................................28

*City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.,*
  8 F.4th 592 (7th Cir. 2021) ..............................................................................23

*Constr. Laborers Pension Tr. for S. California v. CBS Corp.,*
  433 F. Supp. 3d 515 (S.D.N.Y. 2020) .........................................................20, 21

*Cutler v. Kirchner,*
  696 F. App'x 809 (9th Cir. 2017) .....................................................................22

*Dolphin & Bradbury, Inc. v. S.E.C.,*
  512 F.3d 634 (D.C. Cir. 2008) ..........................................................................22

*Dura Pharm., Inc. v. Broudo,*
  544 U.S. 336 (2005) .....................................................................................15, 32

*E. Ohman J:or Fonder AB v. NVIDIA Corp.,*
  81 F.4th 918 (9th Cir. 2023) .............................................................................30

*Flynn v. Exelon Corp.*,

    2021 WL 1561712 (N.D. Ill. Apr. 21, 2021) ...........................................................24

*Ganino v. Citizens Utilities Co.*,

    228 F.3d 154 (2d Cir. 2000).................................................................................................25

*Grigsby v. BofI Holding, Inc.*,

    979 F.3d 1198 (9th Cir. 2020) ..........................................................................................32

*In re Allianz Glob. Invs. U.S. LLC Alpha Series Litig.*,

    2021 WL 4481215 (S.D.N.Y. Sept. 30, 2021)................................................................28

*In re Alphabet, Inc. Sec. Litig.*,

    1 F.4th 687 (9th Cir. 2021) ........................................................................................19, 20

*In re Amgen Inc. Sec. Litig.*,

    544 F. Supp. 2d 1009 (C.D. Cal. 2008) .........................................................................25

*In re Apple Computer Sec. Litig.*,

    886 F.2d 1109 (9th Cir. 1989) ........................................................................................25

*In re Applied Micro Cirs. Corp. Sec. Litig.*,

    No. 01-CV-0649 K AJB, 2002 WL 34716875 (S.D. Cal. Oct. 4, 2002) ..................29

*In re BofI Holding, Inc. Sec. Litig.*,

    2017 WL 2257980 (S.D. Cal. May 23, 2017).................................................................34

*In re Braskem S.A. Sec. Litig.*,

    246 F. Supp. 3d 731 (S.D.N.Y. 2017)............................................................................24

*In re Cadence Design Sys., Inc. Sec. Litig.*,

    692 F. Supp. 2d 1181 (N.D. Cal. 2010) .........................................................................30

*In re Daou Sys., Inc.*,

    411 F.3d 1006 (9th Cir. 2005) ........................................................................................26

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

*In re Emergent BioSolutions Inc. Sec. Litig.*,

　2023 WL 5671608 (D. Md. Sept. 1, 2023) ................................................................28

*In re Facebook, Inc. Sec. Litig.*,

　87 F.4th 934 (9th Cir. 2023) ........................................................................20, 22

*In re Gilead Scis. Sec. Litig.*,

　536 F.3d 1049 (9th Cir. 2008) ........................................................................15

*In re Newbridge Networks Sec. Litig.*,

　962 F. Supp. 166 (D.D.C. 1997) ........................................................................16

*In re NVIDIA Corp. Sec. Litig.*,

　768 F.3d 1046 (9th Cir. 2014) ........................................................................16

*In re Quality Sys., Inc. Sec. Litig.*,

　865 F.3d 1130 (9th Cir. 2017) ........................................................................28

*In re VeriFone Holdings, Inc. Sec. Litig.*,

　704 F.3d 694 (9th Cir. 2012) ........................................................................26

*In re WageWorks, Inc., Sec. Litig.*,

　2020 WL 2896547 (N.D. Cal. June 1, 2020) ............................................................33

*Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*,

　998 F.3d 397 (9th Cir. 2021) ........................................................................21

*Joyce v. Amazon.com, Inc.*,

　2023 WL 8370101 (W.D. Wash. Dec. 4, 2023) ............................................................32, 33

*Khoja v. Orexigen Therapeutics, Inc.*,

　899 F.3d 988 (9th Cir. 2018) ........................................................................15

*Longo v. OSI Sys., Inc.*,

　2021 WL 1232678 (C.D. Cal. Mar. 31, 2021) ........................................................................31

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

*Loos v. Immersion Corp.*,

    762 F.3d 880 (9th Cir. 2014) ..................................................................................33

*Lopez v. Smith*,

    203 F.3d 1122 (9th Cir. 2000) ...............................................................................34

*Meyer v. Jinkosolar Holdings Co.*,

    761 F.3d 245 (2d Cir. 2014).....................................................................................23

*Mineworkers' Pension Scheme v. First Solar Inc.*,

    881 F.3d 750 (9th Cir. 2018) ............................................................................32, 33

*New Mexico State Inv. Council v. Ernst & Young LLP*,

    641 F.3d 1089 (9th Cir. 2011) ...............................................................................31

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,

    380 F.3d 1226 (9th Cir. 2004) ...............................................................................26

*Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,

    58 F.4th 195 (5th Cir. 2023) ..................................................................................18

*Osher v. JNI Corp.*,

    183 F. App'x 604 (9th Cir. 2006).............................................................................34

*Richard v. Nw. Pipe Co.*,

    2011 WL 3813073 (W.D. Wash. Aug. 26, 2011) ..................................................31

*S. Ferry LP, No. 2 v. Killinger*,

    542 F.3d 776 (9th Cir. 2008) ............................................................................26, 31

*S.E.C. v. Platforms Wireless Int'l Corp.*,

    559 F. Supp. 2d 1091 (S.D. Cal. 2008)...................................................................30

*Sanders v. Realreal, Inc.*,

    2021 WL 1222625 (N.D. Cal. Mar. 31, 2021)........................................................24

*Schueneman v. Arena Pharms., Inc.*,

    840 F.3d 698 (9th Cir. 2016) ............................................................................25

*Set Cap. LLC v. Credit Suisse Grp. AG*,

    996 F.3d 64 (2d Cir. 2021)..............................................................................22

*Siracusano v. Matrixx Initiatives, Inc.*,

    585 F.3d 1167 (9th Cir. 2009) ........................................................................22

*Sneed v. AcelRx Pharms., Inc.*,

    2023 WL 4412164 (N.D. Cal. July 7, 2023)...................................................25

*Stratte-McClure v. Morgan Stanley*,

    776 F.3d 94 (2d Cir. 2015)..............................................................................17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,

    551 U.S. 308 (2007)...................................................................................15, 26

*U.S. Sec. & Exch. Comm'n v. C3 Int'l, Inc.*,

    2022 WL 16814859 (C.D. Cal. Nov. 7, 2022)................................................30

*Vess v. Ciba-Geigy Corp. USA*,

    317 F.3d 1097 (9th Cir. 2003) ........................................................................16

**Statutes**

15 U.S.C. § 78u-4(b)(1)(B)......................................................................................16

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

## I.    PRELIMINARY STATEMENT

Adidas signed Kanye West, who now goes by "Ye", away from Nike in 2013 by promising him royalties for apparel sales that Nike would only grant to professional athletes. The Company's partnership with West's design shop – Yeezy – quickly became Adidas's most profitable line of business. By 2021, the Yeezy partnership brought in more than $1.7 billion in sales, which represented 8% of the Company's total revenue and more than 40% of the Company's profits. 3. Adidas described the partnership as "the most significant partnership ever created between a non-athlete and an athletic brand."

The partnership benefited Adidas far beyond the direct Yeezy sales by enhancing the brand's reputation in markets in which it had struggled. At the same time as the Yeezy partnership bolstered Adidas's financials, the Company touted its commitment to social sustainability, diversity, equity and inclusion and the Company's inclusion in various sustainability indexes. The European Union's Non-Financial Reporting Directive required the Company to disclose material risks related to its business relationships, and Adidas also told investors that it voluntarily complied with the core requirements of the Global Reporting Initiative, which required detailed disclosures of the Company's positive and negative contributions to social impact. Adidas told investors that "diversity, inclusion, and equality are key to the success of our company" and provide a "competitive business advantage." Adidas also claimed to have a "zero-tolerance" approach to discrimination and harassment and stated that its business partnership agreements with entertainers contained clauses allowing the Company to terminate the partnerships in case of improper or unethical conduct.

