IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **HRSA-ILA FUNDS**, individually and on behalf of all others similarly situated, | Case No. 3:23-cv-00629-IM |
| Plaintiff, | **OPINION AND ORDER GRANTING DEFENDANTS ADIDAS AG'S AND HARM OHLMEYER'S MOTIONS TO DISMISS** |
| v. | |
| **ADIDAS AG**; **KASPER RORSTED**; and **HARM OHLMEYER**, | |
| Defendants. | |

Laurence Rosen, Phillip Kim, and Daniel Tyre-Karp, The Rosen Law Firm, P.A., 275 Madison Ave., 40th Floor, New York, NY 10016. Jeffrey S. Ratliff, Ransom, Gilbertson, Martin & Ratliff, 5441 S. Macadam Ave., Ste 301, Portland, OR 97239. Attorneys for Lead Plaintiff.

Maeve O'Connor, Brandon Fetzer, and Elliot Greenfield, Debevoise & Plimpton LLP, 66 Hudson Boulevard, New York, NY 10001. Chad M. Colton, Matthew A. Levin, and Stanton R. Gallegos, Markowitz Herbold PC, 1455 SW Broadway, Ste 1900, Portland, OR 97201. Attorneys for Defendants Adidas AG and Harm Ohlmeyer.

**IMMERGUT, District Judge.**

This is a putative class action alleging securities fraud under §§ 10(b) and 20(a) of the

Securities Exchange Act of 1934. Lead Plaintiff is HRSA-ILA Funds. Defendants are Adidas

AG ("Adidas" or the "Company") and two Adidas executives, Kasper Rorsted and Harm

PAGE 1 – OPINION AND ORDER GRANTING THE MOTIONS TO DISMISS

Ohlmeyer. Plaintiff contends that Defendants failed to publicly disclose (i) offensive and inappropriate acts committed between 2013 and 2018 by Adidas's celebrity business partner Ye (formerly known as Kanye West) and (ii) Adidas's concerns about that conduct. *See* Second Amended Complaint ("SAC"), ECF 29. In so doing, Plaintiff argues, Defendants misled investors and committed federal securities fraud.

Adidas and Ohlmeyer have moved to dismiss Plaintiff's claims.[1] *See* Adidas's Motion to Dismiss ("MTD"), ECF 34; Ohlmeyer's Motion to Dismiss, ECF 36. This Court heard oral argument on August 1, 2024. *See* Minutes of Proceedings, ECF 44.

The allegations here show that Ye engaged in erratic, inappropriate, and antisemitic behavior between 2013 to 2018 and beyond, some of which was widely known to the public. Certainly, that Ye allegedly engaged in such behavior while working with Adidas is troubling. This Court does not condone what Ye allegedly did. But the question before this Court is not whether to admonish Ye or hold Adidas morally accountable for Ye's conduct. Rather, this Court is faced with a precise legal question: has Plaintiff sufficiently pleaded facts showing that Adidas misled investors and thereby committed federal securities fraud? On the current record before this Court, the answer is no. None of the corporate statements Plaintiff identifies as allegedly misleading are actionable under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934. Accordingly, this Court GRANTS Defendants' Motions to Dismiss.

## BACKGROUND

The allegations below are based on the Second Amended Complaint and documents incorporated therein by reference. *See In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1051 (9th Cir. 2014). At the motion to dismiss stage, these allegations must be taken as true and construed

---

[1] Defendant Rorsted has not been served.

in the light most favorable to Plaintiff. *See Nguyen v. Endologix, Inc.*, 962 F.3d 405, 408 (9th Cir. 2020). This Court cannot, and does not, make any definitive factual findings in this Opinion.

## A.  The Adidas-Yeezy Partnership

Ye, formerly known as Kanye West, is an American musical artist and fashion designer. SAC, ECF 29 ¶ 28. Ye controls and owns, all or substantially all, of Yeezy LLC, Yeezy Marketing LLC, and Yeezy Footwear LLC (collectively, "Yeezy"). *Id.* Defendant Adidas is a German sports brand that designs, distributes, and markets athletic and sporting lifestyle products. *Id.* ¶ 20. Adidas's American depository receipts ("ADR") trade under the ticker symbols "ADDYY" and "ADDDF." *Id.* Defendant Kasper Rorsted served as Adidas's Chief Executive Officer from 2016 to November 11, 2022. *Id*. ¶ 21. Defendant Harm Ohlmeyer has served as Adidas's Chief Financial Officer since 2017, and he also served as interim Chief Executive Officer from November 12, 2022 to December 31, 2022. *Id.* ¶ 22.

In November 2013, Adidas announced a partnership with Ye and Yeezy to design, promote, and sell shoes. *Id.* ¶ 33. The Adidas-Yeezy shoes quickly proved to be popular. On December 2, 2015, the Yeezy 750 Boost—the first Adidas-Yeezy shoe—won "Shoe of the Year" at the Footwear News Achievement Awards. *Id.* ¶ 35.

On June 29, 2016, Adidas and Ye announced a new ten-year agreement, with plans to expand the varieties of Yeezy styles, open retail stores, and enter new markets. *Id.* ¶ 36. Under that agreement, Yeezy licensed its trademark of "Yeezy" to Adidas in exchange for fifteen percent of sales. *Id.* ¶ 37. Adidas manufactured and sold the Yeezy products, and Adidas retained the ownership of any Yeezy designs. *Id.* ¶ 37. Adidas also provided Yeezy with $100 million per year for marketing purposes and created a Yeezy business unit to work with Ye and his team. *Id.* In 2017, the first full year of the renewed Adidas-Yeezy partnership, net sales reached $300 million. *Id.* ¶ 39. By 2021, the last full year of the agreement, the Adidas-Yeezy partnership

brought in more than $1.7 billion in sales, which represented eight percent of Adidas's total revenue and more than forty percent of Adidas's profits. *Id.* ¶¶ 2, 41.

**B.  Ye's Early Alleged Misconduct (2013–2018)**

According to the Complaint, Ye engaged in misconduct from the very start of the partnership. Just after signing the initial paperwork for the partnership in 2013, Ye "made Adidas executives watch pornography at his Manhattan apartment." *Id.* ¶ 58. Weeks later, Ye, during a meeting with Adidas at its German headquarters, allegedly drew a swastika on the top of a shoe. *Id.* Also in 2013, Ye publicly stated that "Black people don't have the same level of connections as Jewish people."[2] ECF 35, Ex. 1 (Anti-Defamation League press release).

In 2015, Ye told *The Guardian* that "racism is a dated concept." ECF 35, Ex. 2. During the 2013 to 2018 period, he also allegedly made antisemitic statements to both Yeezy and Adidas employees. For example, on an unknown date, Ye said to one of his Yeezy executives that it was "productive" for Hitler to "murder 30,000 Jews a day." SAC, ECF 29 ¶ 67. On another unknown date, Ye allegedly told an Adidas executive that he should "hang a photo of Hitler in his kitchen and kiss it every day to practice unconditional love." *Id.* ¶ 68. In 2018, a Jewish Yeezy executive allegedly almost fought with Ye after Ye praised Adolf Hitler and the Nazis. *Id.* ¶ 66. And the same year, Ye paid $5 million as part of a settlement with one of his Yeezy employees who alleged that Ye had created a hostile workplace by making antisemitic remarks. *Id.* ¶¶ 64–65.

---

[2] Citing documents outside the Complaint, Defendants mention several public instances of Ye making offensive statements during the 2013 to 2020 period. *See* MTD, ECF 34 at 5. This Court will take judicial notice of these documents, "not for the truth of the matter asserted, but for the purpose of showing that particular information was available to the stock market." *Bos. Ret. Sys. v. Uber Techs., Inc.*, Case No. 19-cv-06361-RS, 2020 WL 4569846, at *3 (N.D. Cal. Aug. 7, 2020) (citation and internal quotation marks omitted). Plaintiff agrees that this Court "may . . . take notice of the fact that statements . . . were made" by Ye. Resp., ECF 39 at 15 n.1.