 Investors were shocked in October 2022 as the profitable partnership crumbled as West made a series of anti-Semitic and racist comments at public events, on social media, and in public interviews. West wore a "White Lives Matter" t-shirt to a Paris fashion show on October 3 and, a

1

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

week later, posted on his 31-million-follower Twitter (now called "X") account: "[W]hen I wake up I'm going death con 3 On JEWISH PEOPLE" and "[y]ou guys have toyed with me and tried to black ball anyone whoever opposes your agenda." West bragged on a podcast that "the thing about it being Adidas is like, I can literally say anti-Semitic shit and they can't drop me. I can say anti-Semitic things, and Adidas can't drop me." On October 25, 2022, after weeks of silence and inaction, Adidas finally announced that it was terminating its partnership with West and Yeezy. Adidas's press release stated that "adidas does not tolerate antisemitism and any other sort of hate speech" and that West's offensive comments "violate the company's values of diversity and inclusion, mutual respect and fairness."

Unbeknownst to investors, Defendants knew and concealed throughout the Class Period that West (i) routinely made racist and anti-Semitic comments to Yeezy and Adidas employees; (ii) paid millions of dollars to settle workplace complaints about his anti-Semitic harassment of employees; and (iii) repeatedly watched pornography at work and forced others to do the same. Throughout the Class Period, Defendants violated their disclosure obligations and misled investors by failing to disclose West's misconduct, the Company's refusal to take action in response to complaints about West, and the material risks West's misconduct posed to the partnership and the Company. The Company also misled investors by issuing risk disclosures warning of the hypothetical risk of a celebrity partner's misconduct while concealing that the risk had already materialized. Finally, while concealing and enabling West's horrific misconduct, the Company cynically assured investors that the Company had "zero tolerance" for discrimination or bigotry and was fully committed to social justice.

Investors learned the truth through a series of corrective disclosures, each of which caused the price of Adidas securities to fall and harmed investors.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

Plaintiff pleads a strong inference of scienter based on particularized allegations from confidential witnesses and a plethora of credible news reports that Defendants were fully aware of West's misconduct and the risk it posed to the Company. Despite a steady stream of complaints from employees and recommendations from managers, Defendants refused to confront West. Instead, Defendants actively concealed West's misconduct. The only compelling inference is that Defendants never believed their professed commitment to social sustainability – Defendants only commitment was to making as much money as possible from the Yeezy partnership before it inevitably blew up. CEO Rorsted was particularly motivated to mislead investors given that his multi-million dollar bonus was directly tied to both the Company's ESG performance and net income.

The Motion does not—and cannot—dispute that (i) Defendants were fully aware of West's misconduct throughout the Class Period; (ii) Defendants never confronted West over his misconduct; (iii) Defendants never disclosed West's misconduct to investors; (iv) the NFRD and GRI required Defendants to disclose risks related to the Company's social impact. Accordingly, the Motion effectively concedes that Defendants knowingly or recklessly misled investors. The Court should deny the Motions in their entireties.

## II.    FACTUAL BACKGROUND

### A.    The Parties and Relevant Non-Parties

Defendant adidas AG ("Adidas" or the "Company") is a sports brand and engages in the design, distribution, and marketing of athletic and sporting lifestyle products. The Company is headquartered in Herzogenaurach, Bavaria, Germany. ¶20. Adidas' American depository receipts ("ADRs") trade under the ticker symbols "ADDYY" and "ADDDF." *Id*. Defendant Kasper Rørsted ("Rorsted") served as the Company's CEO from 2016 to November 11, 2022. ¶21. Defendant Harm

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

Ohlmeyer ("Ohlmeyer") has served as the Company's CFO since 2017 and served as interim CEO from November 12, 2022 to December 31, 2022. ¶22.

Ye, formerly known as Kanye West ("West") is an American musician and fashion designer. West owns and control the Yeezy brands. ¶28.

Confidential Witness 1 ("CW1") was the Chief Human Resources Officer and Executive Vice President of Business Strategy across all entities at Yeezy from June 2018 to November 2018. CW1 reported directly to West. ¶30. Confidential Witness 2 ("CW2") worked for Adidas from April 2013 to December 2022 and served as the General Manager and Senior Vice President for Adidas' Yeezy Business Unit from January 2016 to January 2020 and Senior Vice President of the Business Unit from January 2020 to December 2022. During the Class Period, CW2 managed the Yeezy partnership on behalf of Adidas. ¶31. Confidential Witness 3 ("CW3") served as Senior Vice President and Chief Human Resources Officer for North America for Adidas from July 2017 to January 2018. ¶32. CW3 reported to Senior Vice President and Global Chief HR Officer Karin Parkin, and Parkin reported to directly CEO Kasper Rorsted. *Id.*

**B.    The Yeezy Partnership**

Adidas and West announced their partnership in November 2013 following West's split from Nike. ¶33. The partnership was a financial success. On June 29, 2016, Adidas and West announced a new 10-year agreement and outlined plans to expand Yeezy styles, open retail stores, and enter more markets. ¶36. Adidas called the Partnership "the most significant partnership ever created between a nonathlete and an athletic brand." *Id.* Under their arrangement, West licensed his "Yeezy" trademark to Adidas in exchange for a 15% cut of sales. ¶37. The Company was responsible for manufacturing the Yeezy goods and then selling them, and it retained ownership of the designs. *Id.* Adidas also provided Yeezy with $100 million per year for marketing purposes and created a Yeezy business unit to work closely with West and his team. *Id.*

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

In 2017, Yeezy's first full year with Adidas after the contract extension, net sales reached $300 million. ¶39. By 2021, the Yeezy partnership brought in more than $1.7 billion in sales, which represented 8% of the Company's total revenue and more than 40% of the Company's profits. ¶41.

### C.    Adidas Enables West's Misconduct

Adidas was aware of West's misconduct from the start of the Partnership in 2013. Just after signing the initial paperwork for the partnership, West made Adidas executives watch pornography during a meeting at his Manhattan apartment. ¶58. A few weeks later, as West met with Adidas at the Company's German headquarters to discuss ideas for the first Yeezy shoe, West drew a swastika on the top of a shoe. *Id*.

West routinely hurled anti-Semitic invective at his Yeezy and Adidas colleagues. CW1 stated West was obsessed with Hitler and his purported "productivity." ¶67. CW1, who is Jewish, once said to West that Hitler's "productivity" was "to murder 30,000 Jews a day." *Id*. West responded that "[y]ou have to admit that's productive." *Id*. Jon Wexler, who was instrumental in luring West to Adidas while serving as the Company's global director of entertainment and influencer marketing, once yelled at West after West told him to "hang a photo of Hitler in his kitchen and kiss it every day to practice unconditional love." ¶68. In 2018, West paid $5 million to settle a claim by a Yeezy employee alleging that West had created a hostile workplace by making anti-Semitic remarks. ¶¶64-65. The allegation and settlement were promptly reported to Defendant Ohlmeyer and other Adidas executives, who never disclosed either the allegations or settlement to investors. *Id*. West and Yeezy executive Udi Avshalom, who is Israeli and Jewish, almost got into a physical fight in 2018 in response to comments West made praising Adolf Hitler and Nazis. ¶66.

West was also obsessed with pornography and once asked CW1 to host "an employee relations meeting at PornHub." ¶67. The Times reported that, in February 2015, West berated Adidas's Yeezy manager Rachel Muscat and other Adidas employees "using sexually explicit

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

language." ¶69. Rolling Stone reported West played pornography to Yeezy staff in meetings; discussed porn and showed an intimate photograph of Kim Kardashian in job interviews; and showed an explicit video and photos of Kardashian as well as his own sex tapes to Yeezy team members." ¶73.

Rolling Stone also obtained a letter "by prominent former members of the Yeezy team" that "insists that leaders from Adidas were aware of West's 'problematic behavior' but 'turned their moral compass off,' raising questions about whether his corporate partner could have stepped in years ago." ¶73. The Times reported that employees complained to Adidas executives about West's verbal abuse. ¶69. Rolling Stone further reported that, instead of admonishing or punishing West for his misconduct, Adidas executives moved mistreated employees to other divisions within Adidas: "She was basically moved out of the team' after complaining to her manager in human resources, the senior employee says. ¶74. Two other former senior staffers described being told by Adidas leaders in Portland that a 'soft landing' spot was available back at the mothership for colleagues who feared West." *Id*.