The allegation by the Yeezy employee and the settlement were both reported to some Adidas executives, including Defendant Ohlmeyer. *Id.* ¶ 64.

As alleged, Ye also brought his interest in pornography into the workplace. On an unknown date, he asked a Yeezy executive to "host an employee relations meeting at Pornhub." *Id.* ¶ 67. In February 2015, Ye "berated" Adidas's Yeezy manager and other Adidas employees "using sexually explicit language." *Id.* ¶ 69. As reported by *Rolling Stone* magazine on November 24, 2022 and alleged in the Complaint, Ye played pornography during Yeezy staff meetings, discussed porn and displayed an intimate photograph of his then-wife in job interviews, and showed similarly explicit videos and photos of himself and his then-wife to Yeezy team members. *Id.* ¶ 73.

Citing October and November 2022 articles from *Rolling Stone* magazine and the *New York Times*, Plaintiff alleges that Adidas executives were aware of Ye's behavior. *See id.* ¶ 73. Employees complained to Adidas executives about Ye's verbal abuse. *Id.* ¶ 69. In response, Adidas executives would move allegedly mistreated Adidas employees to other divisions within Adidas. *Id.* ¶ 74. In 2016, when Adidas negotiated the extension of its partnership with Ye and Yeezy, Adidas "insisted on adding a morals clause," which was included in the final contract. *Id.* ¶ 70. And according to the October 2022 *New York Times* article, "in 2018, Adidas executives and managers began a text message group called the 'Yzy hotline' to discuss their concerns about" Ye. *Id.* ¶ 71.

Plaintiff also alleges that Adidas funneled complaints about Ye away from the Company's regular channels for resolving workplace complaints. *Id.* ¶ 72. One human resources manager, assigned to working with Ye, reported complaints directly to Adidas's General Counsel. *Id.* According to a Chief Human Resources Officer for Adidas—a confidential

informant for Plaintiff—the human resources manager said that she could not share information about Ye with anyone but the General Counsel. *Id.* The Chief Human Resources Officer attests that this arrangement was "massively unusual," given that typically "[a]nything that was happening in North American went to [the Chief Human Resources Officer]. Except for Yeezy." *Id.* In the Chief Human Resources Officer's words, complaints about Ye went to the General Counsel "so there would be attorney-client privilege" allegedly to prevent the public disclosure of Ye's misconduct. *Id.* Adidas employees also directed complaints about Ye to Adidas Brand Manager Eric Liedtke. *Id.* ¶ 63. According to the October 2022 *New York Times* article, Ye's "Adidas handlers" knew sometime in 2018 that he was considering naming his next album "Hitler." *Id.* In May 2018, Ye publicly suggested that slavery was "a choice" for enslaved people. *Id.* ¶ 97.

In October 2018, Adidas's senior leadership, including Defendants Rorsted and Ohlmeyer, met in Germany to discuss "the risk of continuing a relationship with [Ye]." *Id.* ¶ 59 (citation omitted). The group conferred about "mitigation strategies for the relationship with" Ye, including "cutting ties" with him. *Id.* (citation omitted). But Adidas leadership decided not to part ways with Ye. *Id.* This meeting was not disclosed to the public. *Id.*

In 2020, Ye ran for President of the United States. While campaigning, Ye publicly criticized Harriet Tubman, claiming that she "never actually freed the slaves" and "just had them work for other white people." ECF 35, Ex. 3 (Associated Press article).

## C.  Ye's Public Statements in Fall 2022 and the Fallout (2022–2023)

In the Fall of 2022, Ye made another series of public antisemitic and racist remarks, kickstarting the events leading to this litigation. *See* SAC, ECF 29 ¶ 42. On October 3, 2022, at a fashion show in Paris, Ye wore a t-shirt emblazoned with the phrase "White Lives Matter"— which the Anti-Defamation League has called a "white supremacist phrase." *Id.* ¶ 43. Three days

later, on October 6, 2022, Adidas issued a statement: "After repeated efforts to privately resolve the situation, we have taken the decision to place the partnership under review. We will continue to co-manage the current product during this period." *Id.* ¶ 44. Later that day, Ye posted on Instagram, "FUUUUUUCK ADIDAS I AM ADIDAS ADIDAS RAPED AND STOLE MY DESIGNS." *Id.* ¶ 45.

The next day, on October 7, 2022, Ye posted an image on his Instagram account of a text conversation with Sean "Diddy" Combs and captioned the image with a statement that Ye would "show the Jewish people that told you [Combs] to call me that no one can threaten or influence me." *Id.* ¶ 46. That same day, shares of ADDYY fell $2.69 per ADR, or 4.6%, to close at $56.17, and shares of ADDDF fell $11.32 per ADR, or 9.5%, to close at $107.18. *Id.* ¶ 138.

On October 9, 2022, Ye posted on Twitter to his 31 million followers: "I'm a bit sleepy tonight but when I wake up I'm going death con 3 on JEWISH PEOPLE The funny thing is I actually can't be Anti Semitic because black people are actually Jew also You guys have toyed with me and tried to black ball anyone whoever opposes your agenda." *Id.* ¶¶ 6, 47. Twitter deleted the tweet and suspended Ye's account, and Instagram also suspended Ye's account. *Id.* ¶ 47.

On October 21, 2022, Balenciaga, a French fashion brand, announced that it was ending its relationship with Ye. *Id.* ¶ 139. Later that same day, a clip from a podcast surfaced of Ye stating: "the thing about it being Adidas is like, I can literally say anti-Semitic shit and they can't drop me. I can say anti-Semitic things, and Adidas can't drop me. Now what? Now what?" *Id.* During the same podcast, Ye also said he had "gotten used to getting screwed by the Jewish media" and that "the Jewish media blocked me out." *Id.* By the end of the day on October 21,

shares of ADDYY fell $2.19 per ADR, or 4.1%, to close at $51.75, and shares of ADDDF fell $8.61 per ADR, or 7.5%, to close at $105.75. *Id.* ¶ 140.

Four days later, on October 25, 2022, Adidas announced that it was terminating its partnership with Ye and Yeezy. *Id.* ¶ 8. In its press release, Adidas stated that it "does not tolerate antisemitism and any other sort of hate speech" and that Ye's comments "violate the [C]ompany's values of diversity and inclusion, mutual respect and fairness." *Id.*

On November 27, 2022, the *Wall Street Journal* published an article titled "Adidas Top Executives Discussed Risk of Staff's 'Direct Exposure' to Kanye West Years Ago." *Id.* ¶ 10. The article reported that Adidas executives knew by 2018 that Ye "routinely mistreated employees" and that the Company's executives met in October 2018 regarding whether to end its partnership with Ye. *Id.* On November 28, 2022, shares of ADDYY fell $2.02 per ADR, or 3.13%, to close at $62.34, and shares of ADDDF fell $0.81 per ADR to close at $126.44. *Id.* ¶ 11. Shares of ADDDF further fell $0.44 per ADR the day afterward to close at $126.00 on November 29, 2022. *Id.*

The fallout did not stop there. On February 9, 2023, Adidas warned the public that it could shift from a profit to a loss if it failed to sell its remaining inventory of Yeezy shoes. *Id.* ¶ 13. That day, shares of ADDYY fell $7.40, or 8.96%, to close at $75.16, and shares of ADDDF fell $21.83, or 13.22%, to close at $143.23. *Id.* And on February 10, 2023, ADDYY further fell $0.55, or 0.73%, to close at $74.61. *Id.* Next, on February 21, 2023, S&P Global announced that it was downgrading Adidas's credit rating from A-1 to A-/A-2 and stated that "[e]nding the Yeezy partnership with [Ye] will have a stronger-than expected hit on [Adidas's] operating performance in 2023." *Id.* ¶ 14. By the end of that day, ADDYY dropped $3.56, or 4.62%, to close at $73.59, and ADDDF dropped $4.85, or 3.17%.