Defendants took extraordinary steps to conceal West's misconduct from investors and the public. CW3 stated that Adidas executives removed human resources complaints about West from the usual chain of command. ¶72. West's assigned HR Manager reported complaints directly to General Counsel Paul Ehrlich and told CW3 she had been explicitly instructed not to share information about West with CW3 and that it instead "goes right to Paul Ehrlich." *Id*. CW3 said this arrangement was "massively unusual" because "[a]nything people that was happening in North America went to me. Except for Yeezy. It was the weirdest thing ever." *Id*. CW3 once raised the issue with CW3's supervisor, Senior Vice President/Global Chief HR Officer Karin Parkin. Parkin "moved onto the next topic as quickly as she could. So, she absolutely knew." *Id*. Parkin served on the Company's Executive Board. CW3 stated that complaints were sent to Ehrlich "so there would

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

be attorney-client privilege" to protect West from public disclosure of his misconduct. *Id*. The Times confirmed that Adidas employees complained about West's bigoted statements directly to Adidas brand president Eric Liedtke, who "promised that Adidas would work to address its racial diversity issues." ¶63. The Times also reported that West's "Adidas handlers" knew in 2018 that West was considering naming his next album "Hitler." *Id*.

In October 2018, in response to employee complaints about the Company's mishandling of West's controversial comments about slavery, the Executive Board was presented with evidence highlighting the risks for employees interacting with West. ¶¶59-62. The presentation "detailed mitigation strategies for the relationship with the Yeezy creator, including cutting ties with the rapper-turned-designer." *Id*. But, instead of parting ways when concerns were raised, the senior executives (including Rorsted and Ohlmeyer, had business-unit leaders share various proposals with Mr. West so Adidas could hang on to the Yeezy partnership, which analysts estimate accounted for 8% of annual sales. *Id*. The Board chose to continue the Partnership, and they never disclosed the risk or the presentation to investors. *Id*.

### D.    The Truth Emerges

Over the Fall of 2022, West made a series of public anti-Semitic and other racially offensive remarks.

On October 3, 2022, at a fashion show in Paris for his "Yeezy Season 9" fashion line, West wore a t-shirt he designed that said "White Lives Matter" – a slogan the Anti-Defamation League has described as a "white supremacist phrase." ¶43. On October 6, 2022, Adidas issued a statement to CNBC stating "After repeated efforts to privately resolve the situation, we have taken the decision to place the partnership under review. We will continue to co-manage the current product during this period." ¶44. Notably, the statement from Adidas did not mention West's "White Lives Matter" t-shirt or his history of anti-Semitic remarks. *Id*.

On October 7, 2022, West made a post to his Instagram account showing a text conversation he had with Sean "Diddy" Combs. ¶46. West commented on the post that he would "show the Jewish people that told you to call me that no one can threaten or influence me." *Id*. West was insinuating that Diddy's previous criticism of West's "White Lives Matter" t-shirt was part of a Jewish plot against West. ¶137. On this news, shares of ADDYY fell $2.69 per ADR, or 4.6%, to close at $56.17 on October 7, 2022. ADDDF fell $11.32 per ADR, or 9.5%, to close at $107.18 on October 7, 2022. ¶138.

On October 9, 2022, West posted to Twitter: "I'm a bit sleepy tonight but when I wake up I'm going death con 3 on JEWISH PEOPLE The funny thing is I actually can't be Anti Semitic because black people are actually Jew also You guys have toyed with me and tried to black ball anyone whoever opposes your agenda." ¶47. Twitter, now known as X, deleted the tweet and locked West's account. Instagram also suspended West's account. *Id*.

On October 21, 2022, Women's Wear Daily reported that French fashion house Balenciaga announced that it was severing its relationship with West. ¶139. That same day, a clip also surfaced of West stating on the Drink Champs podcast that "the thing about it being Adidas is like, I can literally say anti-Semitic shit and they can't drop me. I can say anti-Semitic things, and Adidas can't drop me. Now what? Now what?" During the same interview, West stated that he has "gotten used to getting screwed by the Jewish media" and that "the Jewish media blocked me out." *Id*. On this news, shares of ADDYY fell $2.19 per ADR, or 4.1%, to close at $51.75 on October 21, 2022. ADDDF fell $8.61 per ADR, or 7.5%, to close at $105.75 on October 21, 2022. ¶140.

On November 27, 2022, The Wall Street Journal published an article entitled "Adidas Top Executives Discussed Risk of Staff's 'Direct Exposure' to Kanye West Years Ago" revealing that the Company's senior leadership, including Defendant Rørsted, discussed as far back as 2018 the risk of continuing a relationship with Kanye West. ¶141. On this news, ADDYY fell $2.02 per

ADR, or 3.13%, to close at $62.34 on November 28, 2022. ADDDF fell $0.81 per ADR to close at $126.44 on November 28, 2022, and then $0.44 per ADR to close at $126.00 on November 29, 2022, a 1% decline. ¶142.

On February 9, 2023, Adidas warned that it could shift from a profit to a loss if it should fail to sell its inventory of Yeezy shoes, following its termination of the Partnership. ¶¶143-145. On this news, ADDYY fell $7.4, or 8.96%, to close at $75.16 on February 9, 2023. On February 10, ADDYY fell another $0.55, or 0.73%, to close at $74.61. ADDDF fell $21.83, or 13.22%, to close at $143.23 on February 9, 2023. ¶146.

Finally, on February 21, 2023, S&P Global announced that it was downgrading Adidas to 'A-/A-2' From 'A-1' because "[e]nding the Yeezy partnership with Mr. West will have a stronger-than-expected hit on the group's operating performance in 2023." ¶¶14, 147. On this news, ADDYY fell $3.56, or 4.62%, to close at $73.59 on February 21, 2023, and ADDDF fell $4.85, or 3.17%. ¶¶14, 148.

### E.    Defendants' Material Misstatements and Omissions

#### 1.  The European Union's Non-Financial Reporting Directive

The European Union's Non-Financial Reporting Directive ("NFRD") requires large public companies like Adidas to publicly disclose certain non-financial information to investors. ¶77. Amongst other things, NFRD required Adidas to disclose information about its business model, policies, outcomes, risks, risk management and key performance; and Key Performance Indicators ("KPIs") relating to social and employee issues and human rights. *Id*. The objective of the NFRD is to "raise the transparency of the social and environmental information provided." ¶78.

Section 29 requires disclosure of (a) a brief description of the group's business model; (b) a description of the policies pursued by the group in relation to those matters, including due diligence processes implemented; (c) outcome of those policies; and (d) the principal risks related to those

matters linked to the group's operations including, where relevant and proportionate, its business relationships, products or services which are likely to cause adverse impacts in those areas, and how the group manages those risks. ¶80. The NFRD required Adidas to "provide adequate information in relation to matters that stand out as being most likely to bring about the materialisation of principal risks of severe impacts, along with those that have already materialized" and instructed that "[t]he severity of such impacts should be judged by their scale and gravity." The NFRD's required risk disclosures explicitly extend to the Company's "business relationships." ¶81.

The Company's 2018, 2019, 2020, and 2021 annual reports assured investors that its non-financial disclosures complied with the core requirements of the Global Reporting Initiative ("GRI"). ¶82. GRI required Adidas to provide a detailed, complete, and balanced description of the risks the Company faced and estimates of the potential impact of those risks:

- **Completeness** (GRI 101 §1.4): Disclosure must be "sufficient to reflect significant economic, environmental, and social impacts, and to enable stakeholders to assess the reporting organization's performance in the reporting period."; ¶86. The Company must estimate "future impacts (both positive and negative)," and "the reported information is expected to be based on well-reasoned estimates that reflect the likely size and nature of impacts." *Id*. The Company may not "omit relevant information that substantively influences stakeholder assessments and decisions, or that reflects significant economic, environmental, and social impacts."

- **Accuracy** (GRI 101 §1.5): The disclosure "shall be sufficiently accurate and detailed for stakeholders to assess the reporting organization's performance." Although GRI allows for omission of information in certain prescribed cases (i.e., information is not-applicable, subject to confidentiality constraints, subject to legal prohibition, or not available), it requires the Company to describe the specific information that has been

10
PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

omitted and the reasons for omission -- e.g., the specific legal or confidentiality constraints. GRI 101 **§** 3.2; ¶88.