PAGE 8 – OPINION AND ORDER GRANTING THE MOTIONS TO DISMISS

**D.  Procedural Background**

Plaintiff filed the first complaint on April 28, 2023. ECF 1. Plaintiff levied two claims: a violation of § 10(b) of the Exchange Act against Adidas, and a violation of § 20(a) of the Exchange Act against Defendants Ohlmeyer and Rorsted. *Id.* ¶¶ 68–82. Those remain the operative claims at issue in this Opinion. SAC, ECF 29 ¶¶ 164–78. The Class Period is May 3, 2018 to February 21, 2023. *Id.* ¶ 1.

On the same day that Plaintiff filed the initial complaint, Plaintiff's counsel, the Rosen Law Firm, published a notice of this potential class action in *Business Wire*. ECF 8-1. On June 27, 2023, Plaintiff was the sole putative class member to move for appointment as lead plaintiff, and this Court granted the motion on July 25, 2023. *See* ECF 8; ECF 13. Plaintiff filed the Second Amended Complaint, the operative complaint, on December 12, 2023. SAC, ECF 29. The next day, this Court set a briefing schedule for any motions to dismiss. ECF 30. Defendant Adidas timely filed its Motion to Dismiss on February 2, 2024, and Defendant Ohlmeyer filed his Motion to Dismiss on February 20, 2024.[3] *See* MTD, ECF 34; ECF 36. Plaintiff filed a response brief on March 15, 2024. *See* Plaintiff's Response to MTD ("Resp."), ECF 39. Defendants filed their joint reply on April 12, 2024. *See* Defendants' Reply ("Reply"), ECF 40.

On the very day Defendants filed their reply, the U.S. Supreme Court decided *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257 (2024), and Defendants relied on that case in attempting to rebut several of Plaintiff's arguments, *see* Reply, ECF 40 at 4–5. So this Court provided Plaintiff an opportunity to file a sur-reply to respond directly and exclusively to Defendants' arguments on the European Union's Non-Financial Reporting Directive and the

---

[3] Ohlmeyer's Motion adopts the arguments made in Adidas's Motion, and Defendant Kasper Rorsted has not yet been served. So this Court will refer to Adidas's Motion as representing Defendants' collective position.

Global Reporting Initiative. ECF 41. Plaintiff timely filed a sur-reply. Plaintiff's Sur-Reply ("Sur-Reply"), ECF 42.

With the benefit of the Parties' submissions and argument, this Court now resolves Defendants' Motions to Dismiss.

## LEGAL STANDARDS

Under Federal Rule of Civil Procedure 12(b)(6), a motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual allegations, the court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). The court must draw all reasonable inferences from the factual allegations in favor of the plaintiff. *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). But the court need not credit the plaintiff's legal conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In class action securities fraud cases, Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA") impose heightened pleading standards in addition to Rule 12(b)(6)'s requirements. *See Nguyen*, 962 F.3d at 414. Rule 9(b) requires a plaintiff alleging fraud or mistake to "state with particularity the circumstances constituting fraud or mistake." Under Rule 9(b), fraud allegations "must be specific enough to give defendants notice

PAGE 10 – OPINION AND ORDER GRANTING THE MOTIONS TO DISMISS

of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 947 (9th Cir. 2023) (citation and internal quotation marks omitted), *cert. granted sub nom. Facebook, Inc. v. Amalgamated Bank*, No. 23-980, 2024 WL 2883752 (U.S. June 10, 2024). The PSLRA requires a plaintiff alleging securities fraud to "plead with particularity both falsity and scienter." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009) (citation omitted). As to falsity, the complaint must "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1).

## DISCUSSION

Section 10(b) of the Securities Exchange Act of 1934 permits privates parties to sue those who have allegedly "use[d] or employ[ed], in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary." 15 U.S.C. § 78j(b); *see Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (explaining that § 10(b) contains an implied private right of action). To enforce § 10(b), the SEC has implemented Rule 10b-5, which makes it "unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). Section 20(a) provides for controlling persons liability, which requires a primary violation under § 10(b) and Rule 10b-5. *See* 15 U.S.C. § 78t(a); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 623 (9th Cir. 2017).

Section 10(b) and Rule 10b-5 are coextensive, and this Court therefore refers to them collectively as "§ 10(b)." *See SEC v. Zandford*, 535 U.S. 813, 816 n.1 (2002). To prove a

PAGE 11 – OPINION AND ORDER GRANTING THE MOTIONS TO DISMISS

violation under § 10(b), "a plaintiff must allege: (1) a material misrepresentation or omission by the defendant ('falsity'); (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re Facebook*, 87 F.4th at 947.

Plaintiff's claims concern three categories of statements: (1) Adidas's risk disclosures in its Annual Reports for FY 2018 to 2021; (2) Adidas's diversity, equity, and inclusion ("DEI") statements; and (3) those relating to the European Union's Non-Financial Reporting Directive ("NFRD") and the Global Reporting Initiative ("GRI").[4] Resp., ECF 39 at 19–25; Sur-Reply, ECF 42 at 2. Defendants challenge whether these statements were materially misleading and whether Plaintiff has adequately pleaded scienter and loss causation.

As explained below, this Court holds that, pursuant to the heightened pleading standards imposed by the PSLRA and Rule 9(b), Plaintiff has failed to sufficiently plead claims under §§ 10(b) and 20(a). None of the statements underlying Plaintiff's claims are materially misleading. This Court therefore grants Defendants' Motions to Dismiss. This Court need not, and does not, discuss the Parties' arguments on scienter and loss causation.

## A. Material Misrepresentation

An actionable material misrepresentation or omission has two components in federal securities law: First, a plaintiff "must allege a misrepresentation or a misleading omission with particularity and explain why it is misleading," and second, under "an objective standard, that misrepresentation or omission must have been material to investors." *Retail Wholesale & Dep't*

---

[4] Because Plaintiff's Complaint "refers extensively to" documents containing these statements and the documents "form[] the basis of" Plaintiff's claims, they are incorporated by reference in the Complaint. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) (citation omitted). Where necessary, this Court will cite and discuss the documents themselves and not the Complaint's excerpts of these documents. *Id.*

*Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017)

("*Hewlett-Packard*"). Defendants primarily dispute whether any statements Adidas made were

"misleading" and not whether they were material. *See* MTD, ECF 34 at 12–15.

    To determine whether a statement is misleading, courts apply the objective standard of a

"reasonable investor." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 699 (9th Cir. 2021) (citation

omitted). "Statements . . . are actionably false or misleading if they directly contradict what the

defendant knew at that time or create an impression of a state of affairs that differs in a material

way from the one that actually exists." *In re Facebook*, 87 F.4th at 948 (citations and internal

quotation marks omitted). Section 10(b) does not create an affirmative duty to disclose any and

all material information. Instead, disclosure is required only when necessary to make statements

made, in light of the circumstances in which they were made, not misleading. *See In re Alphabet*,

1 F.4th at 699.

    This Court concludes that Adidas's risk disclosures, DEI statements, and statements

about NFRD and GRI compliance were not material misrepresentations under § 10(b). The

following discussion addresses each in turn, first describing what the statements said and then

analyzing Plaintiff's contentions on the merits.