- **Balance** (GRI 101 **§**1.6): The disclosure "shall reflect positive and negative aspects of the reporting organization's performance to enable a reasoned assessment of overall performance." The disclosure must "avoid . . . omissions . . . that are reasonably likely to unduly or inappropriately influence a decision or judgment by the report reader. The report is expected to include both favorable and unfavorable results." ¶89.

The Company's social impact disclosures were incomplete because they failed to provide *any* information concerning West's misconduct or the impact it had on Yeezy and Adidas employees—much less provide a well-reasoned estimate concerning the scope of the impact. Adidas had no valid reason to omit material information regarding the Yeezy partnership, nor did the Company disclose that it had omitted material information. ¶88.

Adidas's annual reports disclosed that it had a "zero-tolerance approach" towards discrimination and harassment, that it has "always been and will always be against discrimination in all forms and stand united against racism," and touted its various DEI commitments and programs. ¶90. But the Company did not present information about the negative aspects of its DEI culture and performance: that West routinely mistreated Yeezy and Adidas employees by subjecting them to anti-Semitic comments and other workplace misconduct; that West had paid $5 million to a Yeezy employee to settle allegations that he subjected employees to anti-Semitism; that the Company endangered employees by segregating complaints about West from normal human resources reporting to protect him; that the Company's reaction to employee complaints about West's behavior was to either ignore them or to transfer the employee—not to punish West or intervene on the employees' behalf; and that Defendants knew and had discussed that these facts,

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

individually and collectively, posed a material risk to the Company's finances. *Id*. These overly rosy disclosures violated the GRI disclosure requirements the Company claimed to have fulfilled.

Finally, West's misconduct, the risks it posed to the Company, and the Company's inappropriate handling of it were material under the NFRD and GRI standards. ¶92. Under GRI, "materiality is the principle that determines which relevant topics are sufficiently important that it is essential to report on them." Materiality is determined by a mix of factors, including "the organization's overall mission and competitive strategy," "the concerns expressed directly by stakeholders," and "broader societal expectations." *Id*. Adidas's DEI disclosures demonstrate that the Company understood the topic was material to its stakeholders and required disclosure pursuant to GRI. ¶93. For example, in its 2020 Annual Report, the Company declared: "We strongly believe that diversity, inclusion, and equality are key to the success of our company." West's anti-Semitism was especially material to Adidas given the Company's sordid history with the Nazi party and the "broader societal expectations" of German companies to stamp out anti-Semitism. ¶95. The German penal code prohibits disseminating Nazi propaganda, including sharing images such as swastikas, wearing an SS uniform, and making statements in support of Hitler. ¶96.

### 2. Risk Disclosures

Throughout the Class Period, the Company's risk disclosures materially misled investors by presenting certain risks as hypotheticals that the Company knew had already materialized.

#### a. Partnership Risk

The Company's annual reports stated that "[u]nethical business practices on the part of business partners or improper behavior of individual athletes, influencers or partners in the entertainment industry could have a negative spill-over effect on the company's reputation, lead to higher costs or liabilities or even disrupt business activities." Adidas also promised that, to "mitigate business partner risks, adidas has implemented various measures. For example, we generally

include clauses in contractual agreements with athletes, clubs and federations or other partners that allow us to suspend or even terminate our partnership in case of improper or unethical conduct. In addition, we work with a broad portfolio of promotion partners, including individual athletes, club teams and federations or associations in numerous sports as well as entertainers and influencers to reduce the dependence on the success and popularity of a few individual partners. [. . .]" ¶¶106-107

### b.    Personnel Risk

The Company's Annual reports stated that "strong leadership and a performance-enhancing culture are critical to the company's success" and that "the failure to install and maintain a performance-oriented culture that fosters diversity and inclusion and strong employee engagement amongst our workforce could also substantially impede our ability to achieve our goals." ¶¶108-109.

### c.    Stakeholder Activity Risk

The Company warned that "adverse or inaccurate media coverage on our products or business practices as well as negative social media discussion may significantly harm the adidas' reputation and brand image, lead to public misperception of the company's business performance and eventually result in a sales slowdown." ¶¶127-128

### 3.    Anti-Discrimination, DEI, and Social Responsibility Statements

The Company repeatedly touted its DEI and social sustainability programs and disclosures. These statements misled investors by omitting West's misconduct and the Company's awareness and cover-up of the same. In 2018 and 2019, the Company touted its inclusion in the Dow Jones Sustainability Indices, stating that Adidas "was rated as industry leader in corporate economic, environmental and social dimensions" and "was rated industry best in seven criteria," including "Human Rights" and "Social Reporting." ¶¶101, 113. A June 9, 2020 press release quoted Defendant Rorsted stating "we must do more to create an environment in which all of our

employees feel safe, heard and have equal opportunity to advance their careers. . . . [W]e will create a lasting change and we will do it now." ¶118. An August 28, 2020 press release announced that the Company strengthened its Global Anti-Discrimination and Non-Retaliation Policy and stated that "[w]e do not tolerate discrimination of any kind." ¶120. On February 25, 2021, a press release stated "globally all senior leaders and nearly all adidas employees" had completed a 25-hour training program on "critical topics including diversity dimensions, unconscious biases, privilege and microaggressions" and "collaborated with a third-party consultant to create the new Corrective Action Matrix" that "provides clear guidance on how the company will respond to harassment, discrimination, disrespectful conduct and retaliation." ¶122.

The Company's 2020 annual report stated "[w]e have always been and will always be against discrimination in all forms and stand united against racism" and announced an "action plan [that] underpins our stance against discrimination and microaggressions." ¶126. A June 2, 2021 press release stated that "All corporate employees have now completed" the Creating a Culture of Inclusion training and that the Company "[c]reated global and local policies . . . that provide clear guidance on how the company will respond to harassment, discrimination, disrespectful conduct and retaliation." ¶130.

### 4. Compliance Management System Statements.

The 2018 Report's Compliance Management System disclosures (the "CMS Disclosures") stated that the Company's CMS is designed to "preserve diversity by fighting harassment and discrimination;" that "[a]ppropriate and timely response to compliance violations is essential;" that "[w]e track, monitor, and report potential incidents of noncompliance worldwide; and that, "[w]here necessary, we react promptly to confirmed compliance violations, through appropriate and effective sanctions ranging from warnings to termination of employment contracts." ¶110.

14

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

These statements were false because Defendants neither reacted promptly nor imposed any sanctions in reaction to West's repeated violations.

## III.    ARGUMENT

Courts assess Rule 12(b)(6) motions by considering the complaint[1] in its entirety, "accept[ing] all factual allegations . . . as true" and construing them in the light most favorable to plaintiff. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). A complaint should not be dismissed if it contains a "sufficient factual matter [that], accepted as true, 'state[s] a claim to relief that is plausible on its face.'" *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts must be mindful that "a district court ruling on a motion to dismiss is not sitting as a trier of fact" and "[a] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

Claims asserted under Section 10(b) of the Securities Exchange Act must plead six elements: a misrepresentation or omission of material fact, scienter, a connection with the purchase of sale of a security, reliance, economic loss, and loss causation. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005). Defendants challenge only falsity, scienter, and loss causation.

### A.  Plaintiff Adequately Pleads Misrepresentations and Omissions of Material Facts

To plead falsity under the PSLRA, a plaintiff must "specify each statement [or omission] alleged to have been misleading [and] the reason or reasons why the statement [or omission] is

---

[1] The Motion requests that the Court take judicial notice of certain documents. To the extent the Court takes notice of these documents, it may only take notice of the fact that statements in those documents were made, and any attempt by Defendants to use these exhibits to defeat Plaintiff's adequately pled claims is improper and highly discouraged by the Ninth Circuit. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018) (recognizing a "concerning pattern in securities cases" by defendants to improperly exploit judicial notice "to defeat what would otherwise constitute adequately stated claims at the pleading stage").

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

misleading." 15 U.S.C. § 78u-4(b)(1)(B). The allegations must identify who made the allegedly misleading statements and what statements were misleading, state where and when the statements were made, and explain why the statements were misleading. *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). A statement is misleading "if it would give a reasonable 'investor the impression of a state of affairs that differs in a material way from the one that actually exists.'" *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008).