    **1. Adidas's Risk Disclosures Were Not Materially Misleading**

        **a. Description of the Risk Disclosures**

    In each of its Annual Reports from 2018 to 2021, Adidas provided three risk disclosures,

which this Court will refer to as Business Partner Risk, Personnel Risk, and Media Risk.[5] SAC,

ECF 29 ¶¶ 105–09, 127–28. All Parties agree that, with respect to these disclosures, the relevant

---

[5] The Annual Reports are incorporated by reference into the Complaint and have been provided as exhibits by Defendants. *See* Declaration of Brandon Fetzer, ECF 35 ¶¶ 5–8.

Annual Reports are substantially similar. *See id.* ¶ 111; MTD, ECF 34 at 6 nn.3–4. These

Reports were published in March of 2019 to 2022. SAC, ECF 29 ¶¶ 105, 115, 124, 132.

 *Business Partner Risk.* The Annual Reports state that "[u]nethical business practices on

the part of business partners or improper behavior of individual athletes, influencers or partners

in the entertainment industry could have a negative spill-over effect on the [C]ompany's

reputation, lead to higher costs or liabilities or even disrupt business activities." *Id.* ¶¶ 107, 111.

 *Personnel Risk.* The Annual Reports state that "the failure to install and maintain a

performance-oriented culture that fosters diversity and inclusion and strong employee

management amongst our workforce could also substantially impede our ability to achieve our

goals." *Id.* ¶¶ 109, 111.

 *Media Risk.* The Annual Reports state that "[a]dverse or inaccurate media coverage on

[Adidas's] products or business practices as well as negative social media discussion may

significantly harm the [A]didas reputation and brand image, lead to public misperception of the

[C]ompany's business performance and eventually result in a sales slowdown." *Id.* ¶¶ 111, 128.

### b.  Analysis of the Risk Disclosures

 At the outset, it is important to clarify which of Adidas's risk disclosures are at issue.

Plaintiff's Complaint points to all the risk disclosures—Business Partner Risk, Personnel Risk,

and Media Risk—as materially misleading statements. *See id.* ¶ 112. But even though

Defendants explicitly moved against all of these risk disclosures, Plaintiff's Response to

Defendants' Motions to Dismiss discusses at length only the Business Partner Risk disclosures.

*See* Reply, ECF 40 at 5; *see also* Resp., ECF 39 at 19–23. The other two disclosures are

mentioned only briefly in a conclusory sentence in the background section and two

parentheticals, but otherwise go undiscussed. As to those disclosures, therefore, Plaintiff has

waived its claims on the merits, and any such claims are dismissed.[6] *See Jenkins v. County of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005) (per curiam); *V.V. & Sons Edible Oils Ltd. v. Meenakshi Overseas, LLC*, 946 F.3d 542, 547 (9th Cir. 2019); *see also Rozier v. Dep't of Homeland Sec. Fed. Protective Serv.*, Case No.: 2:21-cv-07232-SB-AFM, 2022 WL 2199938, at *3 (C.D. Cal. Mar. 7, 2022) (collecting cases).

Turning to Adidas's Business Partner Risk disclosures, this Court holds that Plaintiff has failed to meet its heavy burden of showing that these disclosures were materially misleading. As explained, the Business Partner Risk disclosures stated that "[u]nethical business practices on the part of business partners or improper behavior of individual athletes, influencers, or partners in the entertainment industry could have a negative spill-over effect on the [C]ompany's reputation, lead to higher costs or liabilities or even disrupt business activities." 2020 Annual Report, ECF 35-6 at 19. The disclosures acknowledged that "the [C]ompany is exposed to a multitude of business partner risks." *Id.* The disclosures stated that Adidas "implemented various measures" for dealing with such behavior such as "generally includ[ing] clauses in contractual agreements with partners that allow [the Company] to suspend or even terminate [a] partnership in case of improper or unethical behavior." *Id.* And Adidas stated that its "Global Policy Manual provide[d] a framework for basic work procedures and processes" and that its "Fair Play Code of Conduct" also governed business partners' behavior. *Id.* at 22. The earliest relevant Business

---

[6] In its Response Brief, Plaintiff also did not discuss its claims based on statements Defendant Rorsted allegedly made on May 3, 2018. *Compare* SAC, ECF 29 ¶ 100 *with* Reply, ECF 40 at 3. At oral argument, Defendants reiterated that they had moved against all risk disclosures and Rorsted's statement. Although Plaintiff said that it did not intend to waive any of these claims, it thereafter, for over two hours, failed altogether to address these particular statements. Further, as explained, Plaintiff did not address these statements in its responsive briefing. "Failure to respond *meaningfully*" results in waiver. *LN Mgmt., LLC v. JPMorgan Chase Bank, N.A.*, 957 F.3d 943, 950 (9th Cir. 2020) (emphasis added).

Partner Risk disclosure at issue here was made on March 13, 2019 as part of Adidas's 2018 Annual Report. SAC, ECF 29 ¶ 105.

Plaintiff argues that, by issuing the Business Partner Risk disclosures, "Defendants misled investors by warning of hypothetical risks while omitting that the purportedly hypothetical risks had already come to fruition." Resp., ECF 39 at 19. According to Plaintiff, those relevant risks were that Ye "routinely made racist and anti-Semitic comments to Yeezy and Adidas employees." SAC, ECF 29 ¶ 9.

The Business Partner Risk disclosures "neither stated nor implied," however, that no celebrity partner was ever engaged in "improper behavior." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). To the contrary, the Business Partner Risk disclosures took such "improper behavior" as a given, and the warned-of risk in the disclosures was a hypothetical "negative spill-over effect" on the Company. *See Cao v. Uber Techs., Inc.*, Case No. 22-cv-04688-RFL, 2024 WL 2853968, at *1 (N.D. Cal. May 14, 2024) (explaining that a statement that "itself presumed" that a factual predicate was true could not be misleading). Indeed, while the risk disclosures stated that strategic partners' "approach *might* differ from [Adidas's] own business practices and standards, which could also negatively impact the [C]ompany's business performance and reputation," the same disclosures never used the word "might" to qualify any relevant references to "improper behavior." 2020 Annual Report, ECF 35-6 at 19 (emphasis added); *see Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 190 (2015) ("[A]n investor reads each statement within . . . a document, . . . in light of all its surrounding text, including hedges [and] disclaimers"). Furthermore, the reasonable investor "takes into account the customs and practices of the relevant industry." *Omnicare, Inc.*, 575 U.S. at 190. Here, given Ye's public notoriety, the

reasonable investor would have had further reason to understand that "improper behavior" was a given, not a hypothetical.[7]

Plaintiff's two leading citations, *In re Facebook* and *In re Alphabet*, underscore why the Business Partner Risk disclosures here were not misleading. In *In re Alphabet*, Alphabet (Google's parent company) "warned . . . that even *unfounded* concerns about Alphabet's 'practices with regard to the collection, use, disclosure, or security of personal information or other privacy related matters' could damage the company's 'reputation and adversely affect its operating results.'" 1 F.4th at 702 (emphasis added) (brackets omitted). Alphabet also stated that "'[*i*]*f our security measures are breached* resulting in the improper use and disclosure of user data' then Alphabet[] . . . [']may incur significant legal and financial exposure.'" *Id.* at 694 (emphasis added). These disclosures were misleading, the Ninth Circuit held, because Alphabet knew at the time of the disclosures that any such concerns were not "unfounded" or an "if"; rather, there had been a security bug in its Google+ social media platform for three years, and an internal memo "warned of the significant consequences of the problems discovered and of their disclosure." *Id.* at 703. Thus, the reference to hypothetical "unfounded concerns about Alphabet's" security practices "ripened into actual harm when the [security bug] was detected and created the new risk that this discovery would become public." *Id.* As the Ninth Circuit

---

[7] This Court would be remiss not to note the very public nature of Ye's behavior before Fall 2022. After all, courts "are not required to exhibit a naïveté from which ordinary citizens are free." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (citation and internal quotation marks omitted). Here, there is evidence of public remarks Ye made between 2013 and 2020 that were similar to those he made in Fall 2022. In 2013, Ye stated that "Black people don't have the same level of connections as Jewish people." ECF 35, Ex. 1. In 2015, Ye told *The Guardian* that "racism is a dated concept." ECF 35, Ex. 2. In May 2018, Ye publicly suggested that slavery was "a choice" for enslaved people. SAC, ECF 29 ¶ 97. And in 2020, while running for President of the United States, Ye criticized Harriet Tubman, claiming that she "never actually freed the slaves" and "just had them work for other white people." ECF 35, Ex. 3.

subsequently reaffirmed in *In re Facebook*, the risk in *In re Alphabet* was "the privacy bug itself," not "the anticipation of reputational or financial harm." 87 F.4th at 950.