An omission is actionable if the speaker has a duty to speak. A duty to speak arises, when (1) the speaker chooses to speak and further disclosure is necessary to render the statements not misleading or (2) a "specific rule or regulation" requires disclosure. Both of those bases apply here. In most circumstances, "[w]hether a failure to disclose company problems is an omission causing statements to be misleading is ... a factual determination left to the jury," and thus should not be decided on a motion to dismiss. *In re Newbridge Networks Sec. Litig.*, 962 F. Supp. 166, 180 (D.D.C. 1997). A statement that omits material information may be misleading even if the statement is not literally false. *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1054 (9th Cir. 2014).

The Complaint meets these criteria and adequately pleads falsity.

### 1. Defendants Misled Investors By Omitting West's Misconduct From the Company's Non-Financial Disclosures

The European Union's Non-Financial Reporting Directive ("NFRD"), adopted in 2014, imposes affirmative disclosure obligations on large public companies like Adidas. ¶77. Section 29 of the NFRD obligated Adidas to publish an annually "information to the extent necessary for an understanding of the group's development, performance, position and impact of its activity, relating to, as a minimum, . . . social and employee matters." ¶79. Specifically, Section 29 requires disclosure of the outcomes of its social policies and "the principal risks . . . including, where relevant and proportionate, its business relationships, products or services which are likely to cause adverse impacts in those areas, and how the group manages those risks. ¶80. The NFRD required Adidas to

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

"provide adequate information in relation to matters that stand out as being most likely to bring about the materialisation of principal risks of severe impacts, along with those that have already materialized" and instructed that "[t]he severity of such impacts should be judged by their scale and gravity." ¶81.

The NFRD offers companies flexibility to determine which framework they use to disclose the information required under NFRD. Throughout the Class Period, Adidas assured investors that the Company's disclosures "fulfills the Global Reporting Initiative's (GRI) Standards 'Core' option." ¶82. GRI requires "well-reasoned estimates that reflect the likely size and nature of impacts" and prohibits the omission of "relevant information . . . that reflects significant economic, environmental, and social impacts." ¶86. Further, GRI requires the disclosures to be "sufficiently accurate and detailed for stakeholders to assess the reporting organization's performance." ¶88. The disclosure must reflect "positive and negative aspects of the reporting organization's performance to enable a reasoned assessment of overall performance" and must include "both favorable and unfavorable results." ¶89.

Throughout the Class Period, Adidas's annual reports misled investors by disclosing an overly rosy picture of the Company's social policies while omitting all negative information concerning West's misconduct, the Company's failure to address the misconduct, and the risk the misconduct posed to the Company and the Yeezy partnership.

The Motion's contention that "[n]o court has held that the provisions cited by Plaintiff give rise to disclosure obligations that are actionable under the federal securities laws," (Motion at 17), is irrelevant.[2] The Motion does not – and cannot – dispute that the NFRD imposed affirmative reporting obligations on Adidas. *See Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir.

---

[2] No court has dismissed securities fraud allegations based on NFRD disclosure obligations.

2015) (issuers have an independent duty to disclose material facts "when there is . . . a statute or regulation requiring disclosure"). Nor does the Motion dispute that the Company voluntarily imposed GRI reporting obligations upon itself. *See Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 217 (5th Cir. 2023) ("a duty to speak the full truth arises when a defendant undertakes a duty to say anything").

The Motion asserts that the Company "easily satisfied the NFRD requirements and GRI guidelines by providing in their 'Risk and Opportunity' sections (and elsewhere throughout each Annual Report) both detailed explanations of various risk categories, and the steps taken to mitigate each of those risks." Motion at 18. But the Motion fails to identify *any* disclosures that would allow investors to understand the material risk that West's misconduct posed or the social harms his misconduct was causing to the Company, its employees, and stakeholders. Further, in violation of the GRI guidelines requirement to provide balanced disclosures that report both favorable and unfavorable results, the Company's disclosures painted an overly rosy picture of the Company's social policies and the outcomes of those policies. ¶¶86-89.

Further, the Motion acknowledges that GRI required the Company to provide accurate and detailed disclosures concerning "key topics and concerns that have been raised through stakeholder engagement, including[] how the organization has responded to those key topics and concerns." Motion at 18. But the Company failed to disclose that Adidas employees repeatedly raised concerns about West's misconduct to the Company's management. As the *New York Times* reported, "executives disregarded employee concerns that his troubling conduct risked tainting the brand's reputation."

Finally, GRI imposed an independent duty on Defendants to provide disclosures on topics that are material. Under GRI, "materiality is the principle that determines which relevant topics are sufficiently important that it is essential to report on them." Materiality is determined by a mix of

factors, including "the organization's overall mission and competitive strategy," "the concerns expressed directly by stakeholders," and "broader societal expectations." Defendants do not dispute that West's misconduct, the risks it posed to the Company, and the Company's inappropriate handling of it were material. Accordingly, Defendants omission of these issues violated their disclosure obligations.

## 2. Defendants' Risk Disclosures Misled Investors

Defendants misled investors by warning of hypothetical risks while omitting that the purportedly hypothetical risks had already come to fruition. As the Ninth Circuit has made clear, "Risk disclosures that 'speak[ ] entirely of as-yet-unrealized risks and contingencies' and do not 'alert[ ] the reader that some of these risks may already have come to fruition' can mislead reasonable investors." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 702–05 (9th Cir. 2021) (quoting *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985–87 (9th Cir. 2008)).

The Partnership Risk disclosures warned that "improper behavior of individual athletes, influencers or partners in the entertainment industry could have a negative spill-over effect on the company's reputation, lead to higher costs or liabilities or even disrupt business activities." ¶107. Adidas assured investors that it implemented measures to mitigate these risks, including "clauses in contractual agreements with athletes, clubs and federations or other partners that allow us to suspend or even terminate our partnership in case of improper or unethical conduct." A reasonable investor would assume from these hypothetical warnings that (i) the Company was unaware that any of its celebrity partners were engaging in improper behavior that would damage the reputation of the Company, and (ii) that the Company would take action to mitigate such a risk if it arose, including by suspending or terminating the partnership. This disclosure misled investors because it omitted the fact that (i) West, easily the Company's most important partner, routinely exhibited "improper behavior" that would tarnish the Company's reputation if it became public, and (ii)

despite full awareness of West's improper conduct and the risk it posed to the Company, the Company did not suspend or terminate his contract.

The Ninth Circuit's decision in *Alphabet,* 1 F.4th, at 702–05, reversing the district court's dismissal of allegedly misleading risk disclosures, is particularly instructive. In *Alphabet*, investors alleged that Alphabet's risk disclosure stating that concerns about Alphabet's "practices with regard to the collection, use, disclosure, or security of personal information or other privacy related matters" could damage the company's "reputation and adversely affect [its] operating results" were misleading because they omitted the fact that Alphabet was aware that a privacy bug had potentially exposed private user data. The Ninth Circuit agreed, holding that "Alphabet's warning [] of risks that 'could' or 'may' occur is misleading to a reasonable investor when Alphabet knew that those risks had materialized." *Id*., at 704. The Ninth Circuit held that the risks "ripened into actual harm when the Privacy Bug was detected and created the new risk that this discovery would become public." Similarly, here, the Partnership Risk materialized when Adidas detected West's misconduct, which in turn created a new risk that West's misconduct would become public.

Importantly, in the Ninth Circuit, the fact that a *risk* has materialized does not require the *harm* to have materialized. *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 949 (9th Cir. 2023) (holding "[o]ur case law does not require harm to have materialized for a [risk disclosure] to be materially misleading" and rejecting "suggestion that the shareholders have not adequately pleaded falsity because they 'have not sufficiently alleged that Facebook knew that its reputation and business were *already* harmed at the time of the filing of the 10-K'").

The Motion mistakenly relies on a series on series of inapposite cases to argue that the risk disclosures were not misleading. In *Constr. Laborers Pension Tr. for S. California v. CBS Corp.*, 433 F. Supp. 3d 515, 538 (S.D.N.Y. 2020), investors alleged that risk disclosures concerning the importance of CBS's CEO to the company were misleading because they "failed to disclose the

risk that Moonves would be ousted due to accusations of sexual misconduct." The court held that the allegations were conclusory and implausible: the company had only heard rumors of the CEO's misconduct, and the company promptly began an investigation. *Id.*, at 537 ("the Amended Complaint does not allege that CBS dragged its feet initiating or conducting the investigation. It would have been strange—and irresponsible—for CBS to publicly predict the outcome of its independent investigation into Moonves before the investigation was complete or to disclose that Moonves was at risk of being ousted for having engaged in sexual misconduct based solely on rumors"). Here, in contrast, Defendants had been fully aware of West's improper behavior for years.