Similarly, in *In re Facebook*, Facebook "warned that the 'failure to prevent or mitigate security breaches and improper access to or disclosure of our data or user data could result in the loss or misuse of such data' and that if 'third parties or developers fail to adopt or adhere to adequate data security practices . . . our data or our users' data *may be* improperly accessed, used, or disclosed.'" *Id.* at 948. This disclosure was misleading, the Ninth Circuit held, because it "represented the risk of third parties improperly accessing and using Facebook users' data as purely hypothetical" when, in fact, Facebook had known for over a year that Cambridge Analytica had improperly accessed and compiled such user data.[8] *Id.* at 949.

As the above account shows, unlike the disclosures in *In re Alphabet* and *In re Facebook*, the Business Partner Risk disclosures here did not contain language implying the non-existence of "improper behavior."[9] In other words, Adidas's disclosures did not refer to "improper behavior" as potentially "unfounded," as an "if," or as an event that "may" or "could" occur like the disclosures describing the risks in *In re Alphabet* and *In re Facebook*. A side-by-side comparison (with italics added) of the disclosures highlights the difference in critical language:

---

[8] The Supreme Court has granted a writ of certiorari to hear *In re Facebook* in October Term 2024. *See Facebook, Inc. v. Amalgamated Bank*, No. 23-980, 2024 WL 2883752 (U.S. June 10, 2024).

[9] These differences in phrasing explain why the *In re Facebook* Court held that it did not matter "if Facebook did not yet know the extent of the reputational harm it would suffer as a result of the breach." 87 F.4th at 934. In that case, Facebook did not mislead its investors about the potential future harm from a security breach; it misled its investors because it "presented the prospect of a breach as purely hypothetical when it had already occurred." And "such a statement could be misleading even if the magnitude of the ensuing harm was still unknown." *Id.* Here, the warned-of risk in the Business Partner Risk disclosures was about the hypothetical "negative spill-over effect on the [C]ompany's reputation" and business activities, not about whether their celebrity partner had engaged in antisemitic and other problematic conduct prior to 2018.

PAGE 18 – OPINION AND ORDER GRANTING THE MOTIONS TO DISMISS

- **Adidas's Business Partner Risk disclosures**: "Unethical business practices on the part of business partners or improper behavior of individual athletes, influencers, or partners in the entertainment industry could have a negative spill-over effect on the [C]ompany's reputation, lead to higher costs or liabilities or even disrupt business activities."

- ***In re Alphabet* Statement 1**: "[E]ven *unfounded* concerns about Alphabet's 'practices with regard to the collection, use, disclosure, or security of personal information or other privacy related matters' could damage the company's 'reputation and adversely affect its operating results.'"

- ***In re Alphabet* Statement 2**: "'[*I*]*f our security measures are breached* resulting in the improper use and disclosure of user data' then Alphabet[] . . . [']may incur significant legal and financial exposure.'"

- ***In re Facebook***: "[T]he 'failure to prevent or mitigate security breaches and improper access to or disclosure of our data or user data *could result* in the loss or misuse of such data' and that *if* 'third parties or developers fail to adopt or adhere to adequate data security practices . . . our data or our users' data *may be* improperly accessed, used, or disclosed.'"

These distinctions matter. The PSLRA demands that "securities fraud complaints 'specify' each misleading statement." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. § 78u-4(b)(1)). Likewise, "[t]o satisfy Rule 9(b), a pleading must identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about [the purportedly fraudulent] statement, and why it is false." *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (citation and internal

quotation marks omitted). Assertions like Plaintiff's—conflating differently worded risk disclosures made in different factual contexts—are insufficient under these pleading standards. Plaintiff nowhere acknowledges the key linguistic differences between the disclosures, and its briefing in fact excludes the words "unfounded" and "if" from its summary of the disclosures at issue in *In re Alphabet*.[10] *See* Resp., ECF 39 at 20.

Under § 10(b), moreover, it was not unlawful for Adidas to refer broadly to "improper behavior" rather than specify any past behavior the Company was aware of. Section 10(b) does "not create an affirmative duty to disclose any and all material information" and does not prohibit "statements that are incomplete." *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 880 n.8 (9th Cir. 2012); *see also Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014) ("We have expressly declined to require a rule of completeness for securities disclosures because no matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not." (citation, brackets, and internal quotation marks omitted)). Plaintiff might wish that Adidas had furnished more information about "improper behavior" than the Company did, but that concern is not actionable under § 10(b).

---

[10] To be sure, *In re Alphabet* states at one point that "the complaint plausibly alleges that Alphabet's warning in each Form 10-Q of risks that 'could' or 'may' occur is misleading to a reasonable investor when Alphabet knew that those risks had materialized." 1 F.4th at 704. Judicial opinions, however, are "not always to be parsed as though we were dealing with [the] language of a statute," and thus parties and courts are not to "read too much into too little." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 373 (2023) (citation omitted). Rather, "the language of the court must be read in the light of the facts before it," especially pursuant to the PSLRA's and Rule 9(b)'s formidable pleading standards. *Hamad v. Gates*, 732 F.3d 990, 1000 (9th Cir. 2013) (Ikuta, J.). In *In re Alphabet*, the Ninth Circuit considered a disclosure referring to potentially "unfounded" concerns that "could" lead to adverse outcomes and that also referred to such concerns as an "if." Its holding must be understood in that light. Here, Adidas did not suggest that anything was "unfounded" or an "if," and its disclosures clearly discussed mitigating an extant risk, even if at a high level of generality.

Finally, at oral argument, Plaintiff argued that Adidas should have disclosed that Ye was "antisemitic"—that is, that there was a virtual certainty of Ye saying antisemitic things after 2018.[11] This argument reveals another fundamental difference between this case and the Ninth Circuit's decisions in *In re Alphabet* and *In re Facebook*. The threat of future "improper behavior"—unlike a historical fact such as the fact of a security breach (*In re Facebook*) or the existence of a bug (*In re Alphabet*)—is a "problem [that can] still be remedied [by] the time [a defendant] disclose[s] the risk to investors." *Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1256 (10th Cir. 2022) (distinguishing certain risk disclosures from those in *In re Alphabet*). "Put simply, Google could not undo [a] data breach," but Adidas could help manage Ye's behavior and institute safeguards between October 2018 (when Adidas executives met to discuss Ye) and March 2019 (when Adidas filed the first annual report at issue in this case). *Id.* Indeed, the factual record suggests that after October 2018, Adidas was somewhat successful in remedying Ye's behavior: Plaintiff does not allege that anything of note happened between Ye and Adidas or Yeezy employees between 2018 and 2022.