Further, the *CBS* court held the risk warning was not misleading because it "stated simply that Moonves was important to CBS" and had nothing to do with "misconduct." Here, as Defendants concede, the risk warnings at issue explicitly discussed potential harm caused by a celebrity partner's "improper behavior." *See* Motion at 13 ("the Company's disclosure regarding Business Partner Risk warned investors of precisely the type of occurrence that Plaintiff alleges regarding Ye in the fall of 2022"); *id.* ("the disclosure describes the exact risk mitigation mechanism that adidas ultimately invoked"); *id.* ("the Media and Stakeholder Risk Disclosures contemplated precisely the sort of negative press coverage of Ye that ultimately emerged"). Similarly, the other cases cited by Defendants are distinguishable because they involved a generic risk warning that was "insufficiently specific to render it material and actionable." *Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*, 964 F. Supp. 2d 1128, 1141 (N.D. Cal. 2013) (warning that "the loss of executives and key employees could have a significant impact on our operations" was too generic to require disclosure concerning a specific executive's potential violations of the code of conduct); *see also Irving Firemen's Relief & Ret. Fund v. Uber Techs.*, 398 F. Supp. 3d 549, 557 (N.D. Cal. 2019), *aff'd sub nom. Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*, 998 F.3d 397 (9th Cir. 2021) (generic warning that "Uber's reputation and

business may be harmed by negative publicity . . . does not give rise to a duty to disclose Plaintiff's purported laundry list of possible reputational harms").

Defendants' contention that the risk disclosures do not state or imply "that Ye or any other partner had never engaged in any inappropriate or problematic conduct" is similarly misplaced. Warning about a celebrity partner's misbehavior in purely hypothetical terms conveys to investors that the misconduct is conjecture, not reality. The Ninth Circuit recently rejected this same contention in *Facebook*:

> Referencing Facebook's risk statements as including damage to its business, reputation, and competitive position, the dissent asserts that the risk statements in Facebook's 2016 10-K were not false or materially misleading because they "do not represent that Facebook was free from significant breaches at the time of the filing." The inadequacy of the risk statements, however, is not that Facebook did not disclose Cambridge Analytica's breach of its security practices. Instead, the problem is that Facebook represented the risk of improper access to or disclosure of Facebook user data as purely hypothetical when that exact risk had already transpired. A reasonable investor reading the 10-K would have understood the risk of a third party accessing and utilizing Facebook user data improperly to be merely conjectural.

*In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 949 (9th Cir. 2023). The same logic applies here: Defendants risk disclosures misled investors because they portrayed risks as hypotheticals when they had already materialized. See, e.g., *Cutler v. Kirchner*, 696 F. App'x 809, 813 (9th Cir. 2017) ("statements were misleading because they disclosed a risk 'in the abstract' but omitted the fact that it had 'already ... come to fruition.' . . . The company came to expect these problems, and made efforts to fix them. That is enough to conclude that the risk disclosures were misleading") (quoting *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009)). "[C]autionary words about future risk cannot insulate from liability an issuer's failure to disclose that the risk has, in fact, materialized in the past and is virtually certain to materialize again." *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 85 (2d Cir. 2021); *Dolphin & Bradbury, Inc. v. S.E.C.*, 512 F.3d 634, 640 (D.C. Cir. 2008) (noting "the critical distinction between disclosing the risk a future event

*might* occur and disclosing actual knowledge the event *will* occur"). "One cannot, for example, disclose in a securities offering a business's peculiar risk of fire, the installation of a comprehensive sprinkler system to reduce fire danger, and omit the fact that the system has been found to be inoperable, without misleading investors." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014).

### 3. Anti-Discrimination, DEI, and Social Responsibility Statements Misled Investors

The Company repeatedly touted its anti-discrimination, DEI, and social sustainability programs and disclosures. These statements materially misled investors because they omitted West's misconduct and the Company's awareness and cover-up of the same.

For example, the Company's annual reports claimed that Adidas had a "zero-tolerance approach" towards discrimination and harassment (¶90), and the Company's August 28, 2020 press release announced that the Company strengthened its Global Anti-Discrimination and Non-Retaliation Policy and stated that "[w]e do not tolerate discrimination of any kind (¶120). These statements were false: West routinely mistreated Yeezy and Adidas employees by subjecting them to anti-Semitic comments and other workplace misconduct; West paid $5 million to a Yeezy employee to settle allegations that he subjected employees to anti-Semitism; the Company endangered employees by segregating complaints about West from normal human resources reporting to protect him; the Company's reaction to employee complaints about West's behavior was to either ignore them or to transfer the employee—not to punish West or intervene on the employees' behalf; and Defendants knew and had discussed that these facts, individually and collectively, posed a material risk to the Company's finances. ¶90.

The Motion contends these statements are non-actionable because they are "puffery" and "aspirational in nature." Motion at 16. But such affirmative statements cannot be dismissed as puffery or merely "aspirational." *See, e.g., City of Taylor Police & Fire Ret. Sys. v. Zebra Techs.*

*Corp.*, 8 F.4th 592, 595 (7th Cir. 2021) ("concrete assertion[s]" that are false are not puffery); *Flynn v. Exelon Corp.*, 2021 WL 1561712, at *9 (N.D. Ill. Apr. 21, 2021) ("unqualified statements regarding [company's] conduct," such as "Never use a third party to make payments or offers that could be improper," "take the Code of Conduct and Corporate Guidelines out of the realm of nonactionable aspirational statements and into the realm of statements regarding the Company's conduct and implies compliance"). "A simple heuristic to distinguish between an actionable misstatement and corporate puffery is that the latter is incapable of objective verification." *See Sanders v. Realreal, Inc.*, 2021 WL 1222625, at *9 (N.D. Cal. Mar. 31, 2021). The Company's claim of a "zero-tolerance approach" to discrimination is verifiably false. *See* ¶90. [3]

Further, in 2018 and 2019, the Company touted its inclusion in the Dow Jones Sustainability Indices, stating that Adidas "was rated as industry leader in corporate economic, environmental and social dimensions" and "was rated industry best in seven criteria," including "Human Rights" and "Social Reporting." ¶¶101, 113. The press releases further stated that the index "is based on a thorough analysis of corporate economic, environmental and social performance, assessing issues such as corporate governance, risk management, climate change mitigation, supply chain standards, labor practices, branding and customer relationship management." *Id*. These statements were false because they failed to disclose that the Company's high scores on social reporting were due to the issuance of false and misleading statements concerning the effectiveness of the Company's social policies. The Company's decision to tout these scores put the source of their success "at issue," which obligated disclosure of West's misconduct. *See, e.g.*, *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 761 (S.D.N.Y. 2017) (statements about a company's competitive advantage that fail

---

[3] Similarly, the CMS Disclosures stated that the Company was "fighting harassment and discrimination" and claimed the Company "react[s] promptly to confirmed compliance violations, through appropriate and effective sanctions ranging from warnings to termination of employment contracts." ¶110. These statements were false because Defendants neither reacted promptly nor imposed any sanctions in reaction to West's repeated violations.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

to disclose that the advantage was gained through illegal means are actionable, even if the statements are literally true).

### 4. Defendants' "Truth on the Market" Defense Fails.

Defendants ask the Court to take judicial notice of two news articles that were not cited in the Complaint in an attempt to invoke a "truth on the market" defense (Motion at 5), which posits "a misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000). "[T]o avoid liability under this theory, 'any material information which insiders fail to disclose must be transmitted to the public with a degree of intensity and credibility sufficient to effectively counter-balance any misleading impression created by the insiders' one-sided representations.'" *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1025 (C.D. Cal. 2008) (quoting *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989)). "As a general rule, the truth-on-the-market defense is intensely fact-specific, so courts rarely dismiss a complaint on this basis." *Id.*

Defendants do not even attempt to meet this heavy burden, and nothing in the current record suggests that West's anti-Semitism and other misconduct was conveyed with the necessary degree of intensity and credibility sufficient to counter-balance Defendants' misstatements. *See Sneed v. AcelRx Pharms., Inc.*, 2023 WL 4412164, at *6 (N.D. Cal. July 7, 2023) (refusing to dismiss at pleading stage despite recognizing that "full information . . . was publicly available").