In sum, under the PSLRA's and Rule 9(b)'s pleading standards, Plaintiff has failed to plead that Adidas's Business Partner Risk disclosures were materially misleading. Any claims about the remaining risk disclosures are waived.[12]

---

[11] Plaintiff's representations at oral argument raise the issue of whether the Business Partner risk disclosures should perhaps be treated as forward-looking statements. *See In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 388–89 (9th Cir. 2010) (providing the standard for "forward-looking" statements and explaining that "[t]he fact that the prediction proves to be wrong in hindsight does not render the statement untrue when made." (citation omitted)). This issue was not briefed by the Parties, so this Court does not resolve it.

[12] In any event, those disclosures are not actionable on the merits. With respect to the Media Risk disclosures, Adidas took "adverse or inaccurate media coverage" as a given, and it is otherwise unclear how Adidas misled investors about negative media coverage in 2018. And the Personnel Risk disclosures—which refer to "the failure to install and maintain a performance-oriented culture that fosters diversity and inclusion and strong employee management amongst

PAGE 21 – OPINION AND ORDER GRANTING THE MOTIONS TO DISMISS

## 2. Adidas's DEI Statements Were Not Materially Misleading

### a. Description of the DEI Statements

The DEI statements at issue were made in a variety of contexts across several years. In 2018 and 2019, Adidas issued press releases notifying the public that it had been included on the Dow Jones Sustainability Indices. The press releases stated that Adidas had been "rated as industry leader in corporate economic, environmental and social dimensions" and "rated industry best in seven criteria," including "Human Rights" and "Social Reporting." SAC, ECF 29 ¶¶ 101, 113.

In 2018, Adidas stated that its Compliance Management System was "designed to 'preserve diversity by fighting harassment and discrimination;' that 'appropriate and timely response to compliance violations is essential;' that '[Adidas] track[s], monitor[s], and report[s] potential incidents of noncompliance worldwide;['] and that, 'where necessary, [Adidas] react[s] promptly to confirmed compliance violations, through appropriate and effective sanctions ranging from warnings to termination of employment contracts.'" *Id.* ¶ 110 (original alterations omitted). Adidas's Annual Reports throughout the Class Period contained similar language. *Id.* ¶ 111. And in its Annual Reports, Adidas stated that it had a "zero-tolerance approach" towards discrimination and harassment. *Id.* ¶ 90, 111.

On June 9, 2020, in response to the George Floyd protests of that summer, Adidas issued a press release with a statement from Defendant Rorsted. *Id.* ¶ 118; *see* ECF 35, Ex. 8. In the statement, Defendant Rorsted is quoted as saying, "we must do more to create an environment in

---

our workforce"—were not misleading for many of the same reasons Adidas's DEI statements were not misleading, as explained below in Section III.B.2.b. Further, the Fall 2018 meeting among Adidas executives arguably qualifies as being part of a company attempt to "maintain" such a culture, given that the meeting's primary goals were to address "the risks of employees interacting with [Ye]" and to discuss "mitigation strategies." SAC, ECF 29 ¶ 59.

which all of our employees feel safe, heard and have equal opportunity to advance their careers. . . . [W]e will create a lasting change and we will do it now." SAC, ECF 29 ¶ 118.

On August 28, 2020, Adidas issued another press release announcing, among other things, that the Company "do[es] not tolerate discrimination of any kind" and that it had established a global committee "to focus on the advancement of underrepresented groups and drive company-wide change." *Id.* ¶ 120.

On February 25, 2021, Adidas issued a press release stating that "globally all senior leaders and nearly all adidas employees" had completed a training program on "critical topics including diversity dimensions, unconscious biases, privilege and microaggressions." *Id.* ¶ 122. Moreover, the press release stated that Adidas had "collaborated with a third-party consultant to create the new Corrective Action Matrix," which "provides clear guidance on how the [C]ompany will respond to harassment, discrimination, disrespectful conduct and retaliation." *Id.*

On March 10, 2021, Adidas issued its 2020 Annual Report which stated that Adidas has "always been and will always be against discrimination in all forms and stand united against racism" and announced an "action plan [that] underpins [Adidas's] stance against discrimination and microaggressions." *Id.* ¶ 126.

On June 2, 2021, Adidas issued a press release stating that "[a]ll corporate employees have now completed" the Creating a Culture of Inclusion training. *Id.* ¶ 130.

### b. Analysis of the DEI Statements

Plaintiff points to Adidas's DEI statements, primarily Adidas's "zero-tolerance approach" statements, and argues that "[t]hese statements materially misled investors because they omitted [Ye's] misconduct and the Company's awareness and cover-up of the same." Resp., ECF 39 at 23. In response, Defendants contend that "[n]one of [A]didas's statements expressing its commitment to the values of diversity and inclusion can form the basis of a claim for securities

PAGE 23 – OPINION AND ORDER GRANTING THE MOTIONS TO DISMISS

fraud." MTD, ECF 34 at 15; Reply, ECF 40 at 8–9. This Court agrees with Defendants that none of Adidas's DEI statements constitute material misrepresentations under § 10(b).

Under Ninth Circuit precedent, statements that lack concrete description and are incapable of objective verification by the reasonable investor cannot be materially misleading. *See Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 619 (9th Cir. 2022); *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014); *Hewlett-Packard*, 845 F.3d at 1275; *see also Kahnert v. Kotick*, Case No. CV 21-8968 PA (JEMx), 2022 WL 2167792, at *8–9 (C.D. Cal. May 20, 2022). "Because 'professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives,'" corporate statements "'rise to the level of materially misleading statements only if they provide [a] concrete description of the past and present that affirmatively creates a plausibly misleading impression of a state of affairs that differed in a material way from the one that actually existed.'" *Sylebra Cap. Partners Master Fund Ltd. v. Everbridge, Inc.*, Case No.: 2:22-cv-02249-FWS-RAO, 2023 WL 3549506, at *8 (C.D. Cal. May 9, 2023) (first level quotation marks and brackets omitted) (quoting *In re Alphabet*, 1 F.4th at 700). To see if statements rise to this level, courts read them in context. *See Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 770 (9th Cir. 2023).

In *Hewlett-Packard*, for example, the plaintiff contended that it was materially misleading for Hewlett-Packard to state that it had "zero tolerance" for violations of its corporate code of ethics. 845 F.3d at 1275. The Ninth Circuit disagreed. It explained that "a code of conduct is inherently aspirational" and that "[s]uch a code expresses opinions as to what actions are preferable, as opposed to implying that all staff, directors, and officers always adhere to its aspirations." *Id.* at 1276 (citation and internal quotation marks omitted). Because whether Hewlett-Packard complied with its merely "aspirational" code of conduct was incapable of

objective verification, its statements about compliance with the code were not actionable under § 10(b). *Id.*; *see In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 401–02 (S.D.N.Y. 2016) (similar).

Likewise here, Plaintiff focuses largely on what it sees as Adidas's statement that it had a "zero-tolerance approach" to discrimination and harassment. Resp., ECF 39 at 23–24. But Adidas's reference to a "zero-tolerance approach" was not an objectively verifiable statement on which any reasonable investor would have relied.