### B. Plaintiff Adequately Alleges Scienter

Plaintiff alleges facts raising a strong inference of scienter, which not only includes knowledge, "but also deliberate recklessness." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016). The "inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation,

meets that standard." *Tellabs,* 551 U.S. at 322– 23. A "strong inference" is raised when "a reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference" of nonfraudulent intent. *Id.* at 310. The scienter inference "need not be irrefutable . . . or even the most plausible," and no "smoking-gun" is required. *Id.* at 324–26. "'[F]alsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts,' and the two requirements may be combined into a unitary inquiry under the PSLRA." *In re Capstone Turbine Corp. Sec. Litig.*, 2018 WL 836274, at *5 (C.D. Cal. Feb. 9, 2018) (citing *In re Daou Sys., Inc.*, 411 F.3d at 1015). Moreover, "a tie goes to the plaintiffs when there are multiple plausible theories at the pleadings stage of litigation." *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 999 n.8 (9th Cir. 2014)

Crucially, Defendants fail to offer any competing non-fraudulent inference. Instead of identifying any plausible innocent explanation, Defendants improperly seek to "attack individual allegations in isolation," which "cannot overcome the overwhelming evidence drawn from a holistic view." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 710 (9th Cir. 2012).

### 1. Defendants Knew About West's Misconduct and the Risk that it Posed to the Company

"The most direct way to show both that a statement was false when made and that the party making the statement knew that it was false is via contemporaneous reports or data, available to the party, which contradict the statement." *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004); *see also S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008) ("allegations may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information"). The Complaint pleads facts demonstrating that Defendants knew the material contrary facts that they omitted from investors or that contradicted their statements to investors. The Complaint's confidential witness allegations are corroborated by numerous reports from reliable news sources.

26

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

In July 2018, a Yeezy employee accused West of making anti-Semitic comments and demanded $100 million to settle the matter. CW1 led a two-week investigation into the incident, advised West to settle the claim, and ultimately negotiated a $5 million payout to the Yeezy employee. Fearing news of the settlement would reach the media, CW held a call with West and Adidas executives in Germany – including Ohlmeyer and former Yeezy COO and President of Yeezy Footwear Udi Avshalom. ¶64. The New York Times confirmed that West disclosed to Liedtke and another Adidas manager that he "paid a seven-figure settlement to the outgoing chief executive of his Yeezy operation, who had accused him of commending Hitler and creating a hostile workplace." ¶65.

The Wall Street Journal reported that, in October 2018, "a presentation to members of the Adidas executive board, a group that included CEO Kasper Rorsted and the head of human resources, highlighted the risks for employees interacting with Mr. West and detailed mitigation strategies for the relationship with the Yeezy creator, including cutting ties with the rapper-turned-designer, documents show." ¶59. CW2 and Adidas Senior VP Torbin Schumacher gave the October 2018 presentation to the executive board. CW2 stated that CEO Kasper Rorsted; CFO Harm Ohlmeyer; Brand President Eric Liedtke; Head of Human Resources Karen Parkin; Head of Global Sales Roland Auschel; and the Head of Operations all attended the presentation. CW2 stated that only one risk was presented to the board: West, himself. CW2 said the presentation put forth two options: terminate the Partnership or dedicate more resources to managing West. ¶60. The *New York Times* confirmed that Jim Anfuso, general manager of the Yeezy unit at Adidas, told the executive board at the October 2018 meeting that he "favored paying Mr. West to make a clean break because he 'feared Adidas was becoming dangerously dependent on an increasingly unmanageable partnership.'" ¶61. The Times also reported that Rorsted and Liedtke discussed with the executive board either spinning off Yeezy into a separate company or buying West out of his

contract. *Id.*

"These 'particularized allegations that defendants had 'actual access to the disputed information,' ... raise a strong inference of scienter." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017) (quoting *City of Dearborn Heights Act 345 Police & Fire Retirement Sys. v. Align Tech., Inc.*, 856 F.3d 605, 620 (9th Cir. 2017)).

Defendants contend that their knowledge of the contrary facts is irrelevant because Plaintiff must show that "that adidas knew what would occur in the fall of 2022." Motion at 19. But Plaintiff need not show that Defendants knew the precise outcome of the fraud ahead of time. Plaintiff need only show that Defendants knowingly or extremely recklessly misled investors. *See In re Emergent BioSolutions Inc. Sec. Litig.*, 2023 WL 5671608, at *24 (D. Md. Sept. 1, 2023) ("to adequately allege scienter, the Plaintiffs do not need to allege that Kramer could have predicted that this particular incident would occur in the future. They need only allege that the Defendants were severely reckless in omitting material facts that could mislead investors"); *In re Allianz Glob. Invs. U.S. LLC Alpha Series Litig.*, 2021 WL 4481215, at *31 (S.D.N.Y. Sept. 30, 2021) ("Defendant's failure to predict the COVID-19 pandemic is unrelated to Lehigh's actual allegations, which are that Defendant improperly concealed a change in investment strategy that left the Funds severely exposed to an increase in volatility — an allegation that is sustained regardless of the materialization of any tail risk. That Defendant failed to predict how that volatility actually materialized is immaterial to the scienter issue").

### 2. New CEO Bjorn Gulden's Post-Class Period Defense of West Supports Inference of Scienter

On September 12, 2023, new Adidas CEO Bjorn Gulden complimented and defended West. ¶152. In response to a question about the termination of the Yeezy partnership, Gulden stated: "I think Kanye West is one of the most creative people in the world. Both in music and what I call street culture. So, he's extremely creative and has together with Adi created a Yeezy line that was

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

very successful. And then, as creative people, he did some statements, which wasn't that good. And that caused Adi to break the contract and withdraw the product. Very unfortunate, because I don't think he meant what he said and I don't think he's a bad person – it just came across that way. That meant we lost that business. One of the most successful collabs in history – very sad. But again, when you work with third parties, that could happen. It's part of the game." ¶152.

Gulden's comments further demonstrate that Adidas never believed its promises to investors that the Company was committed to diversity and inclusivity or that it had a zero-tolerance policy for discrimination. To Adidas, the only "unfortunate" part of West's anti-Semitism and hate was the fact that he said it publicly—which eventually forced Adidas to act. The Company would have concealed his misconduct forever, as it did throughout the Class Period, despite knowing that West had made similar remarks to Yeezy and Adidas employees, if doing so allowed them to sell more Yeezy shoes. ¶153.

Defendants contend that Plaintiff cannot rely on post-Class Period statements from the Company's CEO. Motion at 20. Defendants cite no authority for this assertion. Courts allow plaintiffs to rely on post-class period statements to the extent they are relevant to falsity or scienter allegations. *See, e.g., In re Applied Micro Cirs. Corp. Sec. Litig.*, No. 01-CV-0649 K AJB, 2002 WL 34716875, at *10 (S.D. Cal. Oct. 4, 2002) (denying motion to strike post-class period statements and holding that "Plaintiff has sufficiently alleged that the statements are either admissions by the Defendants or relevant to the issue of scienter and falsity").

### 3.   Scienter Can Be Imputed to Defendants

Courts can infer scienter from allegations of facts that "were prominent enough that it would be absurd to suggest that top management was without knowledge of the matter." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 989 (9th Cir. 2008). Here, knowledge of the Company's major interactions with and about West and Yeezy can be imputed to the Defendants. By 2021, the Yeezy

partnership brought in more than $1.7 billion in sales – representing 8 percent of the Company's revenue and over 40 percent of the Company's profits. That, alone, is enough to reasonably infer that Defendants were aware of West's misconduct and the risks he posed to the Company. *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 946 (9th Cir. 2023) ("We state the obvious. A CEO who does not know the source of $1.126 billion in company revenues during fifteen-month period, or $1.35 billion during an eighteen-month period, is unlikely to exist. Or if such a CEO does exist, he or she is not likely to remain CEO for very long.").

Rorsted and Ohlmeyer's scienter can be imputed to the Company. *See, e.g., U.S. Sec. & Exch. Comm'n v. C3 Int'l, Inc.*, 2022 WL 16814859, at *5 (C.D. Cal. Nov. 7, 2022) (executive's "scienter can be imputed to [corporate defendant] because a corporation is responsible for a corporate officer's fraud committed within the scope of his employment"); *S.E.C. v. Platforms Wireless Int'l Corp.*, 559 F. Supp. 2d 1091, 1096 (S.D. Cal. 2008) (same). Further, Rorsted and Ohlmeyer's scienter can be imputed to each other. *See In re Cadence Design Sys., Inc. Sec. Litig.*, 692 F. Supp. 2d 1181, 1192 (N.D. Cal. 2010) (one of five executive officer's direct involvement in fraudulent transaction "support[s] an inference that the other executive officers were aware of certain key facts" about the transactions).