Seen in context, Adidas's "zero-tolerance approach" statement was made to signal, as a general goal, how Adidas "aim[ed] to contribute to creating lasting change." 2020 Annual Report, ECF 35-6 at 3. No reasonable investor would have believed the "zero-tolerance approach" statement concretely established how Adidas dealt with situations involving misbehaving employees or partners. This is apparent from the fact that the 2020 Annual Report stated that among Adidas's "commitments" was "strengthening [its] global anti-discrimination and non-retaliation policy" and "reforming [its] hiring and career development processes." *Id.* In other words, the 2020 Annual Report made explicit that Adidas was reforming its policies in an attempt to achieve something resembling a "zero-tolerance approach," not that it had an existing "zero-tolerance" policy. Moreover, aspiring toward a "zero-tolerance approach" is an ambiguous, subjective goal. That phrase alone does not inherently require a particular response to inappropriate conduct—Adidas necessarily had discretion in how to design any DEI policies. *See zero-tolerance policy*, Black's Law Dictionary (11th ed. 2019) ("An established plan or method of action stating that certain acts will not be permitted or condoned."). Thus, Adidas's asserted benchmarks for its reforms were incapable of measurement and therefore incapable of

PAGE 25 – OPINION AND ORDER GRANTING THE MOTIONS TO DISMISS

objective verification by a reasonable investor. *See Hewlett-Packard*, 845 F.3d at 1276. Adidas's

DEI statements thus could not have been material misrepresentations.[13]

Even so, Plaintiff insists, these statements were "verifiably false," because Adidas issued

its diversity and inclusion statements despite retaining its partnership with Ye. Resp., ECF 39 at

24. By definition, though, a statement that is incapable of objective verification cannot be

verified as false or as true. *See Kalin v. Semper Midas Fund, Ltd.*, No. 22-16766, 2023 WL

8821325, at *1 (9th Cir. Dec. 21, 2023) ("Whether the . . . analysis was 'rigorous' cannot be

proven objectively true or false, and this statement is nonactionable puffery.").

Furthermore, the Ninth Circuit in *Hewlett-Packard* addressed and dismissed an argument

similar to Plaintiff's. There, the plaintiff argued that the extrinsic "context . . . surrounding the

adoption and promotion of the [ethical code] transform[ed] what would otherwise be aspirational

into statements capable of objective verification." *Hewlett-Packard*, 845 F.3d at 1276. Again, the

Ninth Circuit disagreed. It held that any such context "more appropriately factors into the

question of whether an alleged misrepresentation was material to investors, not into whether a

statement itself could be a misrepresentation." *Id.* at 1276–77 (citation omitted); *see also Ferris

v. Wynn Resorts Ltd.*, 462 F. Supp. 3d 1101, 1111 (D. Nev. 2020) (applying *Hewlett-Packard* to

dismiss a similar argument); *Ferris v. Wynn Resorts Ltd.*, Case No.: 2:18-cv-00479-APG-DJA,

2021 WL 3216462, at *10 (D. Nev. July 28, 2021) (same for a later amended complaint).

Therefore, as a rule, Ninth Circuit precedent prevents Plaintiff from using extrinsic "context" to

transform aspirational statements incapable of objective verification—like Adidas's DEI

---

[13] For the same reasons, Adidas's commitments to "fighting harassment and
discrimination" and "react[ing] promptly to confirmed compliance violations, through
appropriate and effective sanctions," Resp., ECF 39 at 24 n.3, are also nonactionable aspirational
statements that are incapable of objective verification by a reasonable investor.

statements—into actionable misstatements. *See City of Pontiac Gen. Emps.' Ret. Sys. v. Bush*, Case No. 20-cv-06651-JST, 2022 WL 1467773, at *4 (N.D. Cal. Mar. 1, 2022) (collecting cases).

Switching tack, Plaintiff contends that Adidas made materially misleading statements by promoting the fact that it was twice included in the Dow Jones Sustainability Index. In Plaintiff's telling, "[t]hese statements were false because they failed to disclose that the Company's high scores on social reporting were due to the issuance of false and misleading statements concerning the effectiveness of the Company's social policies." Resp., ECF 39 at 24. But because Adidas's statements "concerning the effectiveness of the Company's social policies" were not misleading, Plaintiff's syllogism falls short.

Further, Plaintiff's cited case, *In re Braskem S.A. Securities Litigation*, 246 F. Supp. 3d 731 (S.D.N.Y. 2017), has no applicability here. In that case, the defendant had listed four specific factors that, it said, resulted in the "favorable" price it had secured for its "critical raw material input." *Id.* at 758–59. This list of factors, the district court acknowledged, was "not literally false." *Id.* at 759. But the district court still found the list misleading because it "omitted to reveal the—or at least an—elephant in the room: that the favorable purchase price that [the defendant] secured was substantially due to its bribery of [the defendant's supplier] and public officials." *Id.* at 759.

There are no analogous allegations here that gave rise to a duty to disclose. While the defendant in *In re Braskem* "attribute[d] its success to . . . particular cause[s]," *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 808 (S.D.N.Y. 2018), Adidas did not attribute its inclusion on the Index to any particular cause. Rather, as Plaintiff acknowledges, Adidas simply stated that the Index "is based on a thorough analysis of corporate economic, environmental and social

performance, assessing issues such as corporate governance, risk management, climate change mitigation, supply chain standards, labor practices, branding and customer relationship management." SAC, ECF 29 ¶ 101; *see id.* ¶ 113. This wide-ranging list of general factors does not reach the level of attribution or specificity present in the four-factor list in *In re Braskem*. *See Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 297 (S.D.N.Y. 2019) (explaining that *In re Braskem* was inapplicable because the defendant's "statements [were] far too generic" and "attributed the Company's growth to broad trends and corporate strengths, without pointing to any specific factors or sources of revenue"); *In re Telefonaktiebolaget LM Ericsson Sec. Litig.*, 675 F. Supp. 3d 273, 289 (E.D.N.Y. 2023) (explaining that *In re Braskem* was inapplicable because the defendant's statements did not reach the requisite "level of specificity").

Accordingly, Adidas's announcement about the Dow Jones Sustainability Index did not automatically give rise to a duty to disclose information about Ye. And "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5." *Macquarie*, 601 U.S. at 258 (citation omitted).

### 3.  Adidas's Alleged Violations of the NFRD and GRI Are Not Actionable

#### a.  Description of the NFRD and the GRI

Since 2014, the European Union's NFRD has mandated that large companies like Adidas publicly disclose certain non-financial information to investors. SAC, ECF 29 ¶ 77. The NFRD requires Adidas to disclose information about its business model, policies, outcomes, risks, risk management, and key performance. *Id.* The NFRD also directs the disclosure of information concerning "Key Performance Indicators" related to social and employee issues and human rights. *Id.* To that end, as relevant here, companies must provide:

> (a) a brief description of the undertaking's business model;
>
> (b) a description of the policies pursued by the undertaking in relation to those matters, including due diligence processes implemented;

> (c) the outcome of those policies;
>
> (d) the principal risks related to those matters linked to the undertaking's operations including, where relevant and proportionate, its business relationships, products or services which are likely to cause adverse impacts in those areas, and how the undertaking manages those risks;
>
> (e) non-financial key performance indicators relevant to the particular business.

Council Directive 2014/95, art. 29a, 2014 O.J. (L 330) 6 (EU).

To comply with the NFRD, Adidas, in its Annual Reports for FY 2018–2021, chose to follow the GRI.[14] *See* SAC, ECF 29 ¶ 82. In its Annual Reports, Adidas stated that the Reports' "non-financial statement[s] combined with further information in [the Reports] and on [Adidas's] corporate website fulfill[] the Global Reporting Initiative's Standards 'Core' option." *Id.* ¶¶ 82–84. The GRI contains non-mandatory guidance and recommendations. GRI PDF at 8. In relevant part, however, the GRI requires the following of an ostensibly compliant report:

> 101 § 1.4: "The report shall include coverage of material topics and their Boundaries, sufficient to reflect significant economic, environmental, and social impacts, and to enable stakeholders to assess the reporting organization's performance in the reporting period." GRI PDF at 15.
>
> 101 § 1.5: "The reported information shall be sufficiently accurate and detailed for stakeholders to assess the reporting organization's performance." *Id.* at 16.
>
> 101 § 1.6: "The reported information shall reflect positive and negative aspects of the reporting organization's performance to enable a reasoned assessment of overall performance." *Id.*
>
> 102 § 44: "The reporting organization shall report the following information: a. Key topics and concerns that have been raised

---

[14] The GRI that was in effect from 2018 to 2023 is incorporated by reference in the Complaint. *See* Global Sustainability Standards Board, Consolidated Set of GRI Sustainability Reporting Standards 2016 ("GRI PDF"), https://perma.cc/AB4Z-D7CQ (last accessed August 15, 2024).

through stakeholder engagement, including: i. how the
organization has responded to those key topics and concerns,
including through its reporting; ii. the stakeholder groups that
raised each of the key topics and concerns." *Id.* at 64 (paragraph
breaks omitted).

### b. Analysis of the NFRD and the GRI

Plaintiff asserts that Adidas's Annual Reports violated § 10(b) through "omissions of"
information ostensibly required by the European Union's NFRD and the GRI. Resp., ECF 39 at
19.[15] Specifically, Plaintiff contends that Adidas had a duty to disclose stemming from Adidas's
statements in its Annual Reports that Adidas "fulfills the Global Reporting Initiative's Standards
'Core' option." SAC, ECF 29 ¶ 82. Adidas's statements were materially misleading, Plaintiff
says, because Adidas did not actually fulfill the GRI's requirements. According to Plaintiff,
"Defendants' omissions concerning [Ye's] repeated misconduct, Adidas's failure to investigate
or act on the misconduct, and the risks the misconduct posed to the Company also rendered
untrue Defendants' statements in each of its 2018, 2019, 2020, and 2021 annual reports that the
Company complied with GRI disclosure standards." *Id.* ¶ 84; *see* Sur-Reply, ECF 42 at 1–2. In
response, Defendants argue that, "[o]n their face," Plaintiff's "cited NFRD and GRI provisions
are broad and flexible, and there is no basis to conclude that they call for disclosures beyond
those that [A]didas included in its Annual Reports." Reply, ECF 40 at 5.

Those provisions are indeed broad and flexible—too broad and flexible for the reasonable
investor to have relied on them. Because the falsity of Adidas's GRI statements is impossible to

---

[15] In its briefing, Plaintiff originally advanced another theory as well: that Defendants'
failure to abide by the NFRD in itself constituted a violation of § 10(b). *See* Resp., ECF 39 at 18
(quoting *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) for the proposition
that "issuers have an independent duty to disclose material facts when there is a statute or
regulation requiring disclosure"). At oral argument, Plaintiff agreed that the first argument was
no longer viable after the Supreme Court's recent decision in *Macquarie* and made no attempt to
defend it.

verify, they are not actionable under § 10(b). A closer look at the GRI shows why. The GRI has

three levels of standards: requirements, recommendations, and guidance. Only requirements are

"mandatory instructions." GRI PDF at 8. By contrast, recommendations "encourage[]" a

"particular course of action," and guidance is merely intended "to help organizations better

understand the requirements." *Id.* Accordingly, "an organization is not required to comply with

recommendations or guidance in order to claim that a report has been prepared in accordance

with the Standards." *Id.* at 38. The GRI also contains "tests," but again, they are "not disclosures

that are required to be reported." *Id.* at 10. In its Complaint, Plaintiff relies substantially on

language in GRI 101 §§ 1.4–1.6 and GRI 102 § 44 that fall under these categories of non-

mandatory information. *See* SAC, ECF 29 ¶¶ 86, 88–89, 91. Yet only the GRI's mandatory

requirements are relevant here, for the GRI states that to fulfill its "Core" option, as Adidas said

it did, a corporation must "[c]omply with all *requirements*" in GRI 101, not all "guidance" or

"recommendations." *See* GRI PDF at 26 (emphasis added).

      The GRI's requirements teem with open-ended, indeterminate language and afford

investors no concrete idea of what it means to "fulfill" the GRI. A reasonable investor would not

know with sufficient clarity what a "significant economic, environmental, and social impact" is;

when information is "sufficiently accurate and detailed" for a "stakeholder" to "assess the

reporting organization's performance"; what would "enable a reasoned assessment of overall

performance"; or what proper "stakeholder engagement" is. GRI PDF at 15–16, 64. Phrases like

"significant events," "sufficiently accurate and detailed," and "reasoned assessment" have no

clear, empirical meaning to investors. *See Or. Pub. Emps. Ret. Fund*, 774 F.3d at 606 (explaining

that the term "significant events" was "vague" and "provide[d] nothing concrete upon which a

plaintiff could reasonably rely"). Even the term "stakeholder" is ambiguously broad; the GRI

merely says that the term "*can* include" employees, non-governmental organizations, or "vulnerable groups." GRI PDF at 439 (emphasis added). Moreover, it seems any investor or corporation can pick and choose which of the non-mandatory guidance and recommendations to prioritize or on which to rely. Thus, Adidas's statements that it "fulfill[ed]" these standards constitute a "subjective assessment" by Adidas that cannot be proven or disproven. *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) (citations and internal quotation marks omitted).

In short, whether Adidas provided enough information under the GRI is simply "not capable of objective verification." *Hewlett-Packard*, 845 F.3d at 1276. Plaintiff admitted at oral argument that it was unaware of any enforcement body for the GRI that could definitively settle and narrow the meaning of these broad, discretionary provisions. Accordingly, Adidas's statements that it "fulfill[ed]" the GRI cannot be actionable as material misrepresentations, particularly in view of the amount of non-financial information the Company did provide in response to the GRI. *See* ECF 35, Exs. 4–7.

Moreover, "a contrary interpretation" of § 10(b)—i.e., extending § 10(b) liability for all European Union-based entities to any corporate statement or omission that even arguably fails to fulfill the GRI—"is simply untenable, as it could turn all corporate wrongdoing into securities fraud," *Hewlett-Packard*, 845 F.3d at 1276 (citation omitted), and thus "bury the shareholders in an avalanche of trivial information," *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988) (citation omitted). This Court will not construe § 10(b) in this counterintuitive way. *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 163 (2008) ("The practical consequences of an expansion [of § 10(b) liability] provide a further reason to reject petitioner's approach." (citations omitted)).

PAGE 32 – OPINION AND ORDER GRANTING THE MOTIONS TO DISMISS

*    *    *

In sum, Plaintiff has failed to sufficiently plead that Adidas's Business Partner Risk disclosures, its other risk disclosures, and DEI statements were materially misleading. Further, Adidas's alleged non-compliance with the NFRD and GRI is not actionable under § 10(b).

**B.  Section 20(a) Controlling Persons Liability Against Defendants Ohlmeyer and Rorsted**

Plaintiff has made claims under § 20(a) of the Exchange Act against the individual Defendants. As stated above, controlling persons liability under § 20(a) is derivative, such that there can be no liability under § 20(a) without a primary violation under § 10(b). *See City of Dearborn Heights*, 856 F.3d at 623; *Prodanova v. H.C. Wainwright & Co.*, 993 F.3d 1097, 1113 (9th Cir. 2021). Because there was no primary violation here, Defendant Ohlmeyer's Motion to Dismiss is granted.

**C.  Dismissal Without Prejudice**

Although this Court believes that any amendment would likely be futile, *see Ventress v. Japan Airlines*, 603 F.3d 676, 680 (9th Cir. 2010), if Plaintiff believes it can cure the deficiencies identified in this Opinion and Order, Plaintiff has leave to file a Third Amended Complaint within thirty days. Failure to do so will result in dismissal with prejudice.

**CONCLUSION**

For all the reasons above, this Court GRANTS Defendant Adidas's Motion to Dismiss, ECF 34, and Defendant Ohlmeyer's Motion to Dismiss, ECF 36.

**IT IS SO ORDERED.**

DATED this 16th day of August, 2024.

/s/ Karin J. Immergut
Karin J. Immergut
United States District Judge