### 4. Motive and Opportunity Support the Inference of Scienter

Defendant Rorsted was motivated to mislead investors about West's misconduct and the risks it posed to the Partnership and the Company because his compensation was directly tied to both the Company's ESG performance and the Company's net income. ¶151. The 2021 Report states that the performance criterion for Rorsted's performance bonus included the "[a]verage target achievement of Brand Heat, Diversity, Equity, and Inclusion, and logistics efficiency." *Id*. The Board determined Rosted's degree of target achievement for this criterion was 163%, which contributed to netting Rorsted a $2,187,500 performance bonus. Rorsted also received a $4,687,500

long term variable performance bonus in 2020 for Adidas achieving a $1 billion increase in net income, the vast majority of which was attributable to the Partnership. *Id*. Accordingly, Rorsted's motive and opportunity contribute to an inference of scienter. *See Longo v. OSI Sys., Inc.*, 2021 WL 1232678, at *8 (C.D. Cal. Mar. 31, 2021) (denying dismissal and finding scienter in part based on incentive program directly tied to area of fraud); *Richard v. Nw. Pipe Co.*, 2011 WL 3813073, at *4–5 (W.D. Wash. Aug. 26, 2011) (finding inference of scienter, in part, because incentive program was tied to net income, and defendants subsequently overstated net income).

### 5.  The Inference of Scienter Is At Least As Compelling as Defendants' Suggested Inference

The Complaint pleads a strong inference of scienter. However, even if each individual scienter allegations are insufficient, the Court must "conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *New Mexico State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011) (reversing dismissal and finding a strong inference of scienter). The holistic review must consider even "[v]ague or ambiguous allegations" because "federal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).

Defendants suggest that the inference of non-fraudulent intent is more compelling. According to Defendants, the Company took West's misconduct "seriously," dedicated additional resources to the partnership in 2018, and this resource reallocation "worked" until the 2022 termination. Motion at 20. Defendants do not – and cannot – cite to any facts supporting their assertion that the Company took West's misconduct seriously. Indeed, the Complaint is replete with credible, plausible allegations that the Company never even confronted West about his misconduct, much less took any action to remediate it. ¶¶57-76. Nor do Defendants attempt to explain how this

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

counterfactual narrative implies a non-fraudulent intent. As the Ninth Circuit explained in *Alphabet*, remediating a materialized risk does not absolve a company from misleading investors about the risk. In *Alphabet*, the defendants argued that "any omission from the Form 10-Qs was not misleading because Google had already remediated the software glitch in Google+ before it made the 10-Q statements" and that "because Google fixed the Three-Year Bug and no users were harmed, Alphabet's failure to disclose does not support a strong inference of scienter." *In re Alphabet*, F.4th 704, 707. The Court rejected those arguments, explaining that patching a problem does not cure omissions or resolve the underlying corporate failure that led to the problem. *Id*.

The more compelling inference is that Defendants were happy to mislead investors about the Company's commitment to social justice and conceal West's misconduct for as long as Yeezy continued generating billions of dollars of revenue for the Company.

## C.     The Complaint Adequately Pleads Loss Causation

"To prove loss causation, plaintiffs need only show a 'causal connection' between the fraud and the loss by tracing the loss back to the very facts about which the defendant lied." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018). "To be corrective, the disclosure need not precisely mirror the earlier misrepresentation, but it must at least relate back to the misrepresentation and not to some other negative information about the company." *Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1207–08 (9th Cir. 2020). "The Supreme Court has emphasized that pleading loss causation is 'not meant to impose a great burden upon a plaintiff,' and the Ninth Circuit has held that loss causation involves 'no more than the familiar test for proximate cause,' and 'there are an infinite variety of ways for a tort to cause a loss." 753 *Joyce v. Amazon.com, Inc.*, 2023 WL 8370101, at *15 (W.D. Wash. Dec. 4, 2023) (quoting *Dura Pharms.*, 544 U.S. at 347 and *First Solar Inc.*, 881 F.3d at 753.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

Defendants contend the Complaint fails to plead loss causation because the corrective disclosures "do not reveal any fraudulent conduct by adidas." Motion at 21. Defendants misunderstand the law. "Disclosure of the fraud is not a sine qua non of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss."[4] *First Solar Inc.*, 881 F.3d at 753. Rather, "[t]o qualify as a corrective disclosure in the securities fraud context a report need only bring to light the falsity of past challenged statements." *Amazon*, 2023 WL 8370101, at *16.

Defendants' reliance on *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014) is misplaced. The investors in *Loos* failed to connect disappointing financial results to the alleged fraud or misstatements as opposed to simple poor financial health. *Id*; see also *WageWorks*, 2020 WL 2896547, at *8 ("*Loos* addressed only one way of pleading loss causation, not the "infinite variety" of possible proximate cause allegations. The issue in *Loos*—distinguishing loss attributable to fraud, as opposed to poor financial health generally—is not applicable here"). Here, as Defendants neatly summarize (Motion at 21), each of the alleged corrective disclosures are directly tied to the alleged misstatements and omissions concerning West's misconduct and the risks it posed to the Company. ¶¶137-149. Further, the fallout from West's public comments and the subsequent termination of the Yeezy partnership were materializations of the risks Defendants concealed from investors. ¶149; *see also WageWorks*, 2020 WL 2896547, at *5 ("under a 'materialization of the risk' theory, plaintiff may allege that 'the very facts about which defendant lied' caused the injuries. Any kind of proximate cause satisfies this requirement")

---

[4] Defendants' reliance on *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014) is misplaced. The investors in *Loos* failed to connect poor earnings to revelations of earnings to the alleged fraud. *See In re WageWorks, Inc., Sec. Litig.*, 2020 WL 2896547, at *8 (N.D. Cal. June 1, 2020) ("*Loos* addressed only one way of pleading loss causation, not the "infinite variety" of possible proximate cause allegations. The issue in *Loos*—distinguishing loss attributable to fraud, as opposed to poor financial health generally—is not applicable here").

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

### D.    Plaintiff Adequately Alleges Control Person Liability

Plaintiff has adequately pleaded control person liability under Section 20(a) by alleging

primary violations and that Rorsted and Ohlmeyer were in positions of control. ¶¶21-24; *see In re*

*BofI Holding, Inc. Sec. Litig.*, 2017 WL 2257980, at \*21 (S.D. Cal. May 23, 2017).

## IV.    CONCLUSION

The Motions should be denied in their entirety. Alternatively, if the Court grants any portion

of the Motions, Plaintiff respectfully requests leave to amend.[5]


Dated: March 15, 2024                          Respectfully submitted,

                                               **THE ROSEN LAW FIRM, P.A.**
                                               By:  */s/ Phillip Kim*
                                               Phillip Kim, Esq. (pro hac vice)
                                               Laurence M. Rosen, Esq. (pro hac vice)
                                               Daniel Tyre-Karp (pro hac vice)
                                               275 Madison Avenue, 40th Floor
                                               New York, NY 10016
                                               Telephone: (212) 686-1060
                                               Fax: (212) 202-3827
                                               Email: pkim@rosenlegal.com
                                                       lrosen@rosenlegal.com
                                                       dtyrekarp@rosenlegal.com

                                               *Lead Counsel for Lead Plaintiff and the Class*

                                               **RANSOM, GILBERTSON, MARTIN &
                                               RATLIFF, LLP**
                                               Jeffrey S. Ratliff, OSB 895422
                                               5441 S Macadam Ave, Suite 301
                                               Portland, OR 97239
                                               T: 503-226-3664

                                               *Liaison Counsel for Lead Plaintiff and the Class*

---

[5] *See Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (holding that leave to amend should be freely granted unless "the pleading could not possibly be cured by the allegation of other facts"); *Osher v. JNI Corp.*, 183 F. App'x 604, 605 (9th Cir. 2006) ("[l]eave to amend is to be granted with extreme liberality in securities fraud cases, because the heightened pleading requirements imposed by the PSLRA are so difficult to meet").

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